# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| MATTHEW RIGNEY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 3:22-cv-00342 |
| | ) |
| CSX TRANSPORTATION, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Pending before the Court is Defendant CSX Transportation, Inc.'s ("CSXT") Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6) (Doc. No. 66). The motion has been fully briefed, (Doc. Nos. 67, 69, 79), and is now ripe for review. For the following reasons, the Court will deny CSXT's motion (Doc. No. 66).

## ALLEGED FACTS AND BACKGROUND

The Court relies on the relevant factual allegations from the Amended Complaint (Doc. No. 65) and assumes they are true for purposes of ruling on the instant motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

In the past several years, communities across the country have experienced multiple "once-in-a-lifetime" or "once-in-1,000-years" rain events. (Doc. No. 65 ¶ 44). Waverly, a city in Humphreys County, Tennessee, is no different. Within the last 20 years, Waverly has regularly been subjected to historic amounts of rainfall and experienced at least two extensive floods (other than the flood at issue in this case), one in 2010 and the other in 2019. [1] (Id. ¶¶ 35, 39–42).

---

[1] Calling these extreme weather events "historic" is becoming a misnomer given their apparent increasing frequency.

Waverly's geography exacerbates the risks posed by these extreme weather events; Waverly sits at the bottom of a narrow valley, and a river, Trace Creek, runs through it. (Id. ¶ 36). For this reason, federal authorities have deemed Waverly a "special flood hazard area." (Id.).

CSXT, a railroad company operating in Humphreys County, was well aware of the high risk of flooding in Middle Tennessee in the summer of 2021. On July 28, 2021, CSXT publicly acknowledged the "increased frequency and magnitude of flooding" would require "upgrading railroad bridges [and] improving track drainage." (Id. ¶ 50). The research and analysis supporting CSXT's understanding occurred over several years and considered floods from the past decade, including floods in Middle Tennessee, where Humphreys County sits. (Id. ¶ 51). CSXT's public recognition also reflects that the railroad had "an internal methodology to evaluate potential scenarios" where extreme weather events "may impact operations and safety." (Id. ¶ 53).

As early as August 19, 2021, meteorologists were forecasting extremely heavy rain to hit Middle Tennessee, including the Trace Creek drainage basin, starting early on August 21, 2021. (Doc. No. 65 ¶ 17). As predicted, heavy rain began falling in Humphreys County shortly before 1:00 a.m. (Id. ¶ 18). Sometime between 4:00 a.m. and 6:00 a.m., CSXT learned that the ongoing storm had caused a part of the railbed supporting its elevated tracks to wash out about nine miles upstream from Waverly. (Id. ¶ 19). In response, CSXT halted all trains scheduled to pass through Humphreys County. (Id. ¶ 20).

As the rain continued to fall, water accumulated behind the clogged culvert ("Culvert") under the CSXT railroad bridge that spans Trace Creek just one mile upstream of Waverly ("Trace Creek Bridge"). (Id. ¶ 21). Blocked by debris, the storm-swelled waters of Trace Creek were unable to flow along their natural course through the Culvert under the Trace Creek Bridge. (Id. ¶ 22). Instead, those waters were forced to spread over the creek's banks and onto adjoining

properties, (id.), creating an unnatural lake behind the makeshift dam formed by the earthen railbed that supported CSXT's elevated tracks at and around the Trace Creek Bridge ("Railbed Dam"). (Id. at 23). As alleged, CSXT took no action to prevent the creation of this unnatural lake, unclog the Culvert, or inform local officials, emergency services, or anyone else of this growing threat. (Id. ¶¶ 11, 27).

With the Culvert blocked and the torrential rain inundating the Trace Creek watershed, the pressure from the unnatural lake eventually overwhelmed the Railbed Dam, creating massive breaches in the earthen embankment. (Id. ¶¶ 24–25). The breaches unleashed millions of gallons of water on Waverly and its unsuspecting residents. (Id. ¶ 26). One survivor, Greg Triplett, explained, "It was like a tidal wave coming in from the ocean . . . . I had no idea if I had family left. I didn't know." (Id.). Another, Tracy Kilburn, recounted:

> There[ was] a lady going in the water, soaking and screaming for help, and then [my husband] went in the water and right after he went in is when [what] I call the wall of water, the tidal wave hit. He went under and I never saw him again.

(Id.). Ultimately, this "wall of water" left 22 citizens dead. (Id. ¶ 29).

On April 5, 2022, Plaintiffs—17 individuals bringing suit on their own behalf and/or on the behalf of families—filed this action seeking compensatory and punitive damages totaling $300,000,000 in the Circuit Court for Humphreys County, Tennessee at Waverly. (See Doc. No. 4-1 at 2–3, 35). Soon after, CSXT properly removed the case to this Court pursuant to 28 U.S. § 1441(b). (Doc. No. 4 ¶ 31). Plaintiffs have since filed the Amended Complaint, brining claims of wrongful death, negligent infliction of emotional distress, and negligence, premised on CSXT's alleged failures to ensure the natural passage of water through the Culvert and to warn those at risk after the unnatural lake had formed because of that failure. (Doc. No. 65 ¶¶ 58–92).

3

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020). In determining whether a complaint meets this standard, the Court must accept all the factual allegations as true, draw all reasonable inferences in the plaintiffs' favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018). Accordingly, the complaint must "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." Eidson v. Tenn. Dep't of Child.'s Servs., 510 F.3d 631, 634 (6th Cir. 2007) (citing Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)). The Court will not accept a legal conclusion masked as a factual allegation, nor an "unwarranted factual inference," as true. Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).

## ANALYSIS

In its Memorandum Opinion in Support of its Motion to Dismiss (Doc. No. 67), CSXT makes two arguments. *First*, CSXT argues that the duty that the Amended Complaint supposes for each of its claims—one of private landowners to protect communities from natural disasters—has no home in law. (Doc. No. 67 at 3–7). *Second*, CSXT argues that any adequately pleaded claim is nevertheless preempted by federal law. (Id. at 7–19). The Court will address each.

I. **The Amended Complaint Adequately Pleads a Duty.**

"Traditionally, the question of whether a defendant owes a duty of care to the plaintiff is a question of law to be determined by the courts." Giggers v. Memphis Hous. Auth., 227 S.W.3d 359, 365 (Tenn. 2009) (citing West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d 545, 550 (Tenn. 2005)). "Properly defined, duty is the legal obligation owed by defendant to plaintiff to conform

4

to a reasonable person standard of care for the protection against unreasonable risks of harm." McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995) (citing Pittman v. Upjohn Co., 890 S.W.2d 425, 428 (Tenn. 1994)). "A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." Id. (citing Restatement (Second) of Torts, § 291 (1964)). "The imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." Giggers, 277 S.W.3d at 365 (quoting Bradshaw v. Daniel, 854 S.W.2d 865, 870 (Tenn. 1993)).

To determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable, and, if so, must then apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable. Satterfield v. Breeding Insulation Co., 266 S.W.3d 347, 366 (Tenn. 2008). "That is, in consideration of, among other things, the presence or absence of prior similar incidents, and other circumstances, does the foreseeability of the harm outweigh the burden of the duty imposed?" Giggers, 277 S.W.3d at 365 (citing McClung v. Delta Square Ltd. P'ship, 937 S.W.2d 891, 894 (Tenn. 1996)).

Despite this well-defined body of law, CSXT takes the more streamlined tack of arguing that Tennessee courts have already determined that the duty alleged in the Amended Complaint is not recognized by the state's law. (Doc. No. 67 at 3–7). Relying on a single case from over a century-and-a-half ago, Nashville & Chattanooga Railroad Co. v. King, 53 Tenn. 269 (1871), CSXT contends that "the Tennessee Supreme Court resolved that it would be error to 'charge[] it to be the duty of [a] carrier to use all reasonable care and precaution to provide against extraordinary emergencies,' when it considered a similar case in which plaintiffs brought an action

5

against a railroad to recover flood-related damages." Id. at 4 (quoting King, 53 Tenn. at 270). According to CSXT, the court determined that "a 'flood was an extraordinary emergency which no human sagacity guided by any of the known principles of human reasoning could have anticipated, and, consequently, could have been able to provide against at all in advance.'" (Id.).

But CSXT sorely misconstrues the case. In Nashville & Chattanooga Railroad Co., the court considered the jury charge used in a civil action to recover for flour damaged by a flood while in the care of the defendant railroad in Chattanooga. 53 Tenn. at 269. The trial court had "charged it to be the duty of the carrier to use all reasonable care and precaution to provide against extraordinary emergencies." Id. The Tennessee Supreme Court reasoned the charge could have been construed to inappropriately impose "an obligation on the company to anticipate by previous preparation for such an extraordinary event as [the particular] flood." Id. at 270. In doing so, the court took for granted that the flood was unforeseeable; it took no stance on the foreseeability of floods more generally.[2] See id. ("The flood was an extraordinary emergency which no human sagacity guided by any of the known principles of human reasoning could have anticipated, and, consequently, could have been able to provide against at all in advance."). But here, the Amended Complaint is replete with allegations that the torrential rainstorm was foreseeable. (See generally Doc. No. 65 ¶¶ 35–57). Thus, CSXT's argument must be discarded.[3]

---

[2] It is not lost on the Court that CSXT's brief excerpts the case to leave readers with the opposite impression. (See Doc. No. 67 at 4 (writing, "The Nashville Court explained that **a** 'flood was an extraordinary emergency. . .'" as opposed to, "The Nashville Court explained that '**[t]he** flood was an extraordinary emergency. . .'" (emphases added))).

[3] Ironically, CSXT omits that the court also reasoned that the jury charge would have been "sound if understood to mean by the words 'provide against' use all reasonable care to meet the emergency when upon the carrier, and to use all reasonable exertions to prevent loss to the party by injury to his property in the care of the carrier." Nashville & Chattanooga R.R. Co., 53 Tenn. at 269–70. Taken as true, this case indicates that railroads must do more than simply throw up their hands when faced with a flood. Id.

CSXT then leaves behind Tennessee law to show that other courts have found railroad companies owe no duty to protect the public from flooding. Specifically, CSXT offers In re Katrina Canal Consolidated Litigation, 2007 U.S. Dist. LEXIS 95799 (E.D. La. Dec. 27, 2007), a case that CSXT was a defendant in, as representative.[4] (Doc. No. 67 at 12–14). There, a district court considered CSXT's motion to dismiss a complaint that alleged that the company "failed to exercise due care in building its structure, and its failures directly and/or proximately caused and/or contributed to the breaches of the [nearby Inner Harbor Navigational Canal and its flood prevention structures]" during Hurricane Katrina. In re Katrina Canal Consol. Litig., 2007 U.S. Dist. LEXIS 95799, at *114 (E.D. La. Dec. 27, 2007). As the court explained, the plaintiffs only alleged that the CSXT railroad crossing was near the Inner Harbor Navigational Canal's (the "IHNC") flood protection structures——not that it was part of them. Id. at *117. Thus, so reasoned the court, CSXT had no duty to ensure the IHNC's flood protection structures' integrity (i.e. to protect the general public from flooding) by building up its railroad crossing to resist erosion. Id. at *119–20.

This brings the Court to a more fundamental shortcoming in CSXT's argument. For CSXT's analogy to be persuasive, the Amended Complaint must allege that CSXT had a general duty to prevent flooding. Despite what CSXT contends throughout its briefing, (see Doc. No. 67 at 4 ("The Amended Complaint charges CSXT with the duty of flood prevention for the general

---

[4] CSXT also cites to Pere Marquette Hotel Partners, LLC v. United States, 2010 WL 925297 (E.D. La. Mar. 10, 2010). However, the case does little to advance CSXT's argument. There, the court found the allegations "could not be legally distinguished" from those in In re Katrina Canal Consolidated Litigation, 2007 U.S. Dist. LEXIS 95799 (E.D. La. Dec. 27, 2007), which the same judge had penned. Thus, the court simply referred to its prior opinion and stated that its analysis was "equally applicable." Pere Marquette Hotel Partners, LLC, 2010 WL 925297, at *2 (E.D. La. Mar. 10, 2010).

7

population of Waverly, Tennessee."); see also Doc. No. 79 a 4 ("That Complaint (which is what matters) pleads . . . the generalized, free-floating duty of flood control.")), the Amended Complaint does no such thing.

The Amended Complaint alleges CSXT owed seven non-delegable duties of care: (1) "[t]he duty to ensure the natural passage of Trace Creek's water flow through its Culvert under its Trace Creek Bridge without obstruction," (Doc. No. 65 ¶ 59(a)); (2) "[t]he duty to prevent the unnatural accumulation of water on its property and on its property of neighboring property owners," (id. ¶ 59(b)); (3) "[t]he duty to prevent dangerous conditions from existing on its own property," (id. ¶ 59(c)); (4) "[t]he duty not to trespass and create dangerous conditions on its neighbor's property," (id. ¶ 59(d)); (5) "[t]he duty to warn anyone in harm's way if a dangerous condition exists on its own property," (id. ¶ 59(e)); (6) "[t]he duty to warn anyone in harm's way if it creates a dangerous condition on its neighbor's property," (id. ¶ 59(f)); and (7) "[t]he duty to exercise reasonable care under all circumstances." (Id. ¶ 59(g)). Taken together or separately, these duties do not amount to a generalized duty to prevent flooding throughout Humphreys County; rather, they focus on preventing a dangerous condition (the unnatural lake that swelled behind and ultimately broke the Railbed Dam) from forming on and around CSXT's land and warning those whom the condition placed at risk.

Last, CSXT argues that the Amended Complaint does not "allege any special relationship between the parties that might superimpose such a duty on a private entity." (Doc. No. 67 at 6 (citing Lanier v. Norfolk S. Corp., 256 F. App'x 629, 633 (4th Cir. 2007))). Setting aside that the duty CSXT objects to is absent from the Amended Complaint, the Court disagrees. Tennessee law does not require a special relationship to find a duty. See, e.g., West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d 545, 551 (Tenn. 2005) ("In our view, the defendant misconstrues plaintiffs' claims as

8

being based upon a special relationship . . . . Instead, the claims are predicated on the defendant's employees' affirmative acts in contributing to the creation of a foreseeable and unreasonable risk of harm."). Perhaps for that reason, CSXT relies heavily on cases based on the law of a different state as applied in distinct circumstances. Both Lanier v. Norfolk Southern Corp. and Lecroy v. CSX Transportation, Inc., the only new cases CSXT introduces in its "special relationship" argument concern South Carolina law. 256 F. App'x 629, 633 (4th Cir. 2007); 2014 WL 11046154, at *2 (D.S.C. Nov. 17, 2014). What's more, both cases make clear that that state's law requirement applies because the plaintiffs did not allege direct physical injuries. 256 F. App'x at 633; 2014 WL 11046154, at *2.

In Lanier, the Fourth Circuit considered whether a group of employees who were laid off after two Norfolk Southern trains collided and released chlorine near the employee's plant owed them a duty based on Norfolk Southern's "longstanding supply contract with [the plant]." 256 F. App'x at 633. Observing that "South Carolina courts have cut off recovery for plaintiffs who suffer **economic loss[] but have no direct physical injury** and no direct relationship with the defendant," id. (emphases added), the unanimous panel "h[e]ld that South Carolina courts would find the nature of Lanier's **indirect economic loss** too remote for recovery in tort." Id. (emphases added).

In Lecroy, the plaintiffs sued CSXT for economic harms caused by a train derailment that damaged a bridge and caused "their daily commute and transportation [to] bec[o]me more expensive and less convenient for a period of some months, as [the plaintiffs] were forced to use only the southern access route . . . while the bridge was being repaired." 2014 WL 11046154, at *1. Again, these harms were purely economic, and plaintiffs did not allege any direct physical injury. See id. ("Plaintiffs bring four claims alleging that Defendant is liable for economic loses.").

9

As the Amended Complaint alleges, Plaintiffs "suffered direct personal injury and trauma, as well as immeasurable losses associated with the death of their spouses, parents, children, and siblings." (Doc. No. 65 ¶ 14). Thus, the limiting principles that the Lanier and Lecroy courts relied upon would not here.

For the foregoing reasons, CSXT has not demonstrated that the Amended Complaint fails to plead that the railroad company owed a duty to those its alleged actions and omissions put in harm's way.

## II. CSXT Has Not Demonstrated That Federal Law Preempts Plaintiffs' Claims.

CSXT argues that whatever claim the Amended Complaint may adequately state is nevertheless preempted by federal law. The preemption of state law by federal statutes and regulations stems from the Supremacy Clause of the U.S. Constitution. U.S. CONST. art. VI, Cl. 2; see also City of New York v. F.C.C., 486 U.S. 57, 63 (1988). Whether the federal regime preempts state law is an inquiry "largely . . . of congressional intent, i.e., whether the statute demonstrates an 'intent to supplant state authority in a particular field.'" In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig., 65 F.4th 851, 859 (6th Cir. 2023) (hereinafter "In re Ford") (quoting Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604–05 (1991)). "In line with the standards governing motions for dismissal, a defendant bears the burden of proof establishing preemption as grounds for dismissal." Id. at 859 (citing Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 912 (6th Cir. 2007)). So the Court must determine if CSXT has carried its burden.

Here, CSXT asserts that two federal laws preempt Plaintiffs' state law claims: the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10101, *et seq.* (the "ICCTA"), and

10

the Federal Railroad Safety Act, 49 U.S.C. § 20101, *et seq.* (the "FRSA"). (Doc. No. 67 at 14–26). The Court will begin with the ICCTA and then address the FRSA.

### A. The ICCTA

When Congress enacted the ICCTA in 1995, it established the Surface Transportation Board ("STB"), 49 U.S.C. § 1301, and gave it exclusive jurisdiction over: "(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. § 10501(b). Alongside this grant of exclusive jurisdiction, Congress also mandated that "[e]xcept as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." Id. The ICCTA "therefore 'preempts all state laws that may be reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'" Adrian & Blissfield R.R. Co. v. Village of Blissfield, 550 F.3d 533, 540 (6th Cir. 2008) (quoting N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 252 (3d Cir. 2007)).

In 2008, the Sixth Circuit adopted the STB's "comprehensive test for determining the extent to which a particular state action or remedy is preempted by § 10501(b)," Blissfield, 550 F.3d at 539 (quoting New Orleans & Gold Coast Ry. Co. v. Barrois, 533 F.3d 321, 332 (5th Cir. 2008)), and reaffirmed as much in 2019. See CSX Transp., Inc. v. City of Sebree, Kentucky, 924 F.3d 276, 283 (6th Cir. 2019) (quoting Blissfield, 550 F.3d at 539). "Under that test, there are two

types of preempted state actions or regulations: those that are 'categorically preempted' and those that are 'preempted as applied.'" City of Sebree, 924 F.3d at 283 (citing Blissfield, 550 F.3d at 540). "A state [action] is categorically or facially preempted if it would directly conflict with exclusive federal regulation of railroads." Id. (quoting Blissfield, 550 F.3d at 539) (internal quotation marks omitted). On the other hand, "[t]he as-applied analysis requires an 'assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.'" City of Sebree, 924 F.3d at 283 (quoting Barrois, 533 F.3d at 332).

Quizzically, CSXT's briefs do not mention this framework—let alone indicate which type of preemption's analysis CSXT would have the Court use when evaluating Plaintiffs' claims. (See generally Doc. Nos. 67, 79). Likewise, CSXT's briefs neither perform nor invite the Court to perform an assessment of whether the action would prevent or unreasonably interfere with railroad transportation. (See generally Doc. Nos. 67, 79). Thus, the Court must assume that CSXT argues that Plaintiffs' claims are categorically preempted. See In re Ford, 65 F.4th at 859 (placing the burden of proof of federal preemption on defendants).

The ICCTA categorically preempts "two broad categories of state and local actions." Those are:

> (1) "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the [STB] has authorized"[;] and (2) "state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service."

Blissfield, 550 F.3d at 540 (quoting CSX Transp., Inc., STB Fin. Docket No. 34662, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005)). The first category, concerning permitting or preclearance, clearly does not apply. Therefore, the Court must determine whether Plaintiffs' claims seek to regulate "matters directly regulated by the [STB]," id., or merely "'hav[e] a more remote or

12

incidental effect on rail transportation.'" Id. at 539 (quoting N.Y. Susquehanna & W. Ry. Corp., 500 F.3d at 252).

CSXT asserts that Plaintiffs' claims fall squarely within the ambit of matters directly regulated by the STB. Indeed, according to CSXT, "Plaintiffs' claims . . . can only be understood as asserting that CSXT should have altered its design, construction, management, maintenance, and operation of the Trace Creek Bridge and its related rail tracks and structures in the face of increasingly frequent rain events in Middle Tennessee." (Doc. No. 67 at 17). To support this claim, CSXT points to several allegations in the complaint that relate to its alleged failure to keep the Culvert free of debris and ensure the free flow of water under the Trace Creek Bridge. (Id.). It also cites a handful of discovery requests Plaintiffs served that relate the maintenance of the bridge. (Id. at 17–19). To CSXT, these allegations and requests puncture the idea that the case is anything more than an attempt to circumvent the STB. (Id.)

However, CSXT must concede that not every claim that "touch[es] the tracks in a literal sense" is categorically preempted. Blissfield, 550 F.3d at 540 (quoting Barrois, 533 F.3d at 322 (internal quotation marks omitted)). Although the Sixth Circuit has not directly confronted the issue of whether the ICCTA categorically preempts state negligence claims, the Fifth Circuit, which the panels in Blissfield and City of Sebree cite heavily, has repeatedly answered, "no."

For instance, in Guild v. Kansas City Southern Railway Company, the Fifth Circuit considered whether the ICCTA categorically preempted the plaintiffs' Mississippi negligence claim seeking compensation for the alleged damages caused by the defendant's rail cars overburdening a spur track. 541 Fed. App'x 362, 367 (5th Cir. 2013). The panel explained that this inquiry focuses on the purpose of the state law, rather than the specifics of the plaintiffs' claim. Id. Ultimately, the panel determined that it should employ an as-applied preemption analysis

13

because "[t]he purpose of Mississippi's negligence law is not to manage or govern rail transportation." Id. "Rather 'the effects of state negligence law on rail operations are merely incidental.'" Id. (citing Elam v. Kan. City S. Ry. Co., 635 F.3d 796, 807 (5th Cir. 2011)).

More recently, in Gallo v. Union Pacific Railroad Company, the Western District of Texas assessed whether the plaintiffs' state law negligent design-and-construction claims were categorically preempted "because they would have [had] the effect of managing or governing rail transportation by dictating how drainage culverts would be built." 372 F. Supp. 3d 470, 479–80 (W.D. Tex. 2019). As the court explained, only "[a] state tort suit that attempts to regulate 'such areas as train speed, length and scheduling, the way the railroad operates its trains, with concomitant economic ramifications' attempts to manage rail transportation in a direct way, and thus may be [categorically] preempted." Id. at 480 (quoting Franks Inv. Co. LLC v. Union Pacific R.R. Co., 593 F.3d 404, 407 (5th Cir. 2010)). Accordingly, it reasoned that categorical preemption does not "extend[] to state common law tort and property claims because tort claims apply state common law and are thus not concerned with the regulation of rail transportation." Id. (citation omitted). The court then considered the parties' as-applied preemption arguments, noted that the plaintiffs are only seeking monetary damages for their injuries (not an injunction to install new drainage systems), and found that, at least at the summary judgment stage, the plaintiffs' claims "[were] more akin to the simple negligence claims that the Fifth Circuit has held are not preempted by federal law." Id. at 481 (citing Guild 541 F. App'x at 368).

Given the significant overlap between the allegations in the Amended Complaint and the undisputed facts in Gallo and the Sixth Circuit's embrace of the Fifth Circuit's approach to ICCTA preemption, the same result is appropriate here. Plaintiffs bring state common law tort claims for

14

damages;[5] those claims do not concern the regulation of railroad transportation, and, accordingly, are not categorically preempted. Gallo, 541 Fed. App'x at 367 (citing Elam, 635 F.3d at 807). This Court is not the first federal court in Tennessee to take the Fifth Circuit's lead on this issue. In Tipton v. CSX Transportation, a case which CSXT cites and was a party to, the court "note[d] that the purpose of Tennessee's negligence law is not to manage or govern rail transportation, and thus the allegations . . . are not expressly preempted by the ICCTA." 2016 WL 11501426, at *7 (E.D. Tenn. July 7, 2016). Invoking Guild, the Tipton court then analyzed whether the challenged allegations "would unreasonably interfere [with] or prevent rail transportation." Id. at *7–8.

Because the claims are not categorically preempted and CSXT fails to mount any argument that Plaintiffs' claims would unreasonably interfere with or prevent rail transportation, it has made no real attempt to meet its burden. In re Ford, 65 F.4th at 859 ("In line with the standards governing motions for dismissal, a defendant bears the burden of proof establishing preemption as grounds for dismissal."). Accordingly, at this stage, the Court cannot conclude that the ICCTA preempts Plaintiffs' claims.

### B. The FRSA

The FRSA was enacted in 1970 in order "to promote safety in all areas of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To further these goals, Congress specifically empowered the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970." 49 U.S.C. § 20103(a). Accordingly, the FRSA permits states to "adopt or continue in force a law, regulation, or order related to railroad safety or security until the

---

[5] The lack of a request for injunctive relief distinguishes this case from those like Maynard v. CSX Transportation, Inc., 360 F. Supp. 2d 836 (E.D. Ky. 2004), which CSXT relies upon. (Doc. No. 67 at 16).

Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the State requirement." 49 U.S.C. § 20106(a)(2). Whether a state law negligence claim is "covered" by a regulation or order and therefore preempted under 49 U.S.C. § 20106(a)(2) depends on whether "a FRSA regulation 'substantially subsume[s]' the subject matter of the lawsuit." Nickels v. Grand Trunk Western R.R., Inc., 560 F.3d 426, at 429 (6th Cir. 2009) (quoting CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664 (1993))

CSXT argues that because the Amended Complaint's allegations "that CSXT violated several supposed common law duties regarding the safe operation, inspection, and maintenance of [the Culvert]; the failure to inspect and repair unsafe . . . conditions; and the failure to report unsafe conditions" are substantially subsumed by five federal regulations: 49 C.F.R. §§ 213.7, 213.33, 213.233, 213.237, and 213.39. (Doc. No. 67 at 22). However, CSXT offers no explanation, analysis or discussion on how any of these regulations substantially subsume Plaintiffs claims, (see id. (merely listing the five regulations); see also Doc. No. 79 at 6 (referencing only 49 C.F.R. § 213.33)), and the application of the regulations is not self-evident. The Court will not invent argumentation that CSXT does not advance. For instance, 49 C.F.R. § 213.37 regulates the control of "vegetation on railroad property which is on or immediately adjacent to roadbed." 49 C.F.R. § 213.37. 49 C.F.R. § 213.39 does not even exist.[6]

While CSXT might respond that it is intuitive that 49 C.F.R. § 213.33, which concerns drainage, substantially subsumes Plaintiffs claims, other courts, including the Third Circuit, have said the opposite. In MD Mall Associates, LLC v. CSX Transportation, Inc., another case CSXT

---

[6] CSXT likely meant 49 C.F.R. § 213.239 when it referenced the non-existent 49 C.F.R. § 213.39.

was a party to, a Third Circuit panel explained that 49 C.F.R. § 213.33 substantially subsumes only certain claims related to flowing water near railroad tracks:

> Section 213.33 is, by CSX[T]'s own admission, plainly intended to prevent water from pooling on or around railroad tracks and thus to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks, icing conditions, and compromised track integrity. There is no indication whatsoever that it was intended to address storm water discharge onto a neighboring property. . . . Again, CSX[T] pressed its understanding of § 213.33 at oral argument in the District Court, saying that § 213.33 "is a drainage regulation" that "essentially" tells railroad "to keep water off the tracks because it's dangerous to have water there, because it will deteriorate the track." CSX[T] represented that "the intent of" the drainage regulation "is to keep water away from the tracks, that's it."

715 F.3d 479, 493 (3d Cir. 2013). Because of this, the panel found it "difficult to conclude that § 213.33 was intended to prevent the harm plaintiff suffered." Id. (internal quotation marks and citation omitted). The only case upon which CSXT relies that deals with 49 C.F.R. § 213.33 within the context of FRSA preemption only emphasizes the gap between the drainage regulation's apparent scope and the case at hand; Rooney v. City of Philadelphia, a case which predates MD Mall Associates, dealt with track runoff patterns. 623 F. Supp. 2d 644, at 666 (E.D. Penn. 2009). Without more, the Court cannot conclude that FRSA preemption precludes Plaintiffs' claims.[7]

As previously explained, CSXT bears the burden of proof establishing preemption as grounds for dismissal. In re Ford, 65 F.4th at 859. For the reasons stated, it has not done so, and it is not the Court's role to create arguments for CSXT or to supplement the railroad company's work. Though Plaintiffs' claims may be preempted by either or both the ICCTA and the FRSA, CSXT will have to marshal the undisputed material evidence and law at summary judgment.

---

[7] The Court need not reach whether Plaintiffs' claims are excepted from the FRSA's preemption provision pursuant to 49 U.S.C. § 20106(b).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint (Doc. No. 66) will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE