## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MATTHEW RIGNEY and DANIELLE HALL, individually, as the surviving parents and next of kin of Ryan Rigney and Rileighanna Rigney, deceased, and as the parents and legal guardians of M.R. and B.R., minors,

TRACY KILBURN, individually and as the surviving spouse and next of kin of Robert Scott Kilburn, deceased,

MICHELLE FELICIANO, individually and as the surviving parent and next of kin of Lucy Lane Connor, deceased,

KAYLA CELENE BRAKE, individually and as next of kin of Regenia Lynn Brake, deceased,

CARRIE JAZMIN BRAKE, individually,

KENDRA SKYLAR BRAKE, individually,

CAMERON LEVESTER GUY, individually,

QUENTIN ISAIAH BRAKE, individually,

PEGGY BETTY, individually and as surviving spouse of James Michael Betty, deceased,

DOROTHY MAY HANDLING, individually and as the surviving daughter and next of kin of Hallie Lee Gerber, deceased,

JOSEPH PRASNIKAR, individually,

THOMAS SANDERS, individually and as the surviving brother and next of kin of Joshua Lee Tyrone Hendrix, deceased,

NO. 3:22-CV-00342

JUDGE WAVERLY D. CRENSHAW, JR.

MAGISTRATE JUDGE ALISTAIR NEWBERN

Exhibit "A"

KIMBERLY KEE, individually and as the surviving spouse and next of kin of Mark Steven Kee, deceased,

TIFFANY RENAE BRYANT and SHANE KEITH BRYANT, individually and as the surviving parents of Lilly-Anne Grace Bryant, deceased,

HENRY KERSTEN, individually and as the surviving spouse and next of kin of Leslie Meek Kersten, deceased,

BRITTNEY LEANN MCCORD, individually and as the surviving mother and next of kin of Kellen Cole Burrow, deceased, and as the parent and legal guardian of W.S., K.G., K.M., and K.B., minors,

NICHOLAS DAVID SHAWL, individually and as the surviving son and next of kin of Robin Denise Bradley, deceased,

DONALD WAYNE JACKSON, individually and as the surviving son and next of kin of Donna Gail Bradley, deceased,

WILLIAM LEON LUTEN, individually and as the surviving son and next of kin of Mary Louise Luten, deceased,

JEFFREY NEWMAN and DEBBIE NEWMAN, individually and as the surviving parents and next of kin of Amber Rose Newman, deceased,

THOMAS LEE ALMOND, individually and as the surviving son and next of kin of Linda Bryant, deceased,

ANGELA LAY REEVES, individually and as the surviving wife and next of kin of Joseph Anthony Reeves, deceased,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**2**

| JOANNA REEVES, individually, | ) |
| | ) |
| SUSAN VOEGELI, individually and as the grandmother and legal guardian of C.V., | ) |
| | ) |
| KELSEY SCHULTZ, individually and as the surviving mother and next of kin of Nathanal Dwayne Steward Whitsett, deceased, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| CSX TRANSPORTATION, INC., | ) |
| | ) |
| Defendant. | ) |

# [PROPOSED] SECOND AMENDED COMPLAINT

Comes now the Plaintiffs, by and through counsel of record, and does file this *Second Amended Complaint* pursuant to the order of this Court.

This lawsuit arises from a horrific event which occurred in Waverly, Humphreys County, Tennessee on August 21, 2021. Many people lost their loved ones and suffered permanent injuries as a result of the Defendant's negligent actions and inactions which were the product of Defendant's intentional, malicious, or reckless conduct. Accordingly, the Plaintiffs bring this suit against CSX Transportation, Inc. ("CSX") and allege as follows:

## INTRODUCTION

1.      This action arises from a man-made tidal wave which swept through the city of Waverly, Tennessee on August 21, 2021, killing at least 20 people, including many children.

2.      The deadly tidal wave was formed by millions of gallons of water that became bottled up behind the CSX railroad bridge crossing over Trace Creek (the "Trace Creek Bridge"). The water backed up because CSX allowed various debris to clog its culvert under the bridge (the "Culvert"), which substantially impeded the creek's natural flow.

3.      Unable to pass freely through the Culvert, the rushing waters of the storm-swelled Trace Creek were diverted over the banks of the creek bed and were further prevented from flowing downstream by the man-made dam formed by the earthen railbed which supported CSX's elevated tracks (the "Railbed Dam").

4.      CSX knew that its Culvert would regularly clog with debris prior to August 21, 2021, because its personnel would occasionally remove debris from the Culvert.

5.      CSX also knew that its debris-clogged Culvert could turn its elevated railroad tracks into a dangerous makeshift dam because CSX had experienced this same problem in other locations.  For instance, the State of New York threatened CSX with litigation in 2019 because one of its culverts was clogged with debris, and the resultant ponding behind the railbed posed a severe risk to residents downstream.  That same CSX

**4**

culvert has been linked to multiple floods in New York, including one happening in July 2021, just weeks before the tidal wave hit Waverly.

6. In response to the July 21, 2021 flood event in New York, CSX took immediate steps to mitigate the future risks associated with that culvert, however, CSX did nothing to mitigate the risks posed by its Culvert under the Trace Creek Bridge.

7. For example, CSX failed to establish a system to regularly monitor and maintain the Culvert free of debris. Although CSX would on occasion remove timber and other debris clogging the Culvert, it would simply pile the removed materials onto the neighboring creek bank owned by neighboring landowner(s). This made the problem even worse because the next heavy rain would push the piled-up debris back into the creek where it could then return, along with new debris, to the Culvert—creating an environment for an even more significant blockage of the natural flow of Trace Creek.

8. By August 19, 2021, meteorologists were already predicting that a torrential rainstorm would hit Middle Tennessee on August 21st—affording CSX more than sufficient time to clear all debris from the Culvert and nearby creek bank.

9. Soon after the storm began on August 21st, CSX was reminded that its earthen railbeds were not designed to serve as dams and were susceptible to sudden collapse.

10. In the early morning hours on August 21st just a few miles upstream from the Trace Creek Bridge, a portion of a CSX railbed near McEwen, Tennessee collapsed from the pressure of the accumulating storm waters.

11. This initial washout near McEwen occurred hours before the Railbed Dam near the Trace Creek Bridge catastrophically failed, which, again, afforded CSX hours to act to remove any debris clogging the Culvert; and, if this task proved too great, more than sufficient time to pick up a phone and warn Waverly's police and emergency responders of the imminent danger facing the community.

12. Rather than notifying emergency responders of the danger posed by millions of gallons of water held back only by the earthen Railbed Dam, which was not designed for the task, CSX's only action in response to the washout of its tracks near McEwen was to protect its own economic interests by suspending its train operations around Waverly.

13. Inevitably, without the free flow of water through the Culvert, the pressure of millions of gallons of water diverted from the rain-swelled Trace Creek caused a sudden failure of CSX's Railbed Dam, releasing a deadly wall of water into the heart of Waverly.

14. As a result of Defendant's actions and inactions, Plaintiffs needlessly suffered direct personal injury and trauma, as well as immeasurable losses associated with the death of their spouses, parents, children, and siblings.

## I. PARTIES, JURISDICTION, AND VENUE

15. At all material times, Plaintiffs:

   a. Matthew Rigney and Danielle Hall were residents of Humphreys County, Tennessee and the parents of Ryan and Rileighanna Rigney, M.R., and B.R.

b.  Tracy Kilburn was a resident of Humphreys County, Tennessee and Robert Scott Kilburn's wife.

c.  Michelle Feliciano was a resident of Humphreys County, Tennessee and Lucy Lane Connor's mother and legal guardian.

d.  Carrie Jazmin Brake was a resident of Yuma, Tennessee; and Kayla Celene Brake, Kendra Skylar Brake, Cameron Levester Guy, and Quentin Isaiah Brake were residents of Humphreys County, Tennessee and Regenia Lynn Brake's children.

e.  Peggy Betty was a resident of Humphreys County, Tennessee and James Michael Betty's wife.

f.  Dorothy May Handling was a resident of the State of Arizona and Hallie Lee Gerber's daughter.

g.  Joseph Prasnikar was a resident of Humphreys County, Tennessee.

h.  Thomas Sanders was a resident of Humphreys County, Tennessee and Joshua Lee Tyrone Hendrix's brother.

i.  Kimberly Kee was a resident of Humphreys County, Tennessee and Mark Steven Kee's wife.

j.  Tiffany Renae Bryant and Shane Keith Bryant were residents of Humphreys County, Tennessee and the parents of Lilly-Anne Grace Bryant.

k.  Henry Kersten was a resident of Humphreys County, Tennessee and Leslie Meek Kersten's husband.

l.  Nicholas David Shawl was a resident of Humphreys County, Tennessee, and is Robin Denise Bradley's surviving son.

m.  Donald Wayne Jackson was a resident of Humphreys County, Tennessee, and is Donna Gail Bradley's surviving son.

**7**

n. William Leon Luten was a resident of Humphreys County, Tennessee, and is Mary Louise Luten's surviving son.

o. Jeffrey Newman and Debbie Newman were residents of Humphreys County, Tennessee, and are Amber Rose Newman's surviving parents.

p. Thomas Lee Almond was a resident of Humphreys County, Tennessee, and is Linda Bryant's surviving son.

q. Brittney LeAnn McCord was a resident of Humphreys County, Tennessee, and is Kellen Cole Burrow's surviving mother, and is the mother of W.S., K.G., K.M., and K.B.

r. Angela Lay Reeves was a resident of Humphreys County, Tennessee, and is Joseph Anthony Reeves' surviving wife.

s. Joanna Reeves was a resident of Humphreys County, Tennessee.

t. Susan Voegeli was a resident of Humphreys County, Tennessee and is C.V.'s grandmother.

u. Kelsey Schultz was a resident of Humphreys County, Tennessee, and is Nathanal Dwayne Steward Whitsett's surviving mother.

16. At all material times, CSX Transportation, Inc. ("CSX") was a foreign corporation and submitted itself to jurisdiction of Humphreys County, Tennessee because it: (i) transacted business in Tennessee and/or Humphreys County, Tennessee; (ii) contracted to supply services or things in Tennessee and/or Humphreys County, Tennessee; (iii) caused tortious injury by an act or omission in Tennessee and/or Humphreys County, Tennessee; and (iv) had an interest in, used, or possessed real property in Humphreys County, Tennessee.

**8**

## II. GENERAL ALLEGATIONS

### A. CSX's clogged Culvert creates an unnatural lake behind the Railbed Dam.

17. As early as Thursday, August 19, 2021, meteorologists were forecasting extremely heavy rain to hit the Middle Tennessee area, including the Trace Creek drainage basin in Humphreys County, on Saturday, August 21, 2021.

18. As predicted, heavy rain began falling in Humphreys County shortly before 1:00 AM on the morning of Saturday, August 21, 2021.

19. Sometime between 4:00-6:00 AM, CSX learned that, as a result of the ongoing storm, a part of the railbed supporting its elevated tracks washed out near the City of McEwen, about 9 miles upstream from the City of Waverly.

20. In response to the washout near McEwen, CSX immediately acted to protect its own economic interests by stopping all trains scheduled to pass through Humphreys County.

21. As the rain continued to fall, water accumulated behind the clogged culvert (the "Culvert") under the CSX railroad bridge which spanned Trace Creek located about a mile northeast of Waverly (the "Trace Creek Bridge").

22. As the Culvert was plugged with debris, the rushing storm-swelled waters of Trace Creek were unable to flow along their natural course under the Trace Creek Bridge but instead were forced to back up and spread over the creek's banks and onto the land of adjoining owners.

23.     Once over the banks, the diverted waters of Trace Creek began forming an unnatural lake behind the makeshift dam formed by the earthen railbed which supported CSX's elevated tracks at and around the Trace Creek Bridge (the "Railbed Dam").

**B.     The Railbed Dam's sudden collapse releases a tidal wave towards Waverly.**

24.      The torrential rain from the August 21st storm inundated the Trace Creek watershed and greatly increased the volume of water needing to pass under the Trace Creek Bridge through the obstructed Culvert.

25.     With the Culvert blocked, the flow of Trace Creek was redirected upon the lands of adjoining property owner(s) and the pressure of the rising water increased until the ill-equipped earthen Railbed Dam suddenly gave way, unleashing a torrent of millions of gallons of water. The aerial image below, which was taken shortly after the tidal wave was unleashed onto Waverly, depicts multiple massive breaches of the earthen embankment.



26. The sudden breach of the Railbed Dam caused what witnesses and survivors have described as a *"tidal wave"* to be unleashed upon the City of Waverly. A few first-hand accounts include:

*"Just within minutes. It was like a tidal wave coming in from the ocean. I went crazy. I didn't know for like three hours. I had no idea if I had a family left. I didn't know."* – Greg Triplett

*"There's a lady going by in the water, soaking and screaming for help, and then [my husband] went in the water and right after he went in is when [what] I call the wall of water, the tidal wave hit. He went under and I never saw him again."* – Tracy Kilburn

27. At no point during the hours after the storm began, did Defendant alert local officials, police, 911, fire/rescue, or anyone else about the peril posed by the dangerous artificial lake forming behind the Railbed Dam on their private property.

28. While Waverly had been subject to heavy rain and flooding events in the past, the city had never been subject to a deadly and destructive man-made tidal wave. Instead, the prior flooding events – including the flooding associated with a 1000-year rainstorm that hit Humphreys County in 2010 - involved a more gradual accumulation of water that caused property damage but resulted in no serious injury or loss of life to the residents of Waverly.

29. The August 2021 tidal wave caused 22 deaths because there was no time to escape the sudden and violent torrent of water. As Humphreys County Sheriff Davis explained, *"[t]here was no gradual rise to this. Up in one of these flood areas, it went from bone dry to waist-deep water in somewhere less than 15 minutes."* He elaborated:

*It appeared that morning that a lot of the debris had come around this bridge behind us and had created a barrier, or a dam and allowed the water to back up for some length of distance behind the railroad trestle. And at some point in time, it appeared like it had given way. The railroad bed had given way during the build-up of the water and washed out, and eventually created a pretty massive rush of water that appeared to have gone through the areas down through where people lived.*

30. The fatal August 2021 tidal wave could have been easily averted had CSX regularly inspected the Culvert and ensured that it was kept free from debris.

31. Even if CSX neglected its duty to regularly inspect the Culvert, when heavy rain is forecasted, such as it was on August 19, 2021, CSX had a heightened duty to inspect the Culvert to make sure that it was unobstructed so that the anticipated increased flow of Trace Creek could pass through the Culvert unimpeded and not backup behind the Railbed Dam.

32. The Culvert's location just to the northeast of downtown Waverly served as a choke point which, when blocked, caused the water flowing downstream to divert and form an unnatural lake behind the Railbed Dam.

33. The earthen embankment which formed the Railbed Dam was designed to provide vertical support to carry the weight of trains passing above it; however, the Railbed Dam was ill-equipped to withstand the pressure of millions of gallons of trapped water applying horizontal pressure against its sides.

34. Inevitably, the rising water on the adjoining lands was too much for the Railbed Dam to restrain and the Railbed Dam catastrophically failed, releasing the tidal wave that decimated Waverly and its residents.

**C.** **Defendant knew that historic rainfalls are an expected, regular occurrence in Middle Tennessee, including in Humphreys County.**

35. Within the last 20 years, Waverly has regularly been subjected to historic amounts of rainfall, including 2 separate *"historic"* floods in the decade preceding August 2021.

36. Waverly sits at the bottom of a narrow valley, with Trace Creek running westerly down towards and through the town. The Federal Emergency Management Agency has deemed Waverly a *"special flood hazard area"* for this reason.

37. The fact that Waverly is uniquely at risk for extreme flooding events could not have been a surprise to Defendant as the area has seen multiple floods in recent years.

38. Middle Tennessee experienced record-setting rain and catastrophic flooding between May 1 and May 3, 2010. On May 1, 2010, 6.32 inches of rain fell at Nashville International Airport, which was the second-highest rainfall ever measured in a day. On May 2, 2010, 7.25 inches of rain fell, setting a new record for a two-day rainfall event. The combined total of 13.57 inches of rain more than doubled the previous two-day record of 6.68 inches.

39. The rainfall across Middle Tennessee in 2010 qualified as a 1,000-year rainfall event and caused widespread flooding with extensive property damage and 21 deaths.

40. No deaths were reported in Humphreys County from the May 2010 record-setting flood, because, unlike the August 2021 event, either the Culvert was not

obstructed or the Railbed Dam fortuitously withstood the water pressure from the diverted Trace Creek.

41. On February 6 and 7, 2019, heavy rain again caused extensive flooding across Middle Tennessee, including in Humphreys County, with the National Weather Service reporting approximately 40 flash flooding instances in Wilson, Davidson, Dickson, and Cheatham County.

42. Waverly also sustained major flooding from the February 2019 rain event but no deaths were reported because, unlike the August 2021 event, either the Culvert was not obstructed or the Railbed Dam fortuitously withstood the water pressure from the diverted Trace Creek.

**D.** **CSX knew extreme rainfalls are a regular, expected occurrence in Middle Tennessee, including the Trace Creek watershed.**

43. Scientists have identified, described, and produced studies showing a trend towards historic level rainfall events becoming far more frequent over the past several decades.

44. For instance, 5 separate *"1,000-year floods"* occurred within just a 5-month span in 2016. And just 2 years later, another set of 5 separate *"1-in-1,000-year rainfall events"* occurred in the Eastern United States between the months of January and September 2018.

45. Between 1958 and 2016, the Southeast region of the United States, encompassing Tennessee, experienced a 49% increase in *"5-year, 2-day heavy precipitation events"* and a 27% increase in *"99th percentile precipitation days."*

46. *"Intense single-day precipitation events"* have also substantially increased over the past several decades. Indeed, 9 out of the 10 highest *"extreme one-day precipitation events"* on record since 1910 occurred over just the past 25 years.

47. The research summarized above further predicts that the frequency of *"heavy precipitation events"* will potentially triple in the 21st century.

48. Indeed, concerns over the impacts of the increasing frequency of extreme rainfalls and other weather events on transportation infrastructure (including railroad tracks and bridges) has spawned prominent research studies across the world dating back to at least the mid-2000s.

49. For example, a study published in the Transport Policy Journal in March 2019 specifically addressed the increased likelihood of railroad bridge washouts, warning:

> **Precipitation changes could result in flooding that affect bridge stability** and thus **require additional investment to stabilize railroad bridges**. Additional costs could result from **increased intensity of precipitation events** that could result in flash flooding and **wash outs** in localized areas. . . . These considerations **should not be overlooked in overall considerations of rail vulnerability**.

50. On July 28, 2021, just weeks before the August 2021 tidal wave, CSX publicly acknowledged the reality that because of the *"increased frequency and magnitude of flooding...[its] areas of concern include upgrading railroad bridges [and] improving track drainage."*

51. The research and analysis supporting CSX's July 2021 statement occurred over several years, and incorporated information from flooding events occurring over the

past decade, including in Middle Tennessee. This is evidenced by CSX's citation to the 2010 *"Nashville floods"* as an example of the harmful effects of heavy rains on its railroads in its July 2021 statement.

52. For instance, CSX explained, *"[a] case study example of how climate risks have influenced our financial planning process includes analyzing historical climate related expenditures due to extreme weather events."* It went on to explain that *"[t]hese responses include the Nashville floods (2010 - $25.9 million)."*

53. CSX also claimed in its July 2021 statement that it applies *"an internal methodology to evaluate potential scenarios"* where extreme weather events *"may impact operations and safety."*

54. In short, CSX has admittedly known, at all relevant times, that it must account for the increasing frequency and intensity of extreme rainfalls in its business operations, including with respect to its inspection and maintenance of its railroad bridges and culverts.

55. The increasing frequency of 100-year and 1000-year precipitation events rendered such extreme rainfalls readily foreseeable to Defendant in the months and years leading up to the rainstorm that struck Middle Tennessee on August 21, 2021.

56. The fact that Waverly experienced two severe floods in the decade preceding the August 2021 flood, including a 1000-year event in May of 2010, was clear notice to Defendant that Humphreys County was susceptible to extreme precipitation events and underscored the need to keep the Culvert under the Trace Creek Bridge clear of debris.

57.     Despite acknowledging that extreme rains were frequently occurring and that it needed to maintain and upgrade its railroad bridges and culverts as a result, CSX chose to allow debris to block the free flow of water through the Culvert under Trace Creek Bridge—creating the severe danger that turned into an unimaginable tragedy on August 21, 2021.

## III.     THE DEFENDANT'S TORTIOUS ACTS AND OMISSIONS

**A.     <u>CSX failed to take reasonable precautions to mitigate the risk created by its Culvert.</u>**

58.     CSX and its predecessors have operated the railroad line going through Humphreys County since the tracks were first laid down.

59.     As a landowner and railroad operator, CSX owed the following non-delegable duties of care:

   a. The duty to ensure the natural passage of Trace Creek's water flow through its Culvert under its Trace Creek Bridge without obstruction;

   b. The duty to prevent the unnatural accumulation of water on its property and on the property of neighboring property owners;

   c. The duty to prevent dangerous conditions from existing on its own property;

   d. The duty not to trespass and create dangerous conditions on its neighbor's property;

   e. The duty to warn anyone in harm's way if a dangerous condition exists on its own property;

   f. The duty to warn anyone in harm's way if it creates a dangerous condition on its neighbor's property; and

g.  The duty to exercise reasonable care under all circumstances.

60.  CSX's non-delegable duties of care extended to those living downstream of its Railbed Dam, including Plaintiffs and their loved ones, because the foreseeability and gravity of the harm outweighed the burden imposed by engaging in safer, alternative conduct.

61.  As one of the largest railroad operators in the country and as the owner of the Culvert, the Trace Creek Bridge and the Railbed Dam in Humphreys County, Tennessee, CSX knew or should have known that:

a.  The Middle Tennessee area, including Waverly, had experienced multiple historic rainfalls and floods in the years leading up to August 2021;

b.  Waverly is located in an area particularly prone to flooding during heavy rains;

c.  The frequency and intensity of heavy rainfalls in Middle Tennessee have been increasing over the past several decades and are projected to continue doing so;

d.  Meteorologists predicted at least as early as August 19, 2021, that a significant rain event was going to inundate the Middle Tennessee area, including Humphreys County;

e.  That the advanced forecast for heavy rain issued by meteorologists on August 19, 2021 did not preclude another 1000-year flood event hitting the Middle Tennessee area, including Humphreys County;

f.  CSX's railroad lines were increasingly vulnerable to bridge and track washouts as a result of the increasing frequency and intensity of heavy rainfalls;

g.  CSX's Culvert under its Trace Creek railroad bridge was regularly clogged with debris;

h.  Debris clogs under CSX bridges, including the Culvert under its Trace Creek Bridge, could cause adjacent earthen railbed embankments, such as the Railbed Dam near Trace Creek, to act as makeshift dams;

i.  The Culvert under CSX's Trace Creek Bridge is an unnatural chokepoint which, if obstructed, will divert Trace Creek over its banks where its natural flow will be further impeded by the Railbed Dam;

j.  If the Culvert is clogged while Trace Creek is rushing with water fed by heavy rains, the diverted water will rise and put horizontal pressure against the earthen Railbed Dam;

k.  The Railbed Dam was not designed to withstand horizontal pressure delivered by millions of gallons of water and will inevitably fail and collapse if the pressure is not relieved;

l.  On August 21, 2021, the possibility of a catastrophic failure of the Railbed Dam and the resultant sudden release of millions of gallons of water posed a clear and present danger to the residents of Waverly; and,

m.  On August 21, 2021, the only way the residents of Waverly could have protected themselves and their families from the deadly and destructive tidal wave which swept through the city is if they had been provided a warning in advance to evacuate due to the dangerous unnatural buildup of water behind the Railbed Dam.

62.  CSX breached one or more of its duties to the Plaintiffs by failing to engage in safer, alternative conduct that would have constituted a minimal burden when compared with the foreseeability and gravity of harm summarized above, by its:

a.  Failure to properly maintain the Culvert free of debris and other obstructions in the years, months, weeks, and days leading up to the August 21, 2021 rainstorm;

b.  After learning that significant precipitation had been forecast for August 21, 2021, by its failure to order additional inspections and

clear the Culvert of any debris in anticipation of the predicted rainstorm;

c. After the rainstorm began on August 21, 2021, by its failure to monitor the Culvert and clear it from any debris that blocked the free flow of Trace Creek;

d. In the event that it was unable to keep the Culvert clear of debris during the storm on August 21, 2021, by its failure to warn local government and emergency officials as well as the public that the Culvert was clogged with debris and presented a risk of injury and death to those living downstream;

e. By its failure to monitor the buildup of water behind its makeshift Railbed Dam;

f. After the water began to rise and press against the Railbed Dam, by its failure to warn local government and emergency officials as well as the downstream public of the possibility that the earthen embankment was at risk to catastrophically fail;

g. After its tracks were washed out near McEwen Tennessee on August 21, 2021, by its failure to immediately warn government and emergency officials in Waverly to evacuate its residents near Trace Creek because its debris-clogged Culvert was causing millions of gallons of water to press against its Railbed Dam and was at risk of collapse; or

h. By its failure to take any other reasonable measures which would have kept the flow of Trace Creek unobstructed through the Culvert, prevented the buildup of water behind the Railbed Dam, prevented the sudden collapse of the earthen embankment of the Railbed Dam, or which would have warned the residents of Waverly of the impending danger and afforded them the opportunity to evacuate their families before they were struck by millions of gallons of rapidly flowing waters suddenly released when the Railbed Dam collapsed.

63. CSX's conduct detailed above caused or contributed to the creation and release of the tidal wave that injured and killed Plaintiffs and their loved ones.

64. The common law duty of a Tennessee landowner, such as CSX, to warn those endangered by an unnatural condition existing on such landowner's property is not incompatible with or supplanted by any regulations promulgated by the Department of Transportation.

65. The common law duty of a Tennessee landowner, such as CSX, to prevent the unnatural accumulation of water on such landowner's property is compatible with the regulations promulgated by the Department of Transportation governing railroad safety, including 49 CFR 213.33 which provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned."

66. CSX's failure to comply with the federal standard of care for railroad safety set forth in 49 CFR 213.33 establishes a breach by CSX of its duty as a Tennessee landowner to prevent the unnatural accumulation of water on its property which resulted in millions of gallons from the expected water flow from Trace Creek to back up behind the artificial dam formed behind CSX's railbed until the resulting pressure from the unnatural lake caused a catastrophic collapse of the railbed and unleashed a tidal wave that injured and killed Plaintiffs and their loved ones.

## IV.    THE CAUSES OF ACTION

### Count I: Wrongful Death

67. Paragraphs 1 through 66 are realleged.

68.     CSX was negligent for the reasons stated above, including by allowing its Culvert to be clogged, failing to promptly warn local government and emergency officials as well as the downstream public about the dangerous condition it created on its own property as well as on the land owned by adjoining landowner(s), and failing to engage in other safer, alternative conduct that would have constituted a minimal burden when compared with the foreseeability and gravity of harm summarized above.

69.     As a direct and proximate result of the foregoing negligence, on August 21, 2021, the clogged Culvert diverted the free flow of Trace Creek over its banks and onto neighboring property where it collected and rose until the pressure of millions of gallons of water caused a sudden and catastrophic failure of the Railbed Dam and the sudden release of a tidal wave that caused widespread death, injury, and destruction through Waverly.

70.     The Plaintiffs represent the following Waverly residents tragically killed by the tidal wave that struck Waverly on August 21, 2021:

    a.    Ryan Rigney and Rileighanna Rigney, Matthew Rigney and Danielle Hall's 7-month-old son and daughter, and B.R. and M.R.'s brother and sister;

    b.    Robert Scott Kilburn, Tracy Kilburn's husband;

    c.    Lucy Lane Connor, Michelle Feliciano's 7-year-old daughter;

    d.    Regenia Lynn Brake, the mother of Carrie Jazmin Brake, Kayla Celene Brake, Kendra Skylar Brake, Cameron Levester Guy, and Quentin Isaiah Brake;

    e.    James Michael Betty, Peggy Betty's husband;

**22**

f.   Hallie Lee Gerber, the mother of Dorothy May Handling, and long-time companion of Joseph Prasnikar;

g.   Joshua Lee Tyrone Hendrix, the brother of Thomas Sanders;

h.   Mark Steven Kee, Kimberly Kee's husband;

i.   Lilly-Anne Grace Bryant, Tiffany Renae Bryant and Shane Keith Bryant's daughter;

j.   Leslie Meek Kersten, Henry Kersten's wife;

k.   Robin Denise Bradley, Nicholas David Shawl's mother;

l.   Donna Gail Bradley, Donald Wayne Jackson's mother;

m.   Mary Louise Luten, William Leon Luten's mother;

n.   Amber Rose Newman, Jeffrey Newman and Debbie Newman's 22-year-old daughter.

o.   Linda Bryant, Thomas Lee Almond's mother.

p.   Kellen Cole Burrow, Brittney LeAnn McCord's 2-year-old son and the brother of W.S., K.G., K.M., and K.B.

q.   Joseph Anthony Reeves, Angela Lay Reeves' husband and Joanna Reeves' father.

r.   Nathanal Dwayne Steward Whitsett, Kelsey Schultz's son and C.V.'s uncle.

71.   Plaintiffs seek all compensatory damages available for the deaths of their loved ones pursuant to the Wrongful Death Act, Tenn. Code Ann. § 20-5-113, including damages for: (i) medical bills for treatment of the injuries resulting in decedents' deaths; (ii) funeral expenses; (iii) the mental and physical suffering decedents endured while

being pulled under the water and drowning; (iv) loss of enjoyment of life; (v) loss of earning capacity; (vi) the pecuniary value of decedents' lives; and (vii) the loss of decedents' consortium, companionship and society.

72.     CSX's acts and omissions set forth above were done intentionally, maliciously, or recklessly so as to raise a presumption of conscious indifference to consequences and warranting punitive damages in an amount to be set by the jury to deter such conduct in the future.

### Count II: Negligent infliction of emotional distress *(bystander)*

73.     Paragraphs 1 through 66 are realleged.

74.     CSX was negligent for the reasons stated above, including by allowing its Culvert to be clogged, failing to promptly warn local government and emergency officials as well as the downstream public about the dangerous condition it created on its own property as well as on adjoining landowner(s), and failing to engage in other safer, alternative conduct that would have constituted a minimal burden when compared with the foreseeability and gravity of harm summarized above.

75.     As a direct and proximate result of the foregoing negligence, on August 21, 2021, the clogged Culvert diverted the free flow of Trace Creek over its banks and onto neighboring property where it collected and rose until the pressure of millions of gallons of water caused a sudden and catastrophic failure of the Railbed Dam and the release of a tidal wave that caused widespread death, injury, and destruction through Waverly.

76. As a direct and proximate result of the tidal wave unleashed on Waverly:

a. Matthew Rigney suffered severe, serious, and permanent emotional distress from having his 7-month-old twin infants, Ryan and Rileighanna Rigney, ripped from his arms, taken under water, and drowned to death.

b. Danielle Hall suffered severe, serious, and permanent emotional distress from watching the tidal wave inundate her family home, where she knew her 7-month-old twin infants, Ryan and Rileighanna Rigney, were located, and then seeing that they did not make it out of the home alive.

c. M.R. suffered severe, serious, and permanent emotional distress from being physically present with her 7-month-old brother and sister, Ryan and Rileighanna Rigney, as they were pulled under water and drowned to death.

d. B.R. suffered severe, serious, and permanent emotional distress from being physically present with her 7-month-old brother and sister, Ryan and Rileighanna Rigney, as they were pulled under water and drowned to death.

e. Tracy Kilburn suffered severe, serious, and permanent emotional distress from watching her husband, Robert Scott Kilburn, be swept away by the tidal wave while attempting to save another person from drowning.

f. Michelle Feliciano suffered severe, serious, and permanent emotional distress from watching her 7-year-old daughter, Lucy Lane Connor, be swept away by the torrent of water pouring into their apartment.

g. Carrie Jazmin Brake suffered severe, serious, and permanent emotional distress from arriving at the scene and seeing her mother's dead body being retrieved from underneath a pile of debris.

h. Kendra Skylar Brake suffered severe, serious, and permanent emotional distress from watching her mother exit the window of

their home and be swept away by the tidal wave, and then seeing that her mother did not make it out alive.

i.  Cameron Levester Guy suffered severe, serious, and permanent emotional distress from watching his mother exit the window of their home and be swept away by the tidal wave, and seeing that his mother did not make it out alive.

j.  Quentin Isaiah Brake suffered severe, serious, and permanent emotional distress from learning of his mother's death and seeing that his mother did not make it out alive.

k.  Kayla Celene Brake suffered severe, serious, and permanent emotional distress from learning of her mother's death and seeing that her mother did not make it out alive.

l.  Joseph Prasnikar suffered severe, serious, and permanent emotional distress from watching his long-time companion, Hallie Gerber, be swept away by the torrent of water pouring into their home, and then seeing that she did not make it out alive.

m.  Kimberly Kee suffered severe, serious, and permanent emotional distress from watching and being unable to reach her husband, Mark Scott Kee, and being swept away from him before he was pulled under water and drowned to death.

n.  Tiffany Renae Bryant suffered severe, serious, and permanent emotional distress from attempting to reach her children, learning of her daughter Lilly-Anne Bryant's death, and seeing that her daughter did not make it out alive.

o.  Shane Keith Bryant suffered severe, serious, and permanent emotional distress from attempting to reach his children, learning of his daughter Lilly-Anne Bryant's death, and seeing that his daughter did not make it out alive.

p.  Henry Kersten suffered severe, serious, and permanent emotional distress from watching his wife, Leslie Meek Kersten, be swept away by the torrent of water, causing a structure to strike the outbuilding she was in while he was on the phone with her.

**26**

q.  Thomas Lee Almond suffered severe, serious, and permanent emotional distress from being wrenched away from his mother, Linda Bryant, and being dragged under by the same torrent of water that carried his mother underwater, causing her to drown to death.

r.  Brittney LeAnn McCord suffered severe, serious, and permanent emotional distress from having her 2-year-old son, Kellen Cole Burrow, ripped from her arms, taken under water, and drowned to death.

s.  K.M. suffered severe, serious, and permanent emotional distress from being physically present with her 2-year-old brother, Kellen Cole Burrow, as he was pulled under water and drowned to death.

t.  K.B. suffered severe, serious, and permanent emotional distress from being physically present with her 2-year-old brother, Kellen Cole Burrow, as he was pulled under water and drowned to death.

u.  Angela Lay Reeves suffered severe, serious, and permanent emotional distress from watching her husband, Joseph Anthony Reeves, be swept away by the violent and torrential current after holding the door open for Angela and their daughter, Joanna, to escape from the house—sacrificing his life so that his wife and daughter could survive.

v.  Joanna Reeves suffered severe, serious, and permanent emotional distress from watching her father, Joseph Anthony Reeves, be swept away by the violent current after holding the door open for Joanna and her mother, Angela, to escape from the house—sacrificing his life so that his wife and daughter could survive

w.  Kelsey Schultz suffered severe, serious, and permanent emotional distress from watching her son, Nathanal Dwayne Steward Whitsett, get pushed out of his room and carried out by the torrent of water prior to drowning to death.

x.  C.V. suffered severe, serious, and permanent emotional distress from watching his uncle, Nathanal Dwayne Steward Whitsett, get pushed out of his room and carried out by the torrent of water prior to drowning to death.

77. Plaintiffs' emotional distress is serious and severe because a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of this case.

78. The severe emotional harm Plaintiffs sustained as alleged above is permanent and will continue to plague them throughout their lives.

79. CSX's acts and omissions set forth above were done intentionally, maliciously, or recklessly so as to raise a presumption of conscious indifference to consequences and warranting punitive damages in an amount to be set by the jury to deter such conduct in the future.

### Count III: Negligent infliction of emotional distress *(standalone)*

80. Paragraphs 1 through 66 are realleged.

81. CSX was negligent for the reasons stated above, including by allowing its Culvert to be clogged, failing to promptly warn local government and emergency officials as well as the downstream public about the dangerous condition it created on its own property as well as on adjoining landowner(s), and failing to engage in other safer, alternative conduct that would have constituted a minimal burden when compared with the foreseeability and gravity of harm summarized above.

82. As a direct and proximate result of the foregoing negligence, on August 21, 2021, the clogged Culvert diverted the free flow of Trace Creek over its banks and onto neighboring property where it collected and rose until the pressure of millions of gallons of water caused a sudden and catastrophic failure of the Railbed Dam and the

release of a tidal wave that caused widespread death, injury, and destruction through Waverly.

83. As a direct and proximate result of the tidal wave unleashed on Waverly:

    a. Matthew Rigney suffered severe, serious, and permanent emotional distress from being stranded and submerged by water that rose up and over the gutter of his apartment before he was able to escape with his other children, M.R. and B.R.

    b. Danielle Hall suffered severe, serious, and permanent emotional distress from being stranded in a tree for hours, watching the death and destruction unfold while fearing for her life.

    c. M.R. suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

    d. B.R. suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

    e. Tracy Kilburn suffered severe, serious, and permanent emotional distress from being stranded and trapped on top of her vehicle while being unable to swim, all the while fearing for her life.

    f. Michelle Feliciano suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

    g. Kayla Celene Brake suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

    h. Kendra Skylar Brake suffered severe, serious, and permanent emotional distress from being stranded and submerged while being unable to swim, all the while fearing for her life.

i. Cameron Levester Guy suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

j. Quentin Isaiah Brake suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

k. Joseph Prasnikar suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

l. Kimberly Kee suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

m. Henry Kersten suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

n. Tiffany Renae Bryant suffered severe, serious, and permanent emotional distress from being stranded and trapped attempting to reach her children.

o. Shane Keith Bryant suffered severe, serious, and permanent emotional distress from being stranded and trapped attempting to reach his children.

p. Thomas Lee Almond suffered severe, serious, and permanent emotional distress from having to cling onto the side of his house for approximately half an hour before being washed away by the torrent of water, then slamming into another submerged house, and finally being stranded on a rooftop for four hours until he was rescued, all the while fearing for his life.

q. Brittney LeAnn McCord suffered severe, serious, and permanent emotional distress from having to cling onto a porch rail for approximately 45 minutes before being washed down to a clothesline, where she was stranded again for approximately 45 minutes, all the while fearing for her life.

r.      W.S. suffered severe, serious, and permanent emotional distress from having to cling to a pole for safety after the violent torrent pushed him from his home, all the while fearing for his life.

s.      K.G. suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

t.      K.M. suffered severe, serious, and permanent emotional distress from having to cling onto a porch rail for approximately 45 minutes before being washed down to a clothesline, where she was stranded again for approximately 45 minutes, all the while fearing for her life.

u.      K.B. suffered severe, serious, and permanent emotional distress from having to cling onto a porch rail for approximately 45 minutes before being washed down to a clothesline, where she was stranded again for approximately 45 minutes, all the while fearing for her life.

v.      Angela Lay Reeves suffered severe, serious, and permanent emotional distress from being trapped underneath a submerged building for approximately 2 minutes before the current dislodged her and she was then stranded on top of a building for several hours, all the while fearing for her life.

w.      Joanna Reeves suffered severe, serious, and permanent emotional distress from having to climb on top of a semi-truck and then a gas station canopy where she was stranded for several hours, all the while fearing for her life.

x.      Susan Voegeli suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

y.      Kelsey Schultz suffered severe, serious, and permanent emotional distress from being stranded and submerged while being unable to swim, all the while fearing for her life.

z.      C.V. suffered severe, serious, and permanent emotional distress from having to cling to a clothesline for safety after the violent torrent pushed him from his home, all the while fearing for his life.

84. Plaintiffs' emotional distress is serious and severe because a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of this case.

85. The severe emotional harm Plaintiffs sustained as alleged above is permanent and will continue to plague them throughout their lives.

86. CSX's acts and omissions set forth above were done intentionally, maliciously, or recklessly so as to raise a presumption of conscious indifference to consequences and warranting punitive damages in an amount to be set by the jury to deter such conduct in the future.

### Count IV: Negligence *(physical injury)*

87. Paragraphs 1 through 66 are realleged.

88. CSX was negligent for the reasons stated above, including by allowing its Culvert to be clogged, failing to promptly warn local government and emergency officials as well as the downstream public about the dangerous condition it created on its own property as well as on adjoining landowner(s), and failing to engage in other safer, alternative conduct that would have constituted a minimal burden when compared with the foreseeability and gravity of harm summarized above.

89. As a direct and proximate result of the foregoing negligence, on August 21, 2021, the clogged Culvert diverted the free flow of Trace Creek over its banks and onto neighboring property where it collected and rose until the pressure of millions of gallons of water caused a sudden and catastrophic failure of the Railbed Dam and the

release of a tidal wave that caused widespread death, injury, and destruction through Waverly.

90. The following Plaintiffs sustained severe permanent physical injuries as a direct and proximate result of Defendant's actions and omissions:

 a. B.R. suffered a severe head injury resulting in a concussion. This injury is particularly severe given that brain injuries suffered at such a young age are likely to impact a child's development.

 b. Kimberly Kee suffered severe physical injuries to her upper body and torso, including part of her breast being torn, having debris and water enter her body causing illness, and sustaining bruises from being battered by debris and other objects as she was submerged and thrown around by the torrent of water.

 c. C.V. suffered severe physical injuries to his upper body and torso, including sustaining a large gash in his chest, having debris and water enter his body causing illness, and sustaining bruises from being battered by debris and other objects as he was submerged and thrown around by the torrent of water.

91. Plaintiffs B.R., Kimberly Kee, and C.V. seek all available damages for the injuries described above, including for: (i) physical pain and suffering; (ii) emotional pain and suffering; (iii) medical bills and expenses; (iv) loss of enjoyment of life; (v) loss of earnings; (vi) disfigurement; (vii) post-judgment interest; (viii) statutory and discretionary costs; and (ix) all such further relief, both general and specific, to which they may be entitled.

92. CSX's acts and omissions set forth above were done intentionally, maliciously, or recklessly so as to raise a presumption of conscious indifference to

consequences and warranting punitive damages in an amount to be set by the jury to deter such conduct in the future.

### Count V: Strict Liability / Nuisance

93. Paragraphs 1 through 66 are realleged.

94. CSX owed an absolute duty to avoid altering the natural flow of surface water such that it would collect and pour in concentrated form or in unnatural quantities upon lower lands.

95. CSX's Railbed Dam altered the natural flow of surface water on the morning of August 21, 2021, resulting in a large unnatural lake forming behind the Railbed Dam.

96. The unnatural lake then broke through CSX's Railbed Dam and poured down onto the town of Waverly in a concentrated fashion and with unnatural and greater force, volume, and quantities than otherwise would have occurred in the form of a deadly tidal wave.

97. The unnatural lake and tidal wave unleashed onto the town of Waverly and surrounding areas constituted a nuisance.

98. The following individuals were killed by the nuisance alleged above:

   a. Ryan Rigney and Rileighanna Rigney, Matthew Rigney and Danielle Hall's 7-month-old son and daughter, and B.R. and M.R.'s brother and sister;

   b. Robert Scott Kilburn, Tracy Kilburn's husband;

   c. Lucy Lane Connor, Michelle Feliciano's 7-year-old daughter;

d. Regenia Lynn Brake, the mother of Carrie Jazmin Brake, Kayla Celene Brake, Kendra Skylar Brake, Cameron Levester Guy, and Quentin Isaiah Brake;

e. James Michael Betty, Peggy Betty's husband;

f. Hallie Lee Gerber, the mother of Dorothy May Handling, and long-time companion of Joseph Prasnikar;

g. Joshua Lee Tyrone Hendrix, the brother of Thomas Sanders;

h. Mark Steven Kee, Kimberly Kee's husband;

i. Lilly-Anne Grace Bryant, Tiffany Renae Bryant and Shane Keith Bryant's daughter;

j. Leslie Meek Kersten, Henry Kersten's wife;

k. Robin Denise Bradley, Nicholas David Shawl's mother;

l. Donna Gail Bradley, Donald Wayne Jackson's mother;

m. Mary Louise Luten, William Leon Luten's mother;

n. Amber Rose Newman, Jeffrey Newman and Debbie Newman's 22-year-old daughter.

o. Linda Bryant, Thomas Lee Almond's mother.

p. Kellen Cole Burrow, Brittney LeAnn McCord's 2-year-old son and the brother of W.S., K.G., K.M., and K.B.

q. Joseph Anthony Reeves, Angela Lay Reeves' husband and Joanna Reeves' father.

r. Nathanal Dwayne Steward Whitsett, Kelsey Schultz's son and C.V.'s uncle.

99. Plaintiffs seek all compensatory damages available for the deaths of their loved ones pursuant to the Wrongful Death Act, Tenn. Code Ann. § 20-5-113, including damages for: (i) medical bills for treatment of the injuries resulting in decedents' deaths;

**35**

(ii) funeral expenses; (iii) the mental and physical suffering decedents endured while being pulled under the water and drowning; (iv) loss of enjoyment of life; (v) loss of earning capacity; (vi) the pecuniary value of decedents' lives; and (vii) the loss of decedents' consortium, companionship and society.

100. As the direct and proximate result of the nuisance alleged above, the following individuals suffered emotional distress as follows:

a. Matthew Rigney suffered severe, serious, and permanent emotional distress from having his 7-month-old twin infants, Ryan and Rileighanna Rigney, ripped from his arms, taken under water, and drowned to death.

b. Danielle Hall suffered severe, serious, and permanent emotional distress from watching the tidal wave inundate her family home, where she knew her 7-month-old twin infants, Ryan and Rileighanna Rigney, were located, and then seeing that they did not make it out of the home alive.

c. M.R. suffered severe, serious, and permanent emotional distress from being physically present with her 7-month-old brother and sister, Ryan and Rileighanna Rigney, as they were pulled under water and drowned to death.

d. B.R. suffered severe, serious, and permanent emotional distress from being physically present with her 7-month-old brother and sister, Ryan and Rileighanna Rigney, as they were pulled under water and drowned to death.

e. Tracy Kilburn suffered severe, serious, and permanent emotional distress from watching her husband, Robert Scott Kilburn, be swept away by the tidal wave while attempting to save another person from drowning.

f. Michelle Feliciano suffered severe, serious, and permanent emotional distress from watching her 7-year-old daughter, Lucy Lane Connor, be swept away by the torrent of water pouring into their apartment.

g.    Carrie Jazmin Brake suffered severe, serious, and permanent emotional distress from arriving at the scene and seeing her mother's dead body being retrieved from underneath a pile of debris.

h.    Kendra Skylar Brake suffered severe, serious, and permanent emotional distress from watching the tidal wave subsume her home, where she knew her mother was located, and then seeing that her mother did not make it out alive.

i.    Cameron Levester Guy suffered severe, serious, and permanent emotional distress from watching the tidal wave subsume his home, where he knew his mother was located, and seeing that his mother did not make it out alive.

j.    Quentin Isaiah Brake suffered severe, serious, and permanent emotional distress from learning of his mother's death and seeing that his mother did not make it out alive.

k.    Kayla Celene Brake suffered severe, serious, and permanent emotional distress from learning of her mother's death and seeing that her mother did not make it out alive.

l.    Joseph Prasnikar suffered severe, serious, and permanent emotional distress from watching his long-time companion, Hallie Gerber, be swept away by the torrent of water pouring into their home, and then seeing that she did not make it out alive.

m.    Kimberly Kee suffered severe, serious, and permanent emotional distress from watching her husband, Mark Scott Kee, get pulled under water and drowned to death.

n.    Tiffany Renae Bryant suffered severe, serious, and permanent emotional distress from attempting to reach her children, learning of her daughter Lilly-Anne Bryant's death, and seeing that her daughter did not make it out alive.

o.    Shane Keith Bryant suffered severe, serious, and permanent emotional distress from attempting to reach his children, learning of his daughter Lilly-Anne Bryant's death, and seeing that his daughter did not make it out alive.

p.    Henry Kersten suffered severe, serious, and permanent emotional distress from watching his wife, Leslie Meek Kersten, be swept away

**37**

by the torrent of water, causing a structure to strike the outbuilding she was in while he was on the phone with her.

q.  Thomas Lee Almond suffered severe, serious, and permanent emotional distress from watching the torrent of water knock his mother, Linda Bryant, away from the submerged house the two of them had been hanging onto, and then carry her underwater, causing her to drown to death.

r.  Brittney LeAnn McCord suffered severe, serious, and permanent emotional distress from having her 2-year-old son, Kellen Cole Burrow, ripped from her arms, taken under water, and drowned to death.

s.  K.M. suffered severe, serious, and permanent emotional distress from being physically present with her 2-year-old brother, Kellen Cole Burrow, as he was pulled under water and drowned to death.

t.  K.B. suffered severe, serious, and permanent emotional distress from being physically present with her 2-year-old brother, Kellen Cole Burrow, as he was pulled under water and drowned to death.

u.  Angela Lay Reeves suffered severe, serious, and permanent emotional distress from watching her husband, Joseph Anthony Reeves, be swept away by the violent and torrential current after holding the door open for Angela and their daughter, Joanna, to escape from the house—sacrificing his life so that his wife and daughter could survive.

v.  Joanna Reeves suffered severe, serious, and permanent emotional distress from watching her father, Joseph Anthony Reeves, be swept away by the violent current after holding the door open for Joanna and her mother, Angela, to escape from the house—sacrificing his life so that his wife and daughter could survive

w.  Kelsey Schultz suffered severe, serious, and permanent emotional distress from watching her son, Nathanal Dwayne Steward Whitsett, get pushed out of his room and carried out by the torrent of water prior to drowning to death.

x.  C.V. suffered severe, serious, and permanent emotional distress from watching his uncle, Nathanal Dwayne Steward Whitsett, get

**38**

pushed out of his room and carried out by the torrent of water prior to drowning to death.

101. Plaintiffs' emotional distress is serious and severe because a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of this case.

102. The severe emotional harm Plaintiffs sustained as alleged above is permanent and will continue to plague them throughout their lives.

103. As the direct and proximate result of the nuisance alleged above, the following individuals suffered emotional distress as follows:

   a.   Matthew Rigney suffered severe, serious, and permanent emotional distress from being stranded and submerged by water that rose up and over the gutter of his apartment before he was able to escape with his other children, M.R. and B.R.

   b.   Danielle Hall suffered severe, serious, and permanent emotional distress from being stranded in a tree for 6 hours, watching the death and destruction unfold while fearing for her life.

   c.   M.R. suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

   d.   B.R. suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

   e.   Tracy Kilburn suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

   f.   Michelle Feliciano suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

g.  Kayla Celene Brake suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

h.  Kendra Skylar Brake suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

i.  Cameron Levester Guy suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

j.  Quentin Isaiah Brake suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

k.  Joseph Prasnikar suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

l.  Kimberly Kee suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

m.  Henry Kersten suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for his life.

n.  Tiffany Renae Bryant suffered severe, serious, and permanent emotional distress from being stranded and trapped attempting to reach her children.

o.  Shane Keith Bryant suffered severe, serious, and permanent emotional distress from being stranded and trapped attempting to reach his children.

p.  Thomas Lee Almond suffered severe, serious, and permanent emotional distress from having to cling onto the side of his house for approximately half an hour before being washed away by the torrent of water, then slamming into another submerged house, and finally being stranded on a rooftop for four hours until he was rescued, all the while fearing for his life.

**40**

q.  Brittney LeAnn McCord suffered severe, serious, and permanent emotional distress from having to cling onto a porch rail for approximately 45 minutes before being washed down to a clothesline, where she was stranded again for approximately 45 minutes, all the while fearing for her life.

r.  W.S. suffered severe, serious, and permanent emotional distress from having to cling to a pole for safety after the violent torrent pushed him from his home, all the while fearing for his life.

s.  K.G. suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

t.  K.M. suffered severe, serious, and permanent emotional distress from having to cling onto a porch rail for approximately 45 minutes before being washed down to a clothesline, where she was stranded again for approximately 45 minutes, all the while fearing for her life.

u.  K.B. suffered severe, serious, and permanent emotional distress from having to cling onto a porch rail for approximately 45 minutes before being washed down to a clothesline, where she was stranded again for approximately 45 minutes, all the while fearing for her life.

v.  Angela Lay Reeves suffered severe, serious, and permanent emotional distress from being trapped underneath a submerged building for approximately 2 minutes before the current dislodged her and she was then stranded on top of a building for several hours, all the while fearing for her life.

w.  Joanna Reeves suffered severe, serious, and permanent emotional distress from having to climb on top of a semi-truck and then a gas station canopy where she was stranded for several hours, all the while fearing for her life.

x.  Susan Voegeli suffered severe, serious, and permanent emotional distress from being stranded and submerged, all the while fearing for her life.

y.  Kelsey Schultz suffered severe, serious, and permanent emotional distress from being stranded and submerged while being unable to swim, all the while fearing for her life.

**41**

z. C.V. suffered severe, serious, and permanent emotional distress from having to cling to a clothesline for safety after the violent torrent pushed him from his home, all the while fearing for his life.

104. Plaintiffs' emotional distress is serious and severe because a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of this case.

105. The severe emotional harm Plaintiffs sustained as alleged above is permanent and will continue to plague them throughout their lives.

106. As the direct and proximate result of the nuisance alleged above, the following individuals suffered the following injuries:

a. B.R. suffered a severe head injury resulting in a concussion. This injury is particularly severe given that brain injuries suffered at such a young age are likely to impact a child's development.

b. Kimberly Kee suffered severe physical injuries to her upper body and torso, including part of her breast being torn, having debris and water enter her body causing illness, and sustaining bruises from being battered by debris and other objects as she was submerged and thrown around by the torrent of water.

c. C.V. suffered severe physical injuries to his upper body and torso, including sustaining a large gash in his chest, having debris and water enter his body causing illness, and sustaining bruises from being battered by debris and other objects as he was submerged and thrown around by the torrent of water.

107. Plaintiffs B.R., Kimberly Kee, and C.V. seek all available damages for the injuries described above, including for: (i) physical pain and suffering; (ii) emotional pain and suffering; (iii) medical bills and expenses; (iv) loss of enjoyment of life; (v) loss of earnings; (vi) disfigurement; (vii) post-judgment interest; (viii) statutory and

discretionary costs; and (ix) all such further relief, both general and specific, to which they may be entitled.

108.    CSX is absolutely and strictly liable for the deaths and injuries caused by its nuisance.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs, as next-of-kin and in their individual capacities, request the following relief:

A.    That service of process issue and the Defendant be served and be required to answer within the time required by law;

B.    That judgment be entered against the Defendant for compensatory economic and non-economic damages in an amount not to exceed One Hundred Fifty Million Dollars ($150,000,000.00);

C.    That judgment be entered against the Defendant for punitive damages in an amount not to exceed Three Hundred Million Dollars ($300,000,000.00);

D.    That all costs be taxed to the Defendant;

E.    That pre-judgment and post-judgment interest be ordered;

F.    That the Plaintiffs be granted a trial by jury to try the facts of this cause as a matter of right; and

G.    That the Plaintiffs be granted and have such other and further relief to which the Plaintiffs may prove and be entitled.

Respectfully submitted,

s/Timothy V. Potter
**TIMOTHY V. POTTER**         **#017520**
**ANDREW E. MILLS**         **#031236**
Reynolds, Potter, Ragan & Vandivort, PLC
210 East College Street
Dickson, Tennessee  37055
615.446.2221
615.446.2232 Facsimile
tpotter@rprvlaw.com
amills@rprvlaw.com


*Pro Hac Vice:*
**PETER J. FLOWERS**      **IL BAR #06210847**
**JONATHAN P. MINCIELI**      **IL BAR #06274091**
**CHRISTOPHER J. WARMBOLD**    **IL BAR #06314299**
**THOMAS M. CONNELLY**      **IL BAR #06332570**
Meyers & Flowers, LLC
3 North Second Street – Suite 300
St. Charles, Illinois  60174
630.232.6333
630.845.8982 Facsimile
pjf@meyers-flowers.com
jpm@meyers-flowers.com
cjw@meyers-flowers.com
tmc@meyers-flowers.com

*Pro Hac Vice:*
**C. RICHARD NEWSOME**      **FL BAR #827258**
**WILLIAM C. OURAND**      **FL BAR #092503**
**MAEGEN PEEK LUKA**      **FL BAR #549851**
**P. ALEXANDER GILLEN**      **FL BAR #470724**
Newsome Melton, PA
201 South Orange Avenue – Suite 1500
Orlando, Florida  32801
407.648.5977
407.648.5282 Facsimile
newsome@newsomelaw.com
ourand@newsomelaw.com
luka@newsomelaw.com
gillen@newsomelaw.com

*Attorneys for Plaintiffs*

**44**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing *Second Amended Complaint* has been sent to:

| | | |
|---|---|---|
| S. Camille Reifers, Esq.<br>John J. Bennett, Esq.<br>Reifers, Holmes, & Peters, LLC<br>80 Monroe Avenue – Suite 410<br>Memphis, Tennessee 38103<br>901.521.2860<br>creifers@rhpfirm.com<br>jbennett@rhpfirm.com | #019856<br>#031976 | ☐ Via U.S. Mail<br>☐ Via Facsimile<br>☐ Via Email<br>☐ Via UPS Overnight<br>☐ Via Hand Delivery/Courier<br>☐ Via Service of Process<br>☒ Via CM/ECF, efile, or other<br>    electronic service format |

*Attorneys for Defendant CSX Transportation, Inc.*

, this _____ day of _____, 2024.


s/Timothy V. Potter
**TIMOTHY V. POTTER**