# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MATTHEW RIGNEY et al.,** | ) | **NO. 3:22-CV-00342** |
| **Plaintiffs,** | ) | **(consolidated)** |
| **v.** | ) | |
| **CSX TRANSPORTATION, INC.,** | ) | **JUDGE WAVERLY D. CRENSHAW, JR.** |
| **Defendant.** | ) | **MAGISTRATE JUDGE ALISTAIR NEWBERN** |

---

**DEFENDANT CSX TRANSPORTATION, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO RULE 41(b) AND RULE 37(c)**

---

Defendant, CSX Transportation, Inc. ("CSXT"), by and through its undersigned counsel, pursuant to Rule 41 and Rule 37 of the Federal Rules of Civil Procedure, submits its Memorandum in Support of its Motion to Dismiss Pursuant to Rule 41(b) and Rule 37(c). CSXT would respectfully show as follows:

### INTRODUCTION

In the course of recent discovery, CSXT has uncovered disturbing proof of egregious litigation misbehavior by its adversaries in this action, taking two forms.

*First*, it turns out that Plaintiffs received voluminous relevant materials core to this case from the Waverly Police Department ("Waverly PD") in 2022, before this suit was even filed. Yet despite discovery requests from CSXT years ago that should have resulted in the production of all these items, Plaintiffs produced only a tiny subset to CSXT. CSXT only confirmed this in late October of this year when deposing Waverly Police Chief Grant Gillespie, who confirmed under oath having produced to Plaintiffs *thousands of documents and videos* of the tragic flood that centers this lawsuit, including videos taken the

1

very morning of the tragic August 21, 2021 flood. This means, for instance, that in the months of discovery since aimed at investigating Plaintiffs' theory of failure to warn, CSXT did not have video and documentary evidence, available to Plaintiffs and responsive to CSXT's document requests, revealing that numerous warnings were given to Waverly residents on the morning of the flood, including door-to-door visits by Waverly PD and firefighters. All the while, Plaintiffs' counsel assured CSXT that they had produced everything relevant.

*Second*, CSXT only now learns that its litigation adversary has erased important time stamps from videos and cut an hour's worth of footage from at least one video. These time stamps are central to CSXT's defense. After all, time stamps reveal timing. And, in this case, they reveal that rising flood waters in Waverly preceded any breach of CSXT's railbed, thoroughly debunking Plaintiffs' theory of causation on the part of CSXT, which is necessary to all of Plaintiffs' claims.

The gross misconduct taints this entire litigation. From the complaint; to the amended complaint; to the depositions taken without this crucial video and documentary evidence to show witnesses; to the many discovery hearings before Magistrate Judge Newbern that should have been informed by the secreted materials; and beyond as discussed below, there can be no rewinding the clock, for there is no righting these wrongs within the confines of normal litigation. Nor are these antics within the bounds of responsible advocacy. The prejudice, to CSXT and to this Court's administration of justice, is incalculable. The proper recourse, respectfully, is dismissal.

## I. FACTS

The crux of this Motion arose after CSXT discovered that Plaintiffs—for years—unjustifiably withheld and materially altered substantial evidence tending to disprove the allegations made in Plaintiffs' Complaint and permitted CSXT to proceed with discovery, multiple depositions, and several discovery conferences without the benefit of that evidence. Such actions are incurable and evidence a willful

2

disregard for their disclosure and discovery obligations, the Rules of Professional Conduct, and the tenets of fair play and substantial justice. As will be shown in this Memorandum, the supporting Motion, and the exhibits hereto, dismissal is a warranted sanction for this inexcusable, contumacious conduct.

CSXT has provided exemplar samples of the willfully withheld and altered evidence, and a supporting Declaration that lays out the complete breadth of the documents wrongfully withheld. CSXT is pleased to make available the entire file of withheld materials if the Courts so advises. They being voluminous, and mindful of the Court's docket, CSXT seeks the Court's guidance on this before doing so. Further, some of the withheld materials are extremely sensitive and not for public consumption. In case the Court wishes to view any further evidence *in camera* or otherwise, CSXT has simultaneously filed a Motion for Oral Argument on the subject. **Exhibit 1**, *Declar*.

A. <u>Procedural Posture</u>

By August 19, 2022, Plaintiffs had filed two complaints against CSXT concerning the August 21, 2021, flood in Waverly, Tennessee. Compl., *Matthew Rigney, et al. v. CSX Transp. Inc., et al.*, No. 10474 (Tenn. Cir. Ct. filed Apr. 5, 2022); Compl., *Brittney McCord, et al. v. CSX Transp. Inc., et al.*, No. 10487 (Tenn. Cir. Ct. filed Aug. 19, 2022). Altogether, Plaintiffs demanded $450 Million in monetary relief. *Id.* ¶ 93; *Id.* ¶ 93.

On March 15, 2023, Plaintiffs filed their Amended Complaint, reiterating the allegations set forth in their earlier complaints. [ECF No. 65]. CSXT moved to dismiss the consolidated Amended Complaint on March 29, 2023. [ECF No. 66, 67]. Before any responsive records were provided to CSXT, the Parties attended an in-person mediation on April 11, 2023. There was no final resolution. The Court denied CSXT's Motion on March 3, 2024. [ECF No. 118; 119]. On October 30, 2023, the Court entered an order staying all depositions. [ECF No. 106]. On December 3, 2024, Plaintiffs filed their Second Amended Complaint, reiterating their original claims, and including additional claims for Strict Liability and

Nuisance. [*See* ECF No. 147 at ¶ 61(m)].

### B. <u>Pertinent Discovery History</u>

On February 18, 2022, before Plaintiffs commenced the subject lawsuit, Plaintiffs' counsel, Kirk Vandivort, emailed Waverly PD Chief Grant Gillespie, asking about a public records request with respect to the August 21, 2021 flood. **Exhibit 2**, *2022 K. Vandivort and Gillespie Emails*; **Exhibit 3**, *Pl.s' Pub. Rec. Req*. On March 7, 2022, Chief Gillespie responded to Vandivort stating,

> You should get a Dropbox link from me this morning. <u>It will contain 2 folders with video of the flood from surveillance cameras. One is the public housing cameras and the other is a storage facility on Simpson Ave</u>. . . . <u>I believe you will need the player in the folder containing the storage video to view that one</u> . . . .

**Exhibit 2**, at 2. (emphasis added). Chief Gillespie emailed Vandivort on March 11, 2022, noting that he added more files to the Dropbox previously sent to Plaintiffs' counsel. **Exhibit 2**, at 2.

Over a year later, on March 3, 2023, CSXT propounded its first set of written discovery upon all Plaintiffs. By May 12, 2023, all Plaintiffs had responded to these requests, both CSXT's Requests for Production and Interrogatories. *See* Collective **Exhibit 4**, *Pl.s' Req. for Prod. Resp.* In responding, Plaintiffs produced just four videos and only a small portion of the records long before received from the Waverly PD. Plaintiffs never supplemented these responses with the complete video set referenced by Chief Gillespie in his email correspondence with Plaintiffs' counsel, and never sent the required "player" referenced in the same email.

Regarding Request Nos. 1, 8, 10, 11, and 15, all Plaintiffs either directed CSXT to records apparently sourced from Plaintiffs' personal archive (e.g., tax returns, receipts, personal images, etc.), cross-referenced their responses to Requests No. 1, 3, 7, 8, or 9 (which further directed CSXT to Plaintiffs' "General Production" or records from Plaintiffs' personal archive), or stated that they *did not* possess such records. *See* **Exhibit 4**.

By this time, Plaintiffs' counsel were well aware that videos and photographs of the flood were

4

central evidence in this case. Indeed, on May 12, 2023, Plaintiffs' "General Production" even contained folders specifically labeled "Waverly PD Photos and Videos" and "Waverly PD Reports." **Exhibit 5**, *Pl.s' 2023 "Waverly PD Photos and Videos"*; See **Exhibit 6**, *Pl.s' "General Prod." File*. Reading these titles, CSXT understandably presumed them to be complete sets of what the titles plainly say: "Waverly PD Photos and Videos" and "Waverly PD Reports." Plaintiffs did not qualify these titles, nor did they reveal that the folders were far from complete productions.

For Request No. 2, all Plaintiffs referenced Plaintiffs' "General Production," and some Plaintiffs referenced images apparently sourced from their personal archive. The voluminous evidence provided to Plaintiffs by Chief Gillespie via Dropbox link would have been responsive to CSXT's Request for Production. Yet Plaintiffs' 2023 discovery production produced only a fraction of those materials. By way of example, Plaintiffs Susan Voegeli, Kelsey Schultz, C.V., minor child of Susan Voegeli, Debbie Newman, and Jeffery Newman identified witness Greg Vasil in their interrogatory responses. *See* **Exhibit 7**, *Pl.s' Interrog. Resp.*, at 6, 25, 46, 65, 86. In response to Interrogatory No. 3, Plaintiffs Debbie and Jeffery Newman listed Greg Vasil, but stated that "[a]side from Brad Weatherbee, none of the individuals identified below have made a written or recorded statement. . . ." **Exhibit 7**, at 26-27, 47-48. (emphasis added). This is wrong. We now know that Plaintiffs' counsel had received precisely such written statements from Chief Gillespie of the Waverly PD in response to their October 2023 subpoena. *Infra* **Exhibit 19**, at 64:8-24.

On June 23, 2023, CSXT submitted a public records request to the City of Waverly and the Waverly PD. **Exhibit 8**, *Def. 2023 Rec. Req.* On or around July 6, 2023, CSXT received 51 files from the Waverly PD. This production contained none of the videos and video players referenced in Chief Gillespie's March 2022 correspondence with Plaintiffs' counsel. *See* **Exhibit 9**, *Def. July 2023 Waverly PD File*.

On October 23, 2023, Plaintiffs issued subpoenas to the Waverly Department of Public Safety, as well as Humphreys County Fire Department, Humphreys County Sheriff's Office, Humphreys County Medical Examiner and Coroner, the Tennessee Department of Transportation, and the Tennessee Department of Environment and Conservation. *See* Collective **Exhibit 10**, *Pl.s' Oct. 2023 Subpoenas*. However, Plaintiffs did not supplement their discovery responses as to these subpoenas until at least February 14, 2025, when confronted by defense counsel.

On January 10 and 13, 2025, before any deposition was scheduled, CSXT issued its Second and Third Notices of Production, which included *all* documents that it received from various government agencies in response to its public records requests. **Exhibit 11**, *Def. Jan. 2025 Notices of Prod* .

## C. <u>Deposition History</u>

On January 30, 2025, Plaintiffs' counsel emailed CSXT's counsel inquiring about scheduling depositions for the first time since the Court lifted the stay on depositions, and proposed dates and times for third-party witnesses Jessica Mallard, Greg Vasil, Ronnie Toungette, and June Daily; Humphreys County 911 Director Bobby Brown, Humphreys County Sheriff Chris Davis, Humphreys County Emergency Management Agency Director Odell Poyner, and Chief Gillespie; Kimberly Kee, Donald Jackson, spouse of Brittney McCord (Kalaub McCord), sister of Michelle Feliciano (Delia Tuten), and Kevin Tuten. **Exhibit 12**, *Pl.s' and Def. Counsel Jan. and Feb. 2025 Email Corresp*, at 7-8.

The next day, CSXT's counsel responded to Plaintiffs' counsel, emphasizing the fact that Plaintiffs were attempting to schedule the first deposition in this matter with only three days' notice, including witnesses never disclosed in Plaintiffs' Initial Disclosures. **Exhibit 12**, at 6-7; *see* **Exhibit 13**, *Pl.'s Initial Discl.* With strict consideration for the Court's deadlines and unaware of the undisclosed witnesses,[1]

---

[1] Plaintiffs' Rule 26 Initial Disclosures were issued on February 21, 2023, and did not identify Jessica Mallard or Odell Poyner, nor did they identify June Daily with any sort of reasonable certainty. *See* **Exhibit 13**, ¶ 13(e). June Daily provided testimony that harms CSXT's case. (**Exhibit 17**, Daily Dep.,

6

CSXT's counsel obliged, rescheduling just one deposition and pressed forward with the others that were scheduled for February 10, 11, 17, 18, 19, 26, and 28, 2025. **Exhibit 12**, at 1-5.

CSXT issued another public records request the following Monday, February 10, 2025. **Exhibit 14**, *Def. Feb. 2025 Waverly PD Rec. Req.* On February 11, 2025, at 2:16 P.M., after completing the depositions of Sheriff Davis and Odell Poyner and during Greg Vasil's deposition, Chief Gillespie emailed CSXT's counsel in response to CSXT's public records request, stating,

> I am attaching your records request for your reference. <u>I have previously collected all of these records as part of our response to the subpoena [issued by Plaintiff] in the pending litigation involving CSX</u>. . . .

**Exhibit 15**, *Gillespie Feb. 2025 Corresp.*; **Exhibit 16,** *2025 Waverly PD File*. Recall that Mr. Vasil had given a written statement early on that *was in Plaintiffs' possession,* a statement not shared with CSXT, thus preventing CSXT from examining Mr. Vasil on his statement. Plaintiffs' counsel, by contrast, were free to shape their own examination of Mr. Vasil based on its content.

On February 13, 2025, CSXT's counsel emailed Plaintiffs' counsel the Dropbox link received from Chief Gillespie two days prior, indicating that there were over 2,000 files and numerous videos, including the WPD file, and noted that Plaintiffs had apparently received such records in response to their October 2023 subpoena months earlier—materials never produced in response to CSXT's discovery requests. **Exhibit 16**; **Exhibit 19**, *Gillespie Dep.*, 64:12-65:4 (Oct. 24, 2025.

The next day, CSXT's counsel expressed concerns about whether the Parties should proceed with any of the upcoming depositions and asked for Plaintiffs' counsel to confirm that "documents received by plaintiffs in response to the Waverly subpoena and in response to other subpoenas served by plaintiffs do

---

32:14-33:16, Mar. 21, 2025). Further, despite failing to identify Jessica Mallard between the time that Plaintiffs originally served their Initial Disclosures in February 2023 and February 4, 2025, it was later revealed that Jessica Mallard took many photos included in Plaintiffs' General Production produced in May 2023. (**Exhibit 18**, Jessica Mallard Dep., 19:16-80:3, Feb. 18, 2025) *See* **Exhibit 6**.

not have any relevance to the witnesses scheduled next week." **Exhibit 12**, at 11. Plaintiffs' counsel, shockingly, gave CSXT that assurance. In their own words: the only witnesses "for which some documents might be relevant is Bobby Brown . . . ." **Exhibit 12**, at 9-10. Thus, withheld evidence of the gravest importance to this action, relevant to the entire case, was represented to be relevant to only a single fact witness. Thereafter, on February 14, 2025, Plaintiffs finally produced 769 audio files from Humphreys County 911. **Exhibit 20**, *Pl.s' 911 Prod.*

On March 6, 2025, after nine depositions were taken, Plaintiffs provided CSXT with documents received from the Waverly Public Safety Department[2]. **Exhibit 21**, *Pl.s' Waverly Pub. Safety File.* The Public Safety file that Plaintiffs provided as again incomplete, as we know only now from the vast quantity of documents contained in the actual WPD file.[3] *Compare* **Exhibit 21** *with* **Exhibit 16.**

During Chief Gillespie's deposition on October 24, 2025, he confirmed that the records he provided to CSXT's counsel on February 10, 2025 were the same records that he provided to Plaintiffs in 2023. **Exhibit 19**, at 64:12-65:4.

Chief Gillespie further confirmed that "conversion" videos Plaintiffs had produced in response to CSXT's Request for Production did not include their timestamps. He explained that the timestamps were originally visible when using the video player that he provided to Plaintiffs years prior. **Exhibit 19**, at 64:12-65:4, 151:16-152:20. In fact, Chief Gillespie's March 2022 email to Plaintiffs' counsel, which was sent before Plaintiffs filed any complaint, indicated that a video player was required to review the videos that he shared. **Exhibit 2**; **Exhibit 19**, at 71:15-72:25. Chief Gillespie verified that he made no alterations

---

[2] As Chief of Police Grant Gillespie responded to said subpoena directed to Waverly Public Safety Department, specifically referenced the subpoena in his deposition, and gathered materials thereto, the named entity of the subpoena should not alleviate Plaintiffs' WPD file production from being purposefully misconstrued.

[3] Upon information and belief, and in addition to the Waverly PD subpoena, Plaintiffs issued six other subpoenas. Plaintiffs have now produced around 3,683 files with respect to the other six subpoenas.

8

to the videos that were shared to either party. **Exhibit 19**, at 69:16-71:17.

In total, the WPD file that Chief Gillespie provided to CSXT in February 2025 contained 2,427 files, which included around 260 emails with numerous attachments and roughly 75 hours of video footage. Upon CSXT's review, it is apparent that this file contains many records harmful and perhaps fatal to Plaintiffs' case. And that Plaintiffs or their counsel altered the "conversion" videos originally sent to CSXT in April 2023 by removing timestamps from four videos that were allegedly produced in "native format," and cutting the duration of at least one video *by an hour*. *Compare* **Exhibit 22,** *W. Brookside Videos* with **Exhibit 23***, Pl.s' "Conversion" Videos*.

## II. STANDARD OF REVIEW

The actions of Plaintiffs and Plaintiffs' counsel warrant the sanction of dismissal with prejudice. "The use of dismissal as a sanction for failing to comply with discovery has been upheld because it accomplishes the dual purpose of punishing the offending party and deterring similar litigants from misconduct in the future." *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997) (*citing National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, (1976)). The sanction of dismissal may be appropriate in cases of extreme misconduct involving fraud, contempt, or willful bad faith. *Nolt v. Knowles*, 2022 U.S. Dist. LEXIS 255794, 2022 LX 72681, at \*4 (M.D. Tenn. Dec. 5, 2022); *see also* 5A Charles Alan Wright & Authur R. Miller, *Federal Practice and Procedure* § 1336.3 (4th ed. Updated Aug. 19, 2022).

This Court's authority to sanction Plaintiffs and their counsel for their misconduct by dismissing this lawsuit with prejudice derives from the Federal Rules of Civil Procedure and the Court's inherent power. "The Federal Rules of Civil Procedure grant district courts the authority to impose sanctions for discovery violations and failure to comply with court orders." *See* Fed. R. Civ. P. 37(c)(1); 41(b); *see also ECIMOS, LLC v. Nortek Global HVAC, LLC*, 736 Fed. Appx. 577, 582, 2018 U.S. App. LEXIS 14940, at

9

*12-13 (6th Cir. 2018). Courts also possess inherent power to tailor sanctions when bad faith occurs. *ECIMOS* at 582; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991); *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002).

Rule 41(b) provides for the involuntary dismissal of a complaint where the plaintiff violates the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 41(b); *Johnson v. Kirwan*, 2025 U.S. Dist. LEXIS 179351, 2025 WL 2639887, at *2 (W.D. Tenn. Aug. 15, 2025). A dismissal under Rule 41(b) operates as an adjudication on the merits. Fed. R. Civ. P. 41(b); *Craddock v. FedEx Corp. Servs.*, 102 F.4th 832, 839 (6th Cir. 2024).

Rule 37(c)(1) states that in the event of noncompliance with Rule 26(a) or (e), a court may, in addition to precluding the offending party's use of the non-disclosed information at trial, "impose other appropriate sanctions" such as "payment of reasonable expenses, including attorney's fees, caused by the failure" and "any of the actions authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule. . . ." Fed. R. Civ. P. 37(c)(1). Subparagraph (C) of Rule 37(b)(2) explicitly allows for dismissal of the complaint. Fed. R. Civ. P. 37(b)(2)(A)(v); *see also Norris v. MK Holdings, Inc.*, 734 Fed. Appx. 950, 955 (6th Cir. 2018).

Rule 37(c)(1) requires absolute compliance with Rule 26 as it "*mandates* that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts v. Galen of Va, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (emphasis added); *see also Vance by & through Hammons v. United States*, 1999 U.S. App. LEXIS 14943, at *8-9 (6th Cir. 1999); *Ames v. Dyne*, 1996 U.S. App. LEXIS 29700, at *12-13 (6th Cir. 1996) ("Rule 37 is written in mandatory terms and is designed to provide a strong inducement for disclosure of Rule 26(a) material.").

The *Vance* court, citing the First Circuit case of *Klonoski v. Mahlab* as "[perhaps] the best description of this rule and its policy justifications," endorsed the First Circuit's position that Rule 37(c)(1)

"clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule." *Vance* at *10; *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998). The *Vance* court continued:

> The most severe sanctions provided by the rules . . . "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* at 643, 96 S. Ct. 2778. While a warning alone might have made the plaintiffs in that case comply with all future discovery orders, "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts."Thus, enforcement of discovery rules and orders is necessary, the Court concluded, to prevent abuse by future litigants.

*Vance* at *10-11; *Klonoski*, 156 F.3d at 269 (citing *National Hockey League.*, 427 U.S. at 643).

In *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), the United States Supreme Court empowered district courts to sanction misconduct under those courts' inherent authority even—and especially—when the conduct at issue is not precisely covered by other sanctioning provisions under applicable statutes or the Federal Rules of Civil Procedure. *Chambers*, 501 U.S. at 50. Neither, however, are district courts forbidden to sanction bad faith conduct by their inherent power simply because that conduct could also be sanctioned under the Federal Rules. *Id*.

The Sixth Circuit has read *Chambers* "broadly to permit the district court to resort to its inherent authority to sanction bad faith conduct, even if the court has not expressly considered whether such conduct could be sanctioned under all potentially applicable rules or statutes." *In re Ame Church Emp. Ret. Fund Litig.*, 2025 U.S. Dist. LEXIS 169640, 2025 LX 364855, at *29-30 (6th Cir. 2025); *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (citing *Chambers*, 501 U.S. at 45-46). "A district court has substantial discretion in the management of its docket, [and] *this discretion includes the inherent power to dismiss a case for plaintiff's failure to comply with the Federal Rules* or to obey a court order." *Black v. Columbus Pub. Schs*, 2012 U.S. App. LEXIS 27486, at *2 (6th Cir.2012) (emphasis added); *see also Knoll v. AT&T*, 176 F.3d 359, 362-63 (6th Cir. 1999). The exercise of inherent authority is particularly appropriate for impermissible conduct that adversely impacts the entire litigation. *First Bank*, 307 F.3d at

11

516.

The factors considered by Sixth Circuit courts when contemplating dismissal as a sanction under Rule 41(b), Rule 37(c)(1), or a court's inherent power, are largely the same. *Coleman v. American Red Cross*, 23 F.3d 1091, 1094 n.1 (6th Cir. 1994); *see also* Fed. R. Civ. P. 37(c)(1)(C) (incorporating by reference the sanctions allowed under Rule 37(b)(2)(A)(i)-(vi) for violations of Rule 26(a) or (e)). In assessing a district court's decision to dismiss a complaint, Sixth Circuit courts consider four factors as explained in *Regional Refuse Systems, Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 155 (6th Cir. 1988):

> (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*See U.S. v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002) (*Regional Refuse* four factor test used in consideration of a district court's dismissal under either Rule 37(b)(2) or Rule 41(b)); *Edwards v. City of Grand Junction*, 1999 U.S. App. LEXIS 7622, at *6 (6th Cir. 1999) (four factor test to consider when dismissing a lawsuit for failure to cooperate in discovery under Rule 37(c)(1); *Farrar v. Lapan*, 2023 U.S. App. LEXIS 10458, at *3, 2023 WL 3151093 (6th Cir. 2023) (adopting four factor test in consideration of dismissals under a court's inherent power).

"Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct." *Reyes*, 307 F.3d at 458. A party seeking to avoid this sanction "has the burden of showing that his failure to comply was due to inability, not willfulness or bad faith." *Black*, 2012 U.S. App. LEXIS at *3 (*citing Reyes*, 307 F.3d at 458). As established hereafter, application of the *Regional Refuse* four factor test to the conduct of Plaintiffs and Plaintiffs' counsel shows that dismissal with prejudice is the only appropriate sanction here.

### III.    ARGUMENT

**1. Plaintiffs and Plaintiffs' counsel have engaged in willful, bad faith misconduct in their handling**

12

**of evidence, including potentially exculpatory material.**

Evidence of willful misconduct and bad faith is manifest with respect to the acts and omissions of Plaintiffs and their attorneys described above. To show that a party's conduct was motivated by bad faith, willfulness, or fault, the conduct "must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [the party's] conduct on those proceedings." *Mager v. Wis. Cent., Ltd.*, 924 F.3d 831, 838 (6th Cir. 2019) (quoting *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)). Such misconduct justifies dismissal as the first and only sanction because it is "inconsistent with the intent of procedural, ethical, and substantive rules of the Court." *Nolt v. Knowles*, 2022 U.S. Dist. LEXIS 255794, 2022 LX 72681, at *3 (M.D. Tenn. Dec. 5, 2022) (*quoting Metron Nutraceuticals, LLC v. Cook*, 550 F. Supp. 3d 484, 486-87 (N.D. Ohio 2021).

*Years* before a single deposition was taken in this case, Plaintiffs' counsel received the WPD file, containing: (A) 40 emails related to witness Odell Poyner; (B) around 75 hours of video footage from West and East Brookside, where many Plaintiffs of their decedents lived, comprising of 15 West Brookside videos with timestamps and the required video player, and depicting the flood conditions throughout the morning of August 21, 2021; 15 East Brookside videos with timestamps and a video player, depicting a firefighter knocking on residents' doors before it was apparent that the flood waters had covered streets throughout the neighborhood; three-and-a-half hours of Waverly PD body camera footage with timestamps, and among other things, depicting a Waverly PD Officer knocking on residents' doors on the morning of August 21, 2021 near or around where some Plaintiffs resided; Kent's Grocery Store footage with timestamps and a video player, depicting the flood conditions near where some Plaintiffs resided; and around 32 minutes of Humphreys County drone footage from August 21, 2021; (C) recorded statements about the August 21, 2021 flood; (D) a report created by the United States Army Corp of Engineers, directed to the City of Waverly, Humphreys County, and the Humphreys County EMA and

13

discussing the flood plain around Trace Creek and the rain fall on August 21, 2021; (E) various Flood Situational Reports, some of which were included in Odell Poyner's email correspondence; (F) National Oceanic and Atmospheric Association ("NOAA") PowerPoints stating that the August 21, 2021, storm and flood could not have been predicted; (G) map books, tables, and studies conducted or created after flood; (H) Humphreys County Local Emergency Response ("LEPC") related documents, which were discussed during Sheriff Davis's deposition; (I) flood warnings that Chief Gillespie received throughout the morning of August 21, 2021 from Humphreys County; and (J) 2019 flood-related documents, including Computer-Aided Dispatch incident reports that documented relevant timestamps, addresses, and the names of individuals who required rescue. *See* **Exhibit 16**; *See e.g.,* **Exhibit 22**; **Exhibit 24**, *Kent's Grocery Videos*; **Exhibit 25**, *Officer Triplett Body Cam*, **Exhibit 26**, *E. Brookside* Video; **Exhibit 27**, *USACE PowerPoint*; **Exhibit 28**, *NOAA PowerPoint*; **Exhibit 29**, *Gillespie NIXLES*; *See Generally* **Exhibit 19**, at 64:25-72:25, 80:14-85:14, 91:8-102:6, 111:10-120:25, 131:5-133:12; 151:16-152:20. No one would reasonably deny the relevance of these materials to this action.

But by the time that CSXT finally received the robust WPD file—a file that according to the sworn testimony of Chief Gillespie Plaintiffs had possessed *for years*—the Parties had already deposed three witnesses: Sheriff Davis, who Plaintiffs quoted in their original and amended complaints; Odell Poyner, a significant actor with respect to emergency response on August 21, 2021; and Greg Vasil, a family friend of Susan Voegeli and the individual who attempted to help Decedent Amber Newman, and who had made a recorded statement which was not disclosed to CSXT. *See e.g.* ECF No. 147 at ¶ 29. In that long interval of withholding, the parties had also engaged in multiple discovery meet-and-confer sessions, and multiple discovery and scheduling hearings before Magistrate Judge Newburn, with only one side (Plaintiffs) aware of the vast, undisclosed material.

An egregious example of the subject misconduct concerns the intentional alteration of the few

14

videos produced to CSXT in April 2023, including the removal of critical time stamps from the four videos Plaintiffs produced, and in at least one instance, cutting the duration of produced video ***by approximately an hour***. **Exhibit 23**. Plaintiffs compounded their misconduct by claiming to have produced those videos in their "native format," to conceal the material alterations made thereto. *Compare* **Exhibit 22** with **Exhibit 23**. Plaintiffs' selective editing of the videos in question was confirmed by Chief Gillespie, who testified that he had made no alterations to the video evidence he sent to Plaintiffs' counsel in response to their public records request or subpoena. *See generally* **Exhibit 19** at 67:2-71:17. Chief Gillespie further confirmed that the videos at issue were not produced in their "native format" as represented by Plaintiffs' counsel because in their *actual* native format, a particular video player was required to view them (a fact shared by Chief Gillespie in an email to Plaintiffs' counsel). **Exhibit 19**, at 72:14-25; *See* **Exhibit 2**.

The significance of removal of the timestamps in the videos produced by Plaintiffs cannot be overstated. A critical element of Plaintiffs' claims is the allegation that the washout of CSXT's railbed was the cause of the purported "tidal wave" described in Plaintiffs' original and amended Complaints. [*See* ECF. No. 65, ¶ 1-3, 26]. If the washout occurred chronologically after the events shown in the produced videos—which would be readily apparent had the videos' timestamps not been removed—it would be impossible for any action or inaction by CSXT to have caused the subject incident *See* **Exhibit 19**, at 75:21-76:8.

Plaintiffs' and their counsel's deceptive conduct was not limited to covert alterations of the produced videos and their knowing failure to disclose, produce, or supplement their production. Following issuance of a subpoena to the Waverly PD, the files Plaintiffs produced to CSXT were sent in a folder titled, "Sbp Waverly Public Safety," which deceptively (and wrongly) implied that the folder contained *all* of the materials received from the Waverly PD under the relevant subpoena. In fact, the "Sbp Waverly Public Safety" folder Plaintiffs produced contained only 13 PDFs and 14 emails about the 2019 flood, as

15

well as a single case file for one 2021 decedent, Mary Luten. **Exhibit 21**. In comparison, the Waverly PD records that Chief Gillespie provided directly to CSXT contained about 2,427 files, which included around 260 emails with many attachments and roughly 75 hours of video footage. *Compare* **Exhibit 16** *with* **Exhibit 21**. Plaintiffs never made any effort to enlighten Defendants that the "Sbp Waverly Public Safety" file was woefully and deliberately incomplete.

Furthermore, after defense counsel's discovered the multitude of materials that Plaintiffs failed to produce, CSXT's counsel sought assurances from Plaintiffs' counsel that the "documents received by Plaintiffs in response to the Waverly subpoena and in response to other subpoenas served by plaintiffs [did] not have any relevance to the witnesses scheduled [for depositions the following week]. **Exhibit 12**, at 9-11. In response, Plaintiffs' counsel grossly misrepresented the significance of the unproduced materials, stating that the only witness "for which some documents might be relevant is Bobby Brown," the Humphreys County 911 Director. *Id.* at 9-10.  In reality, dozens of documents included in the materials sent years earlier by Chief Gillespie to Plaintiffs' counsel were relevant to the depositions of at least three witnesses who were deposed before Plaintiffs' eventual supplementation.

The nature of the evidence willfully withheld by Plaintiffs betrays the bad faith nature of their misconduct. Among the hundreds of relevant, responsive materials that were knowingly withheld by Plaintiffs were other documents and videos that directly contradict other of Plaintiffs' claims. Most significantly, Plaintiffs allege in Paragraph 61(m) of their Amended Complaint that:

> On August 21, 2021, ***the only way*** the residents of Waverly could have protected themselves and their families from the deadly and destructive tidal wave which swept through the city ***is if they had been provided a warning in advance to evacuate*** due to the dangerous unnatural buildup of water behind the Railbed Dam.

[ECF No. 65, ¶ 61(m) (emphasis added)]. Yet we now know such warnings were given "in advance." Videos withheld by Plaintiffs, and corroborated by the testimony of both Chief Gillespie and Plaintiff Michelle Feliciano, reveal that Waverly officials were, in fact, warning residents in Waverly (specifically

16

including those who resided in the East and West Brookside communities) of the need to evacuate before any personal injuries occurred. *See generally* **Exhibit 19** at 65:14-88:14; **Exhibit 25**; **Exhibit 26**, at 08:38:00.

Other responsive materials withheld by Plaintiffs and their counsel included evidence that Humphreys County provided warnings to anyone signed up for the NIXLE emergency alert system, including Chief Gillespie, at least as early as 3:30 AM on August 21, 2021, and a PowerPoint presentation from NOAA stating that the August 21, 2021 storm and resulting flood ***could not have been predicted***. **Exhibit 19** at 90:25-102:17; **Exhibit 28**; **Exhibit 29**. While not dispositive, evidence from the preeminent federal authority on weather and atmospheric events is particularly strong evidence that the extraordinary weather event at issue was not foreseeable, which goes to the heart of questions of CSXT's duty to Plaintiffs.

In *First Bank v. Hartford Underwriters Ins. Co.*, the Sixth Circuit affirmed the district court's finding that the plaintiff had acted in bad faith when it withheld evidence and violated several discovery orders, reflecting a pattern of deception. *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 524-25 (6th Cir. 2002); *see also Mitan v. Int'l Fid. Ins. Co.*, 23 Fed. Appx. 292, 294-95 (6th Cir. 2001) (in which the plaintiff withheld required documents on the issue of the district court's jurisdiction thereby extending the proceeding). Parallels between the misconduct at issue here and both *First Bank* and *Mitan* are obvious, but the misconduct set forth above is significantly more consequential than either of these cases based on the breadth and duration of such misconduct.

**2.      The record evinces Plaintiffs' and their attorneys' contumacious conduct.**

Sixth Circuit courts have found "bad faith, willfulness, or fault when the record clearly evinces a party's 'delay or contumacious conduct.'" *Saulsberry v. Holloway*, 622 Fed. Appx. 542, 545 (6th Cir. 2015) (identifying "failing to participate in discovery" as one example of contumacious conduct); *see also*

*Moore v. Erickson*, 2023 U.S. App. LEXIS 26639, at *10, 2023 WL 9023353 (6th Cir. 2023) ("Moore's willful and bad faith failure to fulfill one of the most basic duties of a plaintiff—to appear for his own deposition—is the type of 'contumacious conduct' that warrants [dismissal]"). "Contumacious conduct refers to behavior that is 'perverse in resisting authority and stubbornly disobedient." *Carpenter v. City of Flint*, 723 F.3d 700, 704-05 (6th Cir. 2013).

Here, Plaintiffs and their attorneys have stubbornly and repeatedly disobeyed the applicable Federal Rules of Civil Procedure for discovery, compounded in severity by the breadth and duration of the misconduct at issue. Rule 26(e) provides that incomplete discovery responses are to be timely supplemented. But Plaintiffs did not supplement with crucial—and exculpatory—information until after the depositions described *supra*. And this violation was knowing, as evidenced by the alteration of video evidence as described *supra*.

As for Plaintiffs' counsel specifically—all of whom are either admitted *pro hac vice* or are duty bound to act as responsible local counsel—their resistance to this Court's authority and the Tennessee Supreme Court, as well as their stubborn disobedience of the Court's Local Rules and the Rules of Professional Conduct, constitute conduct contumacious to a degree not only warranting but demanding dismissal. The Sixth Circuit in *First Bank v. Hartford Underwriters Inc. Co.* cited favorably an Eighth Circuit decision authorizing the use of inherent powers sanction, without a showing of bad faith, for ethical rule violations by attorneys. *Hartford* at 520; *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir. 1993). Here, Plaintiffs' counsel's repeated and protracted violations of the Tennessee Rules of Professional Conduct demonstrate their reckless disregard for their ethical obligations, undermining the integrity of these proceedings and justifying dismissal.

"The practice of law in Tennessee is a privilege and comes with 'the duty… to act at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as

18

conditions for the privilege to practice law.'" *Tri-Cities Holdings, LLC v. Tenn. Health Servs. & Dev. Agency*, 2016 Tenn. App. LEXIS 135, 2016 WL 721067, at *18 (Tenn. Ct. App. Feb 22, 2016) (citing Tenn. Sup. Ct. R. 19, §1). Tenn. Sup. Ct. R. 19 governs the admission of attorneys licensed in other states into the practice of law in Tennessee and states, *inter alia*, that a state court may deny a lawyer's motion to appear *pro hac vice* only where "the applicant's conduct as a lawyer, including conduct in proceedings in Tennessee in which the applicant has appeared pro hac vice… raises reasonable doubt that the lawyer will comply with the Tennessee Rules of Professional Conduct and other rules and laws governing the conduct of lawyers." Tenn. Sup. Ct. R. 19(b)(1).

Under Tenn. Sup. Ct. R. 19(c), once admitted, a lawyer appearing *pro hac vice* has a continuing duty to meet all requirements of Rule 19, and in failing to do so, "[admission] granted under this [Rule 19] may be revoked by the court or agency granting such admission… upon an affirmative finding by the court or agency that the lawyer has ceased to satisfy the requirements of this Rule." Tenn. Sup. Ct. R. 19(c). Among such requirements is an obligation of an attorney admitted pro hac vice to follow the Tennessee Rules of Professional conduct. Tenn. Sup. Ct. R. 19(d). *Dunlap v. Bd. of Prof'l Resp. of the Supreme Court of Tenn.*, 595 S.W.3d 593, 601 (Tenn. 2020).

Relevant here, a recent Tennessee decision conclusively established that "omitting key information highly relevant to the issues" before a court violated the Tennessee Rules of Professional Conduct. In *Harris v. Bd. of Prof'l Responsibility of the Supreme Court of Tenn.*, 645 S.W.3d 125 (Tenn. 2022), the Supreme Court affirmed the lower court's holding that a lawyer's failure to disclose a substantial "distribution" from his firm in a child support proceeding when asked to testify about a "draw" violated Tenn. R. Prof. Cond. 8.4(c). Citing the Fourth Circuit, the *Harris* court opined, "As officers of the court, lawyers 'have the first line task of assuring the integrity of the process… The system can provide no harbor for clever devices to divert the search, *mislead opposing counsel or the court*, or cover up that which is

19

necessary for justice in the end." *Harris*, 645 S.W.3d at 138-39; *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-8 (4th Cir. 1993) (emphasis added). It continued: " A lawyer's general duty of candor to the courts includes not only the duty to refrain from knowing misrepresentations but also a positive duty to disclose to the court all material facts." *Harris* at 139 (internal citations omitted).

In accordance with the above, the misconduct perpetrated by Plaintiffs' counsel violated their duty of candor toward the court under Rule 3.3[4], as well as their obligation to treat the opposing party and counsel fairly under Rule 3.4[5]. Additionally, like the lawyer in *Harris*, their pattern of deception constitutes professional misconduct under Rule 8.4(c), which prohibits attorneys from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

The willful disregard of the Rules of Professional Conduct in the discovery process, in addition to the actions themselves, is ample evidence for the Court to find the contumacious conduct necessary to sustain this Motion.

**3.      There is substantial prejudice to CSXT by Plaintiffs' actions.**

Plaintiffs' and Plaintiffs' counsel's insidious misconduct has so pervaded this litigation that CSXT's ability to fairly defend itself has been critically subverted. By withholding thousands of relevant, responsive documents and videos *for years* and engaging in a pattern of deception to conceal the existence of some or all of that evidence while CSXT unknowingly proceeded with depositions, Plaintiffs prejudiced CSXT by preventing it from obtaining evidence essential to the preparation of its defense.

Plaintiffs' failure to disclose relevant witnesses, documents, and videos; failure to supplement their

---

[4] Tenn. R. Prof. Cond. 3.3, Comment [3] states that "[there] are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation, while Comment [13] details a lawyer's obligation to withdraw or disaffirm documentary or tangible evidence the lawyer knows has been altered or falsified.
[5] Tenn. R. Prof. Cond. 3.4 states "A lawyer shall not... unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value."

responses to CSXT's interrogatories and requests for production; and incomplete or incorrect responses to said interrogatories and requests severely prejudiced CSXT's ability to fairly conduct discovery and to defend itself. To wit, despite having most or all of the withheld documents and videos in their possession since March 2022, Plaintiffs made *no* supplementation of the responsive materials in their possession until CSXT's counsel—who only fortunately discovered the existence of those materials independently of Plaintiffs—confronted them. Plaintiffs' and their counsel's actions in withholding numerous relevant documents further prejudiced CSXT's ability to fairly prepare for and depose critical witnesses as described above and to provide all available factual evidence to its experts. By March 6, 2025, *after CSXT had taken nine depositions*, Plaintiffs finally provided CSXT with documents they received from several subpoenas, which ultimately contained numerous documents relevant to the foregoing witnesses.

CSXT's ability to fairly conduct discovery going forward is imperiled as well. Discovery in this suit closes on November 20, 2025. Having only confirmed Plaintiffs' misconduct on October 24, 2025 via the deposition of Chief Grant Gillespie, CSXT has no time to re-take depositions, re-issue discovery requests, track down leads, or otherwise fairly conduct discovery. More broadly, Plaintiffs' and their counsel's misconduct has unnecessarily delayed the progression of this lawsuit and unreasonably increased the cost for CSXT to defend itself. Furthermore, this misconduct has irreparably undermined the integrity of these proceedings, as CSXT has no confidence in Plaintiffs' discovery responses, production, or representations made by Plaintiffs' counsel. Certainly, allowing such conduct to pass unscathed will undermine the integrity of future proceedings, as well. Therefore, the only appropriate sanction is dismissal with prejudice.

**3.      Given the conduct, no prior warning regarding dismissal is necessary.**

The third prong of the four factor *Regional Refuse* test concerns whether the dismissed party was warned that failure to cooperate could lead to dismissal. *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th

Cir. 2013) (quotation omitted). But, as explained in *Fharmacy Records v. Nassar*, "prior warning is not indispensable." *Fharmacy Records v. Nassar*, 379 Fed. Appx. 522, 524 (6th Cir. 2010)(internal citations omitted); *see also Universal Health Group v. Allstate Ins. Co.*, 703 F.3d 953 (6th Cir. 2013).

Moreover, courts in the Sixth Circuit have taken a broad view of what constitutes a "prior warning." In *U.S. v. Reyes*, the court found that the very motion seeking dismissal "provided some notice." *U.S. v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002). In, *Farrar v. Lapan*, the Sixth Circuit found that "no explicit warning of dismissal" was necessary where the misconduct at issue was prohibited by the relevant rules of professional conduct and the Federal Rules of Civil Procedure. *Farrar v. Lapan*, 2023 U.S. Dist. LEXIS 10458, 2023 WL 3151093, at *5 (6th Cir. 2023). Indeed, the *Farrar* court found that "plaintiffs and their counsel were on notice that faking evidence and lying under oath leads to sanctions. The Federal Rules of Civil Procedure and Michigan's Rules of Professional Conduct make that clear." *Farrar*, 2023 U.S. Dist. LEXIS 10458 at *5.

Finally, in *Harris v. Callwood*, the Sixth Circuit, after reviewing a number of earlier decisions, concluded that "from these cases we extract the principle that in the absence of notice that dismissal is contemplated, a district court should impose a penalty short of dismissal *unless the derelict party has engaged in 'bad faith or contumacious conduct*.'" *Harris v. Callwood*, 844 F.2d 1254, 1256 (6th Cir. 1988) (emphasis added). CSXT respectfully avers that in light of the bad faith and contumacious conduct here, an explicit prior warning from this Court was not necessary to justify dismissal with prejudice as the first and only sanction.

**4. Dismissal with prejudice as a sanction is appropriate, as a less drastic sanction would be inadequate.**

"Because failures to produce relevant evidence fall along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality—the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Trimboli v. Maxim Crane Works, L.P.*,

22

2020 U.S. Dist. LEXIS 113798, at *13, 2020 WL 3546810 (M.D. Tenn. June 30, 2020) (*citing Adkins v. Wolever*, 554 F.3d 650, 652-53 (6th Cir. 2009). Sanctions serve "both fairness and punitive functions" and may be as severe as the court's outright "granting summary judgment" to the wronged party. *Id*. As set forth herein, there exists here a "clear record of delay or contumacious conduct" *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997), including substantial evidence of misconduct, as well as instances of calculated deception, unnecessary delay, and intentional manipulation of evidence for self-serving purposes.

Due to the breadth and duration of the conduct here, no adverse instruction would be adequate to account for every piece of evidence withheld by Plaintiffs, nor would prolonging the discovery period do much more than cause CSXT to incur additional expenditures of time, cost, and frustration. Pecuniary sanctions, as well, are too meager to account for the prolonged campaign of deception and abuse of these proceedings. As such, the full exercise of this Court's authority under the Federal Rules of Civil Procedure and its inherent power will command Plaintiffs' respect for the judicial process, or as for Plaintiffs' counsel, secure their commitment to maintaining the integrity of the practice of law in Tennessee. Indeed, no lesser sanction would reflect the seriousness of the conduct here.

Most significantly, any lesser sanction would not achieve the requisite deterrent effect. This matter is particularly suited for dismissal, not only because Plaintiffs and their attorneys' misconduct supports a finding of flagrant bad faith, but also because of the high-profile nature of this suit and the attention it has garnered. "The most severe in the spectrum of sanctions [dismissal]… must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). A mild sanction here could encourage future parties to manipulate or withhold the discovery of relevant evidence in order

23

to inflate their claims and "see what they could get away with." *Farrar v. Lapan*, 2023 U.S. App. LEXIS 10458, at *6 (6th Cir. 2023).

As to the argument that punishment for the sins of the lawyer should not be visited upon the client, there is "no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link*, 370 U.S. at 633-34. "[A]ny other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent." *Id*. at 634. Indeed, "[e]very violation of the Rules has consequences; the question is who will bear them." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 277-78 (6th Cir. 2010).

The flagrant bad faith and willful misconduct of Plaintiffs and Plaintiffs' counsel not only warrant but demand dismissal of this action. Any lesser sanction would be wholly inadequate.

Date: November 20, 2025

Respectfully submitted,

*/s/ S. Camille Reifers*
S. Camille Reifers (BPR #19856)
John J. Bennett (BPR#31976)
REIFERS HOLMES & PETERS, LLC
80 Monroe Avenue, Suite 410
Memphis, TN 38103
(901) 521-2860
creifers@rhpfirm.com
jbennett@rhpfirm.com

***Attorneys for CSX Transportation, Inc.***

24

## CERTIFICATE OF SERVICE

I certify that on November 20, 2025, the foregoing document has been served via the

Court's CM/ECF system to the following Counsel of Record:

Timothy V. Potter
Andrew E. Mills
Mary Lane Story
Kirk Vandivort
Jennifer Foster
Reynolds, Potter, Ragan & Vandivort, PLC
210 East College Street
Dickson, Tennessee 37055
615.446.2221
615.446.2232 Facsimile
tpotter@rprvlaw.com
amills@rprvlaw.com
mstory@rprvlaw.com
kvandivort@rprvlaw.com
jfoster@rprvlaw.com


Peter J. Flowers
Frank V. Cesarone
Jonathan P. Mincieli
Christopher Warmbold
Tom Connelly
Meyers & Flowers, LLC
3 North Second Street – Suite 300
St. Charles, Illinois 60174 630.232.6333
630.845.8982 Facsimile
 pjf@meyers-flowers.com
fvc@meyers-flowers.com
jpm@meyers-flowers.com
cjw@meyers-flowers.com
tmc@meyers-flowers.com

*Attorneys for Plaintiff*

/s/ *S. Camille Reifers*
S. Camille Reifers

25