# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MATTHEW RIGNEY et al.,

Plaintiffs,

v.

CSX TRANSPORTATION, INC.,

Defendant.

No. 3:22-cv-00342 (consolidated)

JUDGE WAVERLY D. CRENSHAW, JR.

MAGISTRATE JUDGE LUKE A. EVANS

## DEFENDANT CSX TRANSPORTATIONS, INC.'S MEMORANDUM IN SUPPORT OF ITS' MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF PLAINTIFFS TRACY KILBURN, PEGGY BETTY & MICHELLE FELICIANO

COMES NOW, Defendant CSX Transportation, Inc. (hereinafter "CSXT"), and files this, its Memorandum in Support of its Motion for Summary Judgment as to the Claims of Tracy Kilburn, Peggy Betty, and Michelle Feliciano. In support of same, CSXT states:

### I.    FACTUAL BACKGROUND

CSXT has contemporaneously filed its Omnibus Motion for Summary Judgment demonstrating the absence of competent evidence sufficient to sustain the claims brought by all remaining plaintiffs in this matter. As set forth in Section I and II of its Omnibus motion, this lawsuit arises from the catastrophic flood of August 21, 2021, that took place in Waverly, Tennessee. CSXT submits the instant motion to separately address the claims brought by Plaintiffs Tracy Kilburn, Peggy Betty and Michelle Feliciano.[1] While the circumstances surrounding the

---

[1] Because the claims of all three plaintiffs are borne out of the same flood scenario, CSXT hereby incorporates by reference Sections I and II of its Omnibus Motion for Summary Judgment which describe the scope of the flood in detail.

1

claims of all three plaintiffs are undeniably tragic, those circumstances support the conclusion that the claims of all three plaintiffs should be barred as a matter of law.

**II.      LEGAL STANDARD**

**A.  The Summary Judgment Standard**

Summary judgment s appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of a non-moving party's claim or by demonstrating a lack of evidence to support the non-moving party's case. *Id.*

After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Such "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). And a genuine dispute as to any material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A mere scintilla of evidence in support of the nonmoving party's position is not enough to deny summary judgment; instead there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595.

**B.  The Doctrine of Assumption of Risk**

The Sixth Circuit has held, "[i]n order for a defendant to establish the affirmative defense of assumption of the risk, the defendant must prove (1) that the plaintiff knew of the dangers of

2

the defect or unreasonably dangerous condition presented; (2) that plaintiff fully appreciated the danger; and (3) that plaintiff nevertheless voluntarily and unreasonably exposed himself to that danger. *Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319, 1321 (6th Cir. 1992).

Tennessee has abandoned the common law concepts of implied assumption of risk and its traditional terminology in the wake of its adoption of a statutory comparative fault scheme. *Perez v. McConkey*, 872 S.W.2d 897 (Tenn. 1994). Accordingly, the types of issues raised by implied assumption of risk, including the reasonableness of a party's conduct in confronting a known risk, should still be considered, but now under the principles of comparative fault. *Id*. at 905-06.

While comparative fault is typically a question for the trier of fact, summary judgment is appropriate in those situations where reasonable minds could only conclude that a plaintiff's fault is equal to or greater than the fault of the defendant. *Hall v. Owens*, 2015 Tenn. App. LEXIS 920, *15-16 (Tenn. Ct. App. 2015) ("In their motion for summary judgment and supporting documents, the Defendants negated an essential element of the Halls' negligence claim by establishing that Mr. Hall's own negligence was the proximate cause of the accident. In doing so, the Defendants shifted the burden of production to the Halls to demonstrate the existence of a genuine issue of material fact. To defeat the Defendants' motion for summary judgment, the Halls were required to demonstrate evidence that would permit a reasonable juror to find that Mr. Hall was less than 50% at fault for the accident."); *see also Cryer v. City of Algood*, 2022 Tenn. App. LEXIS 14 (Tenn. Ct. App. 2022); *Lewis v. Norfolk S. Ry. Co.*, 618 F. Supp. 2d 833 (W.D. Tenn. 2008).

As relevant here, according to the "rescue doctrine" traditionally recognized by Tennessee courts, when a person is exposed to danger of life and limb through the negligence of another, the latter will be liable for injuries received by a third party in a *reasonable* effort to rescue the one in danger. *Mobile & O.R. v. Ridley*, 114 Tenn. 727, 86 S.W. 606 (Tenn. 1905) (citations omitted)

3

(emphasis added). But even in such a case, the rescuer must not rashly expose himself to danger. *Id* at 734, 609.

### C. CSXT's Affirmative Defenses

CSXT has asserted affirmative defenses in its Answer to Plaintiffs' Second Amended Complaint. [Doc No. 147]  Among other affirmative defenses, CSXT has pled the doctrine of comparative fault (First Defense); the doctrine of assumption of risk (Eleventh Defense); that any act or omission on the part of CSXT was not the cause in fact or proximate cause of Plaintiffs' alleged injuries (Fifth Defense); and that the claimed injuries and damages of Plaintiffs were the result of intervening or superseding causes not attributable to CSXT (Seventh Defense).

Under Tennessee law, as with assumption of risk, the traditional concepts of intervening and superseding cause have also largely been subsumed into the comparative fault scheme, particularly where only the negligence of the plaintiff and defendant are considered,  as opposed to an act of a third person or other force. *Potter v. Ford Motor Company Co*., 213 S.W.3d 264 (Tenn. Ct. App. 2006) ("[i]n the present case, there is no allegation of a third tort-feasor or other malfeasant force – only the negligence of the Plaintiff and Defendant Ford, which are properly and adequately compared under our comparative negligence system, with no need for the intervening cause doctrine.")  Therefore, as with any negligence case after the adoption of comparative fault, where a plaintiff's negligence is determined to be a proximate cause of his own injury, plaintiff's damages will be reduced by his percentage of fault or barred if his fault is determined to be 50% or more. *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992); *See Hall v. Owens*, 2015 Tenn. App. LEXIS 920, *15-16 (Tenn. Ct. App. 2015).

## II.     ARGUMENT

As set forth below, the evidence conclusively establishes that the injuries claimed by all three plaintiffs were proximately caused by the negligence of their decedents (Kilburn and Betty), or by their own negligence (Feliciano). Even viewing the facts most favorably to plaintiffs, the record demonstrates that there is no genuine dispute that plaintiffs or their decedents were the sole proximate cause of the injuries alleged or, at the very least, that no reasonable jury could conclude that they were less than 50% at fault. The evidence is sufficient for this court to determine these issues as a matter of law.

1. **Tracy Kilburn, Individually and as Surviving Spouse of Robert Scott Kilburn, Deceased**

Plaintiff Tracy Kilburn brings an individual claim for emotional distress, as well as a wrongful death claim for her husband, Robert Scott Kilburn, who died during the flood. Mr. Kilburn was swept away after making the "split" decision to leave a position of relative safety on the roof of his truck and jump into the raging flood water. *See supra.* He apparently did so in an effort to help Regina Brake, whom he did not know, and who is the decedent in another claim brought in this matter by her daughter, Kayla Celene Brake.

Plaintiff testified that they left their residence at 299 Old Linden Road, Waverly, sometime between 8:30 a.m. and 9:00 a.m., on the morning of the flood. **Ex. A**, *T. Kilburn Dep.* at 39:6-12. After they were unable to reach Ms. Kilburn's daughter via phone, they decided to drive toward the Briarwood Apartments, where the daughter lived with her three children. *Id.* at 40:23-41:13. Scott drove his truck and Tracy rode in the passenger seat. *Id.* at 48:16-21.

Sometime prior to leaving their residence, Scott spoke to his brother, who lived in nearby Gorman, Tennessee, after seeing his brother's online posting of photographs depicting the rising flood waters. **Ex. B**, *Tracy Kilburn 00061-62*; **Ex. A** at 39:13-40:22, 73:17-74:4.

5

During their drive to Briarwood Apartments, they observed heavy flooding at Cooley Road and Main Street, such that they couldn't see the road beneath the rising floodwaters. **Ex. A** at 47:18-48:9. Scott and Tracy Kilburn turned right from Main Street onto Highway 70 and drove until they had almost reached the turnoff into Briarwood Apartments but were stopped as flood water began overtaking their truck. *Id*. at 52:18-55:22. At that point, Scott got out and onto the roof of the truck, where he helped Tracy move from her position standing on the door of the vehicle, to the roof. *Id*. The flood water was already rising over the windows and flowing into the truck. *Id*. While on top of the roof, they eventually noticed Regina Brake, who was "in the raging water". *Id*. at 57:19-59:16. Mr. Kilburn then made the "split decision" to jump in the "raging" waters in an apparent attempt to assist Ms. Brake. *Id*. at 59:17-61-23. Ms. Kilburn remained on the roof of the truck until she was rescued to safety in a tractor driven by a fellow citizen. *Id*. at 62:14-65:3.

Ms. Kilburn's testimony, as well as the other photographic, testimonial and documentary evidence demonstrating the extreme danger presented by the rising waters on that day make it obvious that Scott and Tracy Kilburn were aware of those dangers prior to and at the time of Mr. Kilburn's decision to jump into the water.

Given that Ms. Kilburn testified that she and Mr. Kilburn acknowledged flooding in Gorman, subsequently observed significant flooding on their route to Briarwood, and avoided the shortest routes to Briarwood through town, it is incontrovertible that Mr. Kilburn was subjectively aware of and appreciated the imminent risk of death presented in those circumstances. His decision to leap into the "raging" waters, while noble, was nonetheless rash and unreasonably dangerous. Accordingly, there is sufficient evidence for the court to find as a matter of law that he voluntarily assumed the risk by unreasonably proceeding to encounter a known and obvious danger such that

his actions, in common law parlance, break the chain of causation and supersede any liability of CSXT. *Hurt v. Coyne Cylinder*, 956 F.2d 1319 at 1325; see also, *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534 (Tenn. Ct. App. 1981). This is particularly true given that the objective evidence supports the conclusion that he had little or no chance of rescuing Ms. Brake in the raging waters. Had he not acted with reckless disregard for the clearly dangerous situation he was able to observe throughout the morning it is likely that he, like his wife, would have been rescued. No reasonable juror could find that Mr. Kilburn was less than 50% at fault for his death, after he acknowledged the flooding in Gorman and throughout Waverly. *Hall*, 2015 Tenn. App. LEXIS 920, at *15-16 (Tenn. Ct. App. 2015)

Nearly all courts that have interpreted the rescue doctrine under Tennessee law have acknowledged that the rescue doctrine should not be applied where decision to imperil oneself during the attempted rescue of person or property is one that is "rash", "reckless" or "unreasonable". See, e.g., *Ruth v. Ruth*, 213 Tenn. 82, 372 S.W.2d 285 (Tenn. 1963); *Mobile & O.R. Co. v. Ridley*, 114 Tenn. 727, 86 S.W.606 (Tenn 1905); *Chattanooga Light & Power v. Hodges*, 109 Tenn. 331, 70 S.W. 616 (Tenn. 1902); *Caldwell v. Ford Motor Co.*, 6t19 S.W.2d 534, (Tenn. Ct. App. 1981). Tennessee courts have equated "rash" conduct with conduct variously described as "ill-advised," "foolhardy," "reckless," "unnecessarily dangerous." *Anderson v. Westfield Group*, 259 S.W.3d 690 (Tenn. 2008) (noting a dictionary definition of rash as "disregard for consequences: imprudently involving or incurring risk").

Applying those definitions, Mr. Kilburn's decision to voluntarily enter the "raging" waters can fairly be categorized as rash such that this Court should conclude as a matter of law that he voluntarily and unreasonably assumed the risk and was either the sole proximate cause of his own

7

injuries or, at minimum, that no reasonable jury could conclude on the basis of the evidence presented that he was less than 50% at fault for his own injuries.

**2. Peggy Betty, individually and as Surviving Spouse of James Michael Betty, Deceased**

Plaintiff Peggy Betty brings a claim for the wrongful death of her husband, James Michael Betty, who died during the flood when he decided to leave a place of safety in the midst of the rising flood waters to assist a friend with moving a boat. He did this despite having significant physical limitations on his potential ability to be of any assistance to his friend.

Peggy Betty testified that her husband was "about six two or three" and weighed "320 something [pounds] at the time of the flood." **Ex. C**, *P. Betty Dep*. 26:8-15 (Mar. 7, 2025). He had numerous health problems and procedures prior to and leading up to the flood, including cataract surgery in both eyes, surgery to remove his gallbladder, kidney stones and infection, and heart surgery including the placement of four stents. *Id*. at 23:1-34:21. Additionally, he underwent total left knee replacement in early June 2021, approximately two-and-a-half months before the flood. *Id*. In the weeks after the surgery, he underwent physical therapy and could only walk short distances using a walker or a cane. *Id*. Just four days before the flood, Mr. Betty "tweaked" his left knee and sought medical care, complaining that his kneecap was sliding out of place. *Id*. at 24:22-24.

According to her sworn testimony, "it was pouring down rain" on the day before the flood. *Id*. at 34:23-35:4. Ms. Betty testified that during the morning of August 21, 2021, Mr. Betty observed Trace Creek and the ravine near the Betty's driveway to assess whether the rain had caused the creek water to rise from its banks. *Id*. at 35:6-15. Ms. Betty testified that the creek "was beginning to come up [the] ravine beside the driveway," so she and Mr. Betty decided to relocate their vehicles to her sister's house at 159 Old Linden Road, Waverly. *Id*. at 35:17-36:4. Ms. Betty

drove one car and he followed her in his truck. *Id*. After parking the first car at her sister's residence, Mr. and Mrs. Betty went back together to relocate another one of their cars. *Id*. When they returned to their residence to retrieve the second car, the water had risen close to her knees. *Id*. at 47:20-48:23. When asked whether, at the point at which they returned to get the second car, she and her husband were aware that they were in a dangerous situation, she replied "yes, of course." *Id*. at 49:1-5.

Nonetheless, when they moved the second car to safety, James began to back his truck out of her sister's driveway and she asked him where he was going. *Id* at 35:17-36-5. She further explained:

> **And he says, 'I'm going back over to help Ray with his boats next door over there.' I said, Michael, there's nothing you can do. The water is coming out of the bank. So he says, 'I've got to try and help him.' So I says, all right. So he left and I went on over in the house and my sister said, 'well, there's nothing he can do over there after his surgery. You know he's not going to be able to help with getting the boats out of there,' and I said well, you -- he's stubborn, bullheaded. And I said, well, if somebody needs help, he's going to be there.**

*Id*. at 36:6-19 (emphasis added); <u>*See* 53:14-54:1</u>.

A short time later, at approximately 7:30 or a quarter to 8:00 a.m., she received a call from James, she explained:

> **And he says, 'I'm trapped.' He said, 'The car in front of me is stalled out and there's a truck behind me trying to push me.' And that was -- he says, 'I've got to go.' So I hung up, and that was the last I heard of him**

*Id*. at 36:24-37:4 (emphasis added).

Indeed, Mr. Betty's decision to leave his position of safety at his sister-in-law's house amid continuously rising waters, weeks after knee surgery to help move his neighbor's boat, is the very definition of rash and unreasonable conduct as defined by Tennessee courts. There is no credible question whatsoever that Mr. Betty knew, appreciated, and voluntarily encountered the risk

9

associated with heading back into the flood waters.  Moreover, his decision to do so in order to assist in moving personal property that did not belong to him, when he was physically unable to assist with such a task in the first place, makes the traditional policy underpinnings of the rescue doctrine inapplicable.

Courts have been divided as to whether to extend the benefits of the rescue doctrine to one injured in an effort to save his own or another's property. *Chattanooga Light & Power v. Hodges*, 109 Tenn. 331, 70 S.W. 616 (Tenn. 1902) (citations to cases in other jurisdictions omitted). Under Tennessee law, it has nonetheless been established that the rescue doctrine applies to attempts to save personal property if the attempt is not rash or reckless. *Id*., 109 Tenn. at 336, 70 S.W. 616. More specifically, the doctrine extends to property rescue "where [the] effort…has been such as a reasonably prudent man would have made under the circumstances." *Id*.

In *Chattanooga Light & Power*, a utility company employee died after he left a position of safety during a rapidly spreading fire and returned to the burning building in order to access a telephone to call the fire department. *Id*., 109 Tenn. at 334, 70 S.W. 616. The plaintiff was denied recovery because it was determined that the decedent was reckless and unreasonable in re-entering the building, his attempt being called "foolhardiness" by a policeman on the scene. *Id*.

The case is analogous to the unreasonable risk scenario voluntarily encountered by Mr. Betty.  Like the plaintiff in *Chattanooga*, he made the unnecessarily dangerous decision to leave a position of safety to face an imminent risk of serious injury or death, in his case to move another person's personal property that he was physically unfit to move.  Though tragic, the Court can fairly conclude as a matter of law that, in light of the evidence, his decision was reckless and that a reasonably prudent man would not have made the same decision under the same or similar circumstances.  His decision can be distinguished from other circumstances where the courts have

10

determined that plaintiffs facing danger acted reasonably such that the rescue doctrine applied. *See Caldwell v. Ford Motor Co.*, 619 S.W.2d 534 (Tenn. Ct. App. 1981).

Respectfully, no such indicia of reasonableness exist with regard to the unfortunate decision Mr. Betty made to return to danger instead of staying with his wife and her sister in safety. Accordingly, as with Mr. Kilborn, this Court should apply traditional assumption of risk principles to Tennessee's comparative fault analysis and conclude that Mr. Betty was solely responsible for his own injury, or at minimum, that no reasonable jury could conclude under the circumstances that he was less than 50% at fault.

3. **Michelle Feliciano, Individually and as the Surviving Parent of Lucy Lane Connor, Deceased**

Plaintiff Michelle Feliciano also brings a claim for emotional distress allegedly sustained as a result of the flood, as well as a wrongful death claim for her daughter, who died during the flood. Plaintiff's daughter, Lucy Lane Connor, was six years old at the time of the flood. They both resided at 2B East Brookside Drive, Waverly, and had lived at that address for almost two years prior to August 21, 2021. **Ex. D**, *M. Feliciano Dep*. 27:17-20 (Mar. 21, 2025). Plaintiff owned a car and drove between Waverly and McEwen every day to drop off and pick up Lucy at school. *Id*. at 19:25-20:4.

On the morning of the flood, Ms. Feliciano was awakened by a phone call from her next-door neighbor, informing her that there was a flood alert. *Id*. at 39:7-40:10. She then woke her daughter and got her ready to go to her sister's house. During that time, she noticed that the flood waters were rising in her back yard. *Id*. at 41:22-42-21. Around that same time, a firefighter knocked on her door and informed her that she needed to evacuate due to the imminent flood. *Id*. at 42:4-12. She never asked the firefighter for any help evacuating. *Id*. at 49:8-10. Instead, Ms. Feliciano called her sister, telling her that the water was rising and asking her to pick her and her

daughter up in her truck because she didn't think her own car was going to make it through the water. *Id*. 47:20-48:4. She estimated that it would take her sister about fifteen minutes to arrive. *Id*. at 49:4-7.

When asked whether, at the time the firefighter warned her and told her to evacuate, she could have walked up the road to a higher location and a position of safety. She replied, "I couldn't tell you." *Id.* at 48:5-10. However, the East Brookside neighborhood surveillance camera captured video of fire personnel going door to door on Ms. Feliciano's block. The video time stamps indicate that this occurred approximately between 8:35 a.m. to 8:40 a.m. with a firefighter walking in the direction of her apartment at 8:38 a.m.[2] **Ex. E**. The video shows that the ground was wet at that time, with some puddling in some places in the middle of the street, but that the emergency SUVs were moving up and down the street with ease, and the sidewalks on both sides of the street were without any standing water and entirely passable by foot. *Id.*

At approximately 8:45 a.m., the residents at 1 East Brookside (down the block from Ms. Felicano) are shown relocating their vehicles, with the street not yet flooded. **Ex. E**. They returned to their residence at approximately 8:50 a.m., and then left again in their vehicle at 8:56 a.m., driving down the now flooded but passable street. **Ex. E**. This directly undermines Ms. Feliciano's stated belief that her car would make it down the street at the time she called her sister (and during the considerable period of time following). To the contrary, the conditions depicted in the video establish that she could have easily driven or walked down the street to safety. Indeed, even Plaintiffs' retained expert in emergency management and emergency medical services, Kristin Weivoda, testified that the residents on Ms. Feliciano's block could have driven southeast to Main Street, which is higher ground, in less than two minutes. **Ex. F**, *K. Weivoda Dep. Day 2*, 83:3-85:8

---

[2] The video does not depict the moment when the firefighter knocked on her door.

(Mar. 20, 2026). A simple search of Google Maps reveals that the distance from Ms. Feliciano's apartment to higher ground on Main Street is 0.2 miles and that she and her daughter could have walked there in approximately 6 minutes. **Ex. G**.

Ms. Feliciano was able bodied and testified that she was not experiencing any illnesses or health problems at the time of the flood. **Ex. D,** *M. Feliciano Dep.* at 32:2-9. Instead, she stayed on the phone with her sister and watched the water rise. *Id* at 49:14-50:14.

At 9:00 a.m., the video shows the street flooded with the water level approximately halfway up the wheels of her neighbors' cars as they drove down the street evacuating. **Ex**. **E**. The front yard grass areas on both sides of the street were not yet flooded at that time. Approximately twenty-two minutes after the firefighter walked towards Ms. Feliciano's door, and seventeen minutes after her next-door neighbors evacuated, other residents of the block are shown moving their cars and continuing to evacuate. **Ex. E**. By 9:08 a.m., the water had risen to reach the buildings on East Brookside and vehicles were beginning to float. **Ex. E.** By 9:16 a.m., the water had risen to the building windows. **Ex. E**. Instead of moving to safety – in her car or by foot – Ms. Feliciano waited, without reasonable justification or explanation, until the flood waters overwhelmed her building walls, flooded her apartment and submerged her daughter. **Ex. D**, *M. Feliciano Dep.* at 49:1-52:25.

The evidence leaves little doubt that Ms. Feliciano was fully aware of and appreciated risk the dangers of the rising floodwaters and that she voluntarily and unreasonably exposed herself and her daughter to the risk of serious injury or death by choosing not to evacuate despite multiple warnings. That evidence is abundant and is sufficient for this Court to conclude as a matter of law that she assumed the risk and was solely responsible, or no less than 50% responsible, for any claimed injury to herself.

Moreover, as for her daughter, the evidence clearly demonstrates that if Ms. Feliciano had heeded warnings and timely evacuated herself and her daughter, her daughter would more likely than not be alive. Accordingly, the evidence supports the conclusion that her negligence was the proximate cause of her daughter's injury and that she was no less than 50% at fault. See, e.g., *Smith v. Henson*, 214 Tenn. 541, 381 S.W.2d 892 (Tenn. 1964) (finding, prior to Tennessee's adoption of comparative fault, that plaintiff-mother's negligence was the proximate cause of her daughter's death); *Nichols v. Nashville Housing Authority*, 187 Tenn. 683, 216 S.W.2d 694 (Tenn. 1949) (finding, prior to Tennessee's adoption of comparative fault, that negligence of mother and father plaintiffs proximately caused son's death). As with Plaintiffs Kilburn and Betty, this Court should determine as a matter of law that no reasonable jury could conclude otherwise.

## I. CONCLUSION

For the reasons set forth herein, CSXT's Motion for Summary Judgment as to Plaintiffs Tracy Kilburn, Peggy Betty and Michelle Feliciano should be granted.

Respectfully submitted,

*s/S. Camille Reifers*
S. Camille Reifers (BPR#19856)
John J. Bennett (BPR #31976)
Andrew Todd (BPR #39590)
Wai-Lin Danieley (BPR #41433)
REIFERS, HOLMES & PETERS LLC
80 Monroe Avenue, Suite 410
Memphis, TN 38103
(901) 521-2860
creifers@rhpfirm.com
jbennett@rhpfirm.com
atodd@rhpfirm.com
wdanieley@rhpfirm.com

**Attorneys for CSX Transportation, Inc.**

14

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, the foregoing document has been served via the Court's CM/ECF system to the following Counsel of Record:

| | |
|---|---|
| Timothy V. Porter | Peter J. Flowers |
| Andrew E. Mills | Frank V. Cesarone |
| Mary Lane Story | Jonathan P. Mincieli |
| Kirk Vandivort | Christopher Warmbold |
| Jennifer Foster | Tom Connelly |
| Reynolds, Potter, Ragan & Vandivort, PLC | Meyers & Flowers, LLC |
| 210 East College Street | 3 North Second Street-Suite 300 |
| Dickson, Tennessee 37055 | St. Charles, Illinois 60174 |
| 615-446-2221Telephone | 630-232-6333 Telephone |
| 615-446-2232 Facsimile | 630-845-8982 Facsimile |
| tpotter@rprvlaw.com | pjf@meyers-flowers.com |
| amills@rprvlaw.com | fvc@meyers-flowers.com |
| mstory@rprvlaw.com | jpm@meyers-flowers.com |
| kvandivort@rprvlaw.com | cjw@meyers-flowers.com |
| jfoster@rprvlaw.com | tmc@meyers-flowers.com |

***Attorneys for Plaintiffs***

*s/S. Camille Reifers*
S. Camille Reifers