# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |
|---|---|
| MATTHEW RIGNEY et al., | No. 3:22-cv-00342 (consolidated) |
| Plaintiffs, | |
| v. | JUDGE WAVERLY D. CRENSHAW, JR. |
| CSX TRANSPORTATION, INC., | |
| Defendant. | MAGISTRATE JUDGE LUKE A. EVANS |

## MEMORANDUM IN SUPPORT OF CSX TRANSPORTATION, INC.'S OMNIBUS MOTION FOR SUMMARY JUDGMENT

DCACTIVE-86696111.8

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 2

III. LEGAL STANDARD ................................................................................................ 3

IV. ARGUMENT ............................................................................................................. 4

    A. Plaintiffs Cannot Establish Cause-In-Fact .................................................... 4

    B. Most Duties That Plaintiffs Allege Do Not Exist Or Apply, And Any Duty CSXT Owed Under Tennessee Common Law Or FRA Regulation Was Not Breached ................................................................................................. 10

        1. GCOR Does Not Apply ...................................................................... 11

        2. CSXT Internal Policies Create No Duty Enforceable by Third Parties ....... 12

        3. CSXT Breached No Duty To Conduct Inspections Or Train Employees ... 13

        4. CSXT Assumed No Voluntary Undertaking ............................................... 14

        5. CSXT Breached No Duty Concerning Debris or The Trace Creek Bridge, And Breached No Theorized Duty to Warn ................................................. 15

        6. A Washout And "Pooling" Were Not Foreseeable ..................................... 18

    C. ICCTA Preempts Plaintiffs' Effort to Dictate Rail Regulation Through Tort Law ........................................................................................................ 20

    D. The FRSA Preempts Plaintiffs' Attempt To Impose Additional Safety-Related Duties Beyond Subsuming FRA Obligations ......................................... 24

    E. Plaintiffs' Strict Liability/Nuisance Claim (Count V) Lacks Evidence And Does Not Fit This Case ................................................................................. 26

    F. No Evidence Warrants Punitive Damages ..................................................... 27

    G. Plaintiffs' Lack Of Necessary Evidence Is More Acute As Two Of Their Experts Should Be Disqualified ..................................................................... 30

V. CONCLUSION ....................................................................................................... 30

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*A & W Props., Inc. v. Kan. City S. Ry. Co.*,
200 S.W.3d 342 (Tex. App. 2006)........................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................3, 4

*Bradshaw v. Daniel*,
854 S.W.2d 865 (Tenn. 1993)..............................................................................................10

*Burnette v. W. Knox Util. Dist.*,
No. C.A. 1155, 1988 WL 67154 (Tenn. Ct. App. June 30, 1988)...........................................26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................................3

*Clark v. Danek Med., Inc.*,
No. CIV.A. 3:94CV-634-H, 1999 WL 613316 (W.D. Ky. Mar. 29, 1999).............................9

*Cotten v. Wilson*,
576 S.W.3d 626 (Tenn. 2019)...............................................................................................4

*Cox v. Tenn. Valley Auth.*,
No. 92-5641, 1993 WL 72488 (6th Cir. Mar. 15, 1993) (unpublished table
decision).........................................................................................................................7, 9

*CSX Transp., Inc. v. City of Sebree, Kentucky*,
924 F.3d 276 (6th Cir. 2019) ...................................................................................20, 23, 24

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993)..........................................................................................................25

*Demaree v. Toyota Motor Corp.*,
37 F. Supp. 2d 959 (W.D. Ky. 1999)......................................................................................7

*Doe v. Linder Constr. Co.*,
845 S.W.2d 173 (1992).........................................................................................................4

*Duran v. Hyundai Motor Am., Inc.*,
271 S.W.3d 178 (Tenn. Ct. App. 2008)................................................................................29

*Epps v. Thompson*,
No. M201701818COAR3CV, 2018 WL 1353589 (Tenn. Ct. App. Mar. 15,
2018) ..............................................................................................................................9

Case 3:22-cv-00342   Document 257   Filed 04/03/26   Page 3 of 39 PageID #: 5537

*Fisher v. Green*,
 No. 01A01-9708-CH-00389, 1999 WL 5081 (Tenn. Ct. App. Jan. 7, 1999) ...........................4

*Flax v. DaimlerChrysler Corp.*,
 272 S.W.3d 521 (Tenn. 2008).............................................................................................29, 30

*Giggers v. Memphis Hous. Auth.*,
 277 S.W.3d 359 (Tenn. 2009)................................................................................................10, 18

*Goff v. Elmo Greer & Sons Const. Co.*,
 297 S.W.3d 175 (Tenn. 2009).....................................................................................................30

*Grogan v. Uggla*,
 535 S.W.3d 864 (Tenn. 2017).....................................................................................................15

*Hickman v. Jordan*,
 87 S.W.3d 496 (Tenn. Ct. App. 2001) .......................................................................................10

*Hixson v. Am. Towers, LLC*,
 593 S.W.3d 699 (Tenn. Ct. App. 2019) .....................................................................................19

*Hodges v. S.C. Toof & Co.*,
 833 S.W.2d 896 (Tenn. 1992).....................................................................................................28

*Johnson v. Rowsell*,
 No. M2009-00731-COA-R3-CV, 2009 WL 3460365 (Tenn. Ct. App. Oct. 27,
 2009) ...........................................................................................................................................13

*Jones Creek Invs., LLC v. Columbia Cnty.*,
 98 F. Supp. 3d 1279 (S.D. Ga. 2015)..........................................................................................22

*Kellner v. Budget Car & Truck Rental, Inc.*,
 359 F.3d 399 (6th Cir. 2004) ......................................................................................................19

*Kilpatrick v. Bryant*,
 868 S.W.2d 594 (Tenn. 1993)...............................................................................................4, 6, 7

*Liddle v. Corps of Eng'rs of U.S. Army*,
 981 F. Supp. 544 (M.D. Tenn. 1997)...........................................................................................27

*Lindsey v. Miami Dev. Corp.*,
 689 S.W.2d 856 (Tenn. 1985).......................................................................................................4

*McCall v. Wilder*,
 913 S.W.2d 150 (Tenn. 1995)................................................................................................10, 19

*Metro. Gov't of Nashville & Davidson Cnty. v. Counts*,
 541 S.W.2d 133 (Tenn. 1976)......................................................................................................26

iii

*Meyer v. Tapeswitch Corp.*,
   No. 3:14-CV-01398, 2017 WL 5495738 (M.D. Tenn. Nov. 16, 2017)....................................7

*Nickels v. Grand Trunk W. R.R., Inc.*,
   560 F.3d 426 (6th Cir. 2009) ...........................................................................................25

*Owings v. Owings*,
   661 S.W.3d 141 (Tenn. Ct. App. 2022) .............................................................................9

*Parker v. CSX Transp., Inc.*,
   No. 17-2262, 2017 WL 5560865 (W.D. Tenn. Nov. 17, 2017)..........................................25

*Beal ex rel. Putnam v. Walgreen Co.*,
   408 F. App'x 898 (6th Cir. 2010) .....................................................................................30

*Rice v. Sabir*,
   979 S.W.2d 305 (Tenn. 1998)...........................................................................................19

*Rodgers v. Banks*,
   344 F.3d 587 (6th Cir. 2003) ..........................................................................................3, 4

*Rogers v. Louisville Land Co.*,
   367 S.W.3d 196 (Tenn. 2012)........................................................................................4, 10

*Sadler v. Tennessee*,
   56 S.W.3d 508 (Tenn. Ct. App. 2001) ..............................................................................26

*Satterfield v. Breeding Insulation. Co.*,
   266 S.W.3d 347 (Tenn. 2008)...........................................................................................15

*Scott v. Harris*,
   550 U.S. 372 (2007)............................................................................................................3

*Staples v. CBL & Assocs., Inc.*,
   15 S.W.3d 83 (Tenn. 2000)................................................................................................10

*Thompson v. Nat'l R.R. Corp.*,
   621 F.2d 814 (6th Cir. 1980) ............................................................................................30

*Tipton v. CSX Transp., Inc.*,
   No. 3:15-CV-311-TAV-CCS, 2017 WL 10398182, at *21 (E.D. Tenn. Oct.
   25, 2017); ..........................................................................................................................13

*Tubbs v. Surface Transp. Bd.*,
   812 F.3d 1141 (8th Cir. 2015) ..........................................................................................22

*Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*,
   CV No. 12-4179, 2014 WL 4287086 (D.S.D. Aug. 28, 2014)..........................................22

*Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*,
 756 S.W.2d 274 (Tenn. Ct. App. 1988) ...................................................................27

*Wilburn v. City of Memphis*,
 No. W2009-00923-COA-R3-CV, 2010 WL 1407233 (Tenn. Ct. App. Apr. 9,
 2010) .....................................................................................................................10

*Wright v. Citizen's Bank of E. Tenn.*,
 640 F. App'x. 401 (6th Cir. 2016) ....................................................................27, 28

**Statutes**

49 U.S.C. § 20101 .....................................................................................................25

49 U.S.C. § 20103(a) .................................................................................................25

49 U.S.C. § 20106(a)(1) .............................................................................................25

49 U.S.C. § 20106(a)(2)(A)–(C) .................................................................................25

49 U.S.C. § 20106(b)(1) .............................................................................................25

Federal Rail Safety Act, 49 U.S.C. §§ 20101, *et seq.* ....................................... *passim*

Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10101,
 *et seq*. ......................................................................................................... *passim*

Tenn. Code Ann. § 20-5-113 ......................................................................................10

**Other Authorities**

49 CFR 213.33 ......................................................................................................16, 17

 (49 CFR 213.33) .....................................................................................................16

49 CFR 237.101 ........................................................................................................14

49 CFR 243 ...............................................................................................................14

49 CFR § 213.33 .......................................................................................................21

Fed. R. Civ. P. 56(a) ...................................................................................................3

Federal Rule of Civil Procedure 56 ...............................................................................1

Restatement (Second) of Torts § 821B (Am. Law Inst. 1979) .......................................26

Restatement (Second) of Torts § 821C cmt. B (Am. Law Inst. 1979) ............................26

Restatement (Second) of Torts § 821C cmt. D (Am. Law Inst. 1979) .........................................27

Rule of Evidence 702.................................................................................................................30

Case 3:22-cv-00342     Document 257     Filed 04/03/26     Page 7 of 39 PageID #: 5541

Defendant, CSX Transportation, Inc. ("CSXT"), pursuant to Federal Rule of Civil Procedure 56, submits its Memorandum in Support of its Omnibus Motion for Summary Judgment.

## I.    INTRODUCTION

This lawsuit arises from a catastrophic flood of August 21, 2021, that devastated Waverly, Tennessee. Plaintiffs claim that CSXT, through an allegedly obstructed culvert under its Trace Creek Bridge, created an "unnatural lake" that burst into a "tidal wave," injuring multiple Waverly residents. The theory is dramatic. The evidence supporting it is nonexistent. The record does not contain competent evidence sufficient for Plaintiffs to survive summary judgment, in five respects.

*First*, the record contains no evidence causally connecting anything CSXT did or did not do to any Plaintiff's alleged harm. Tennessee's requirement of cause-in-fact—the foundational "but for" requirement of negligence law—requires that Plaintiffs prove their harm would not have occurred but for CSXT's conduct. Plaintiffs must therefore establish that CSXT's acts or omissions caused a washout, that the washout produced a "tidal wave," and that the "tidal wave" caused each Plaintiff's injuries—meaning that each Plaintiff would not have been injured but for the tidal wave or because of Plaintiffs' theorized failure to warn. Plaintiffs have done none of these things.

*Second*, the causation void is matched by an equally critical absence of duty. The evidence now reveals that most of the duties Plaintiffs allege do not exist: they rest on industry rules that Plaintiffs' own expert concedes do not apply to CSXT; on internal company rules that no third party may enforce; on FRA training and inspection regulations that Plaintiffs' expert admits were met or do not apply; or a misunderstanding of voluntary undertaking doctrine. The one theory that might rest on a cognizable duty—that CSXT allegedly permitted debris to obstruct the flow of water under the Trace Creek Railroad Bridge—is ignored altogether by Plaintiffs' experts and flatly contradicted by the undisputed record. Just the opposite: the undisputed evidence reflects that the area under the Trace Creek Bridge was free of obstruction, with water flowing freely,

1

during the storm. Moreover, duty under Tennessee water law depends on foreseeability, and all evidence shows that a washout at this specific location, as Plaintiffs posit, was not foreseeable.

*Third*, without evidence of an obstructed culvert preventing water from flowing freely, Plaintiffs' theory of water flow harming anyone can only be one attacking railroad infrastructure—the design, construction, and operation of CSXT's rail bridge and its support—claims classically preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101, *et seq*. Because Plaintiffs now reveal their extensive dependence on FRA regulations, and with the uncontested evidence being that all either do not apply or were met, the claims are also preempted by the Federal Rail Safety Act ("FRSA"), 49 U.S.C. §§ 20101, *et seq*.

*Fourth*, Plaintiffs' "absolute nuisance" claim confuses this case for one involving damage to their property, or to circumstances uniquely affecting some individual plaintiff, and is supported by no record evidence.

*Fifth*, no evidence supports Plaintiffs' prayer for punitive damages.

This Motion does not rest on competing interpretation of a disputed evidentiary record. It is not a debate among experts. It is about evidence—specifically, the absence of evidence creating genuine disputes of fact that might aid Plaintiffs on each of these dispositive points.

The Waverly flood was undeniably tragic and brutally horrific. Yet there is no evidence that CSXT played any role in it. Respectfully, summary judgment should be granted.

## II. FACTUAL BACKGROUND

The Court ably set out the factual context of this action, as characterized by Plaintiffs' then-operative complaint, in its March 6, 2024, ruling. Mem. Op. at 1, Dkt. No. 118 ("Op"). On August 21, 2021, Tennessee recorded the highest 24-hour rainfall in its history. Ex. 20, Bardol Dep. Tr. at 55:7-56:1. That morning, flooding swept through Humphreys County, Tennessee, on Big Richland Creek, Trace Creek, Blue Creek, and Hurricane Creek. Ex. 5, Gillespie Dep. Tr. at 116:7-9; 116:7-

2

9; Ex. 26, Poyner Dep. Tr. at 100:19-23; 109:8-15. Waverly, the county seat of Humphreys County, sits at the bottom of a valley and experienced at least two other extensive floods (one in 2010 and the other in 2019). Op. at 1-2. Waverly has been deemed a "special flood hazard area." *Id*. at 1. Despite the unprecedented nature of the storm, even when compared to prior "historic" storms, Plaintiffs allege that CSXT is responsible for the flooding in Waverly—though they fail to explain why other streams experienced similar flooding. Plaintiffs claim that CSXT is responsible for floodwater that accumulated behind its railbed and that it should have taken different actions to manage, maintain, and operate its Trace Creek railroad bridge in a manner that allegedly would have prevented harm to downstream members of the public. Plaintiffs further allege that CSXT should have provided warnings to public officials about the storm and the potential for flooding.

### III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of a non-moving party's claim or by demonstrating a lack of evidence to support the non-moving party's case. *Id*.

After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation omitted). Such "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). This exists only if "the evidence is such that a reasonable jury

3

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A mere scintilla of evidence is not enough to deny summary judgment; instead there must be evidence on which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595.

## IV.    ARGUMENT

### A.  Plaintiffs Cannot Establish Cause-In-Fact

Essential to all of Plaintiffs' claims are two types of causation: cause-in-fact, and proximate causation. *See Cotten v. Wilson*, 576 S.W.3d 626, 638 (Tenn. 2019) ("plaintiff in a wrongful death negligence action must prove that the defendant's conduct was both the cause-in-fact and the legal cause of the decedent's death"); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012) (elements of NIED claim "include the elements of . . . causation in fact, and proximate causation"); *Fisher v. Green*, No. 01A01-9708-CH-00389, 1999 WL 5081, at *3 (Tenn. Ct. App. Jan. 7, 1999) (nuisance claims require a showing of causation); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (cause in fact and proximate cause are required elements of a negligence claim).

Cause-in-fact, the essential element at issue in this Motion, is a "but for" concept in Tennessee law. "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Kilpatrick,* 868 S.W.2d at 598 (citing *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534, 543 (Tenn. Ct. App. 1981)). This imposes on Plaintiffs the burden to prove that each Plaintiff would not have been harmed "but for" CSXT. If Plaintiffs lack competent evidence to establish this most basic causal dot-connection, summary judgment is in order, since "[p]roof of negligence without proof of causation is nothing." *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 181 (1992) (quoting *Drewry v. Cnty. of Obion*, 619 S.W.2d 397, 398 (Tenn. Ct. App. 1981)). That is because the absence of cause-in-fact evidence leaves a jury with nothing to go on but conjecture and speculation, which is not permitted. *See Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985) ("when the matter remains one of pure speculation or

4

conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant") (quoting Prosser and Keeton, Torts, § 41, p. 269 (5th ed., 1984)).

With discovery closed, Plaintiffs have no evidence of causation-in-fact. This is not a matter of arguing the facts, or of competing interpretations of evidence. There is nothing competing.

Plaintiffs allege that "millions of gallons of water . . . became bottled up behind" CSXT's Trace Creek Bridge, Second Amended Complaint, Dkt. No 147 ("SAC") ¶ 2, leading to a washout, *id.* ¶¶ 25-26, causing a "tidal wave," *id.* ¶ 26, which caused Plaintiffs' injuries, *id.* ¶¶ 29, 34, including because CSXT did not warn public officials of the impending tidal wave, *id.* ¶¶ 27, 29, 62(d). Thus to prove their claims, Plaintiffs must establish, by a preponderance of the evidence, that (1) CSXT action or inaction caused a washout; (2) this resulted in a "tidal wave," and either (3) that "tidal wave" is the but-for cause of each individual Plaintiff's claimed injuries, or (4) a failure of some duty to warn was that but-for cause. Plaintiffs have not and cannot do so.

***No expert evidence – tidal wave as cause.*** None of Plaintiffs' experts offers opinions or conclusions on cause-in-fact. Of Plaintiffs' five disclosed experts, the only conceivable candidate for this is Dr. Blackler, a licensed engineer. Plaintiffs commissioned Dr. Blackler to "perform a hydrologic and hydraulic analysis of the flood event on August 21st, 2021." Ex. 1, Blackler Rept. at 1. Yet only in a very narrow sense: Dr. Blackler does not study water flow from the many water sources in and around Waverly (*only* from and around CSXT's Trace Creek Bridge) and therefore Dr. Blackler does not and cannot opine that the water he claims came from CSXT was the "but for" cause of anything. *See, e.g.*, Ex. 1 at 1, 3; Ex. 2, Blackler Dep. Tr. at 158:21-159:3, 159:9-10.

Nor does Dr. Blackler tie any water flow to any Plaintiff. Nor could he, as he admits he did not study any Plaintiff, their individual and varied predicaments, or what may have caused their individualized alleged harms. Again, in his words: "Q: Did you provide opinions as to the water's

5

impact on any individual plaintiff? A: On an individual? Q: Yes. A: No." Ex. 2 at 146:7-11, 159:21-25 ("I did not provide opinions on injuries"). So again, Dr. Blackler provides no evidence that water coming from Plaintiffs' so-called "tidal wave" harmed any individual Plaintiff. This is especially pertinent given the fact that flooding occurred on streams throughout Humphreys County and actually resulted in the fatality of Wayne Spears along Hurricane Creek, miles to the south of Waverly and part of a different watershed from Trace Creek. Ex. 5, Gillespie Dep. Tr. at 116:7-9; Ex. 28, Vasil Dep. Tr. at 90:15-17; 91:24-93:6.

In short, Dr. Blackler opines that something water-related occurred. As the Tennessee Supreme Court has observed, a "mere occurrence" does not satisfy the foundational requirement of causation. *See, e.g.*, *Kilpatrick*, 868 S.W.2d at 599 ("the mere occurrence of an injury does not prove negligence . . . the plaintiff must still establish the requisite causal connection between the defendant's conduct and the plaintiff's injury") (citing *Doe*, 845 S.W.2d at 181).

***No Plaintiff evidence – tidal wave as cause.*** Plaintiffs are likewise not "but for" witnesses. They allege that they were harmed, and that their harm resulted from a flood of water. SAC ¶¶ 14, 69, 83. It is undisputed that not all water that day came from under the Trace Creek Bridge. Ex. 16, Oakley Dep. Tr. at 123:20-124:11. Dr. Blackler himself repeatedly references the torrential rain falling that day, rain which obviously cannot be blamed on CSXT. In his words, this was "already [a] large storm," and a "storm event," without considering CSXT. Ex. 1, Blackler Rept. at 27, 5 n.5; *see also id*. at 2 (citing "rain totals more than 16-inches within 24 hours"); *id.* at 5.

Evidence that water harmed someone does not address "but for" causation, as it does not connect CSXT conduct or "CSXT water" with anyone or anything. Nor could Plaintiffs make this connection, they are lay people and not qualified in hydrogeology, meteorology, topography or other expert disciplines that might speak to water flow and might distinguish "CSXT water" from

other water sources. *See Cox v. Tenn. Valley Auth.*, No. 92-5641, 1993 WL 72488, at *4 (6th Cir. Mar. 15, 1993) (unpublished table decision) ("causation of flooding is a complex issue which must be addressed by experts").

***No other evidence – tidal wave as cause.*** No other evidence in the record can fill the void, connecting CSXT to anyone's harm in the required "but for" fashion.

What remains, then, is speculation—a jury on its own extrapolating from the many sources of water in Waverly the conclusion that water under or around the CSXT Trace Creek Bridge was "but for" in causing each of Plaintiffs' claimed harms. When an evidentiary record permits only speculation, there is no cause in fact as a matter of law. *See Kilpatrick*, 868 S.W.2d at 602 ("A mere possibility of such causation is not enough; [upon] matter[s] . . . of pure speculation and conjecture or the probabilities are at best evenly balanced, *it becomes the duty of the court to direct a verdict for the defendant*") (emphasis added) (quoting *Lindsey*, 689 S.W.2d at 861)).

***The no-warning theory lacks cause-in-fact evidence.*** Plaintiffs' retort may be to invoke their fallback "no-escape"/no-warning theory—their notion that debris, uncleared by CSXT, unleashed a tidal wave that prevented exit, and that CSXT failed to warn public safety officials that it was coming. SAC ¶¶ 27, 29, 62(d). Plaintiffs' expert in emergency management, Kristin Weivoda, espouses this theory; namely, that CSXT should have issued warnings to emergency personnel (and not to other community members, for instance). Ex. 3, Weivoda Dep. Tr. Vol. 2 at 59:10-22. Plaintiffs' warning theory thus requires evidence that the individuals so warned—public safety officials—would have changed their behavior in response to the warning. *See Demaree v. Toyota Motor Corp.*, 37 F. Supp. 2d 959, 968 (W.D. Ky. 1999) (granting summary judgment on warning claim in the absence of evidence that a warning would have changed the plaintiff's behavior); *Meyer v. Tapeswitch Corp.*, No. 3:14-CV-01398, 2017 WL 5495738, at *8 (M.D. Tenn.

7

Nov. 16, 2017) (plaintiffs must demonstrate both lack of a warning and its causation).

With discovery closed, the undisputed record shows just the opposite. Ms. Weivoda opines that CSXT should have made a warning to public officials at 7:50 am CT. Ex. 4, Weivoda Rept. at 3. She goes on to enumerate the actions that emergency personnel could have taken had CSXT made that warning at that time. *Id.* at 3-4. Yet the undisputed record reveals that emergency personnel were already taking (or had no intention of taking) each of those efforts by 7:50 am CT:

| Action Ms. Weivoda Testified a 7:50 am CT Warning Would Have Allowed | Emergency Personnel Actions Already Underway Before 7:50 am CT |
|---|---|
| The City of Waverly would have started to "call in more officers and deputies." Ex. 3 at 40:1-19. | Chief Gillespie started paging in additional personnel between 6:00 and 7:00 am CT, Ex. 5, Gillespie Dep. Tr. at 44:8-14, and paged the entire department. *Id.* at 44:24-45:11. |
| Waverly emergency personnel "would have prepositioned." Ex. 3 at 40:1-19. | Around 6:25 am, the police department "started moving folks into a place" due to knowledge of flooding risk. Ex. 5 at 94:24-95:15. At approximately 7:00 am CT, emergency personnel were assigning resources to start evacuations and rescues, if needed. *Id.* at 45:20-46:18. |
| The City of Waverly "would have asked for swift water to pre-position." Ex. 3 at 40:1-19. | Waverly emergency personnel did not have training in and historically did not conduct swift water rescues. Ex. 5 at 40:3-41:9. Waverly personnel have a boat, but it may not have "even launched that day because the water was so rough." *Id.* at 46:3-18. |
| The City of Waverly "would have done the push WEA notification." Ex. 3 at 40:1-19. | Nixle weather alerts to Waverly residents began at 3:29 am CT on August 21, 2021. Ex. 5 at 91:16-92:7; Ex. 6, B. McCord Dep. Tr. at 84:13-85:6. |
| The City of Waverly "could have started door-to-door notification." Ex. 3 at 40:1-19. | Waverly police and fire department officials were going door-to-door to evacuate residences at or before 7:48 am CT. Ex. 5 at 96:12-17. |
| The City of Waverly "could have done sirens." Ex. 3 at 40:1-19. | Emergency personnel elected to go door-to-door, rather than drive through neighborhoods warning on a PA system because it is more impactful. Ex. 5 at 86:7-16. |
| The City of Waverly could have deployed social media alerts. Ex. 3 at 40:1-19. | At 7:12 am CT, the Waverly Department of Public Safety–Police & Fire posted a warning on Facebook: "If you are along trace creek in flood prone areas evacuate now." Ex. 7, Waverly Department of Public Safety–Police & Fire Facebook Post (Weivoda Dep. Ex. 260). |

The real-world timeline of Plaintiffs' own expert (7:50 am CT) forecloses the warning theory, demonstrating that public officials' flood response did not and could not have turned on CSXT's supposed failure to warn. Indeed, the first call for water rescues began at 7:33 am CT. Ex. 21, Brown Dep. Tr. at 76:6-12. Even Ms. Weivoda does not say otherwise: she does not opine that a 7:50 am CT warning would have changed any outcomes, merely that such warnings would have increased "situational awareness." Ex. 4 at 3. This alone cannot meet Plaintiffs' burden to show "some evidence from which a jury might conclude that an adequate warning *would have altered the conduct that led to the injury*." *Clark v. Danek Med., Inc.*, No. CIV.A. 3:94CV-634-H, 1999 WL 613316, at *6 (W.D. Ky. Mar. 29, 1999) (emphasis added) ("the Court finds no evidence to support the assertion that either [the plaintiff] or [his treating physician] would have made a different decision had either known that the [medical device implanted in the plaintiff] was not FDA approved for this specific operation").

For avoidance of doubt, this too is not some battle of the experts. This causation deficiency requires no consideration of CSXT's experts. Crediting all Plaintiffs' causation evidence, expert and otherwise, Plaintiffs cannot meet their burden of establishing cause-in-fact causation. Summary judgment is thus in order. *See, e.g.*, *Cox*, 1993 WL 72488, at *1 (unpublished table opinion) (affirming summary judgment for TVA in flood case where "plaintiff failed to produce any evidence to establish essential elements" including causation); *Owings v. Owings*, 661 S.W.3d 141, 149 (Tenn. Ct. App. 2022) (affirming summary judgment in part because plaintiff's argument "is based entirely on speculation and points to no facts demonstrating that Defendant's actions were negligent except that an accident occurred and that Defendant was driving"); *Epps v. Thompson*, No. M201701818COAR3CV, 2018 WL 1353589, at *5 (Tenn. Ct. App. Mar. 15, 2018) ("mere speculation about the cause of an injury is insufficient to establish liability on a negligence

9

claim") (citation omitted); *Hickman v. Jordan*, 87 S.W.3d 496, 499 (Tenn. Ct. App. 2001) ("negligence is not presumed from the mere fact of an accident or injury").

### B. Most Duties That Plaintiffs Allege Do Not Exist Or Apply, And Any Duty CSXT Owed Under Tennessee Common Law Or FRA Regulation Was Not Breached

Plaintiffs' negligence claims all depend on the existence of a duty of care CSXT owed to them. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995) (duty is "an essential element in all negligence cases"); *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993) (same); *Rogers,* 367 S.W.3d at 206 ("The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, which are duty, breach of duty . . ."); Tenn. Code Ann. § 20-5-113 (West); *Wilburn v. City of Memphis*, No. W2009-00923-COA-R3-CV, 2010 WL 1407233, at *5-6 (Tenn. Ct. App. Apr. 9, 2010).[1]

"Traditionally, the question of whether a defendant owes a duty of care to the plaintiff is a question of law to be determined by the Court." Op. at 4 (quoting *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 365 (Tenn. 2009) (citation in *Giggers* omitted); *see also Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000) (same).

In denying CSXT's motion to dismiss, the Court found that Plaintiffs had adequately pleaded legal duties owed. Op. at 5-10. The Court proceeded to list Plaintiffs' seven alleged duties:

> (1) "[t]he duty to ensure the natural passage of Trace Creek's water flow through its Culvert under its Trace Creek Bridge without obstruction," (Dkt. No. 65 ¶ 59(a)); (2) "[t]he duty to prevent the unnatural accumulation of water on its property and on its property of neighboring property owners," (id. ¶ 59(b)); (3) "[t]he duty to prevent dangerous conditions from existing on its own property," (id. ¶ 59(c)); (4) "[t]he duty not to trespass and create dangerous conditions on its neighbor's property," (id. ¶ 59(d)); (5) "[t]he duty to warn anyone in harm's way if a dangerous condition exists on its own property," (id. ¶ 59(e)); (6) "[t]he duty to warn anyone in harm's way if it creates a dangerous condition on its neighbor's property," (id. ¶ 59(f)); and (7) "[t]he duty to exercise reasonable care under all

---

[1] As discussed in Section IV.E, the nuisance claim (Count V) fails on other grounds.

circumstances." (Id. ¶ 59(g)).

*Id* at 8. "Taken together or separately," these "focus on preventing a dangerous condition (the unnatural lake that swelled behind and ultimately broke the Railbed Dam) from forming on and around CSXT's land and warning those whom the condition placed at risk." *Id*.

Discovery has since revealed the alleged sources and bases of these pleaded duties. Most do not exist, as they are based on a general code of some railroads that even Plaintiffs' expert admits does not apply to CSXT; on internal CSXT company rules that Plaintiffs have no private action to enforce; or a misunderstanding of the duty of voluntary undertaking. As for duties that might exist and apply, FRA standards that Plaintiffs' expert initially raised were in fact met, some by the expert's own concession. Plaintiffs' experts ignore the only relevant FRA drainage statute, with good reason: the undisputed evidence shows that there is no violation of that statute because the Trace Creek Bridge was free of obstruction, with water flowing freely, on August 21, 2021, according to the sworn testimony of both Craig Orr and Cory Oakley. Ex. 15, Orr Dep. Tr., Vol. II at 15:1-16:11; 16:24-17:7; 18:10-17; 42:18-23; Ex. 16, Oakley Dep. Tr. at 123:10-124:11. There is no competing evidence to the contrary as to the condition of the bridge on the morning of the flood. This leaves only pleaded duties under Tennessee water law, which do not apply because neither the August 21 washout nor the "unnatural lake" allegedly formed behind the railbed was foreseeable by CSXT, an essential requirement for imposing a duty, as this Court has observed.

### 1. GCOR Does Not Apply

Plaintiffs' retained expert Mr. Porro initially opined that CSXT owed duties under provisions of a general code of operating rules which some railroads observe, and which he shortforms as "GCOR."[2] Ex. 8, Porro Rept. at 9 (alleging CSXT failed to comply with GCOR

---

[2]GCOR sets out certain rules for certain railroads, mainly Class I railroads that operate west of the Mississippi. General Code of Operating Rules Committee. (2020). *General Code of*

11

1.47); *id.* at 11 (alleging CSXT failed to comply with GCOR 6.32); *id.* ("CSX's combined rule violations show a systemic departure from standard operating practices, GCOR obligations and CSX's own MWI protocols."); *id.* ("The dispatcher's lack of communication directly violated GCOR"). Yet, in deposition, Mr. Porro conceded he was mistaken: "I confused my GCOR and my NORAC rules, so per this report whatever I give you would be irrelevant, because it's -- *CSX does not fall under GCOR.*" Ex. 9 at 212:25-213:11 (emphasis added). His admission ends the GCOR theory of duty.

### 2. CSXT Internal Policies Create No Duty Enforceable by Third Parties

Mr. Porro next pivots to internal CSXT rules, opining that "CSX's internal rulebooks and GCOR provisions impose strict, non-discretionary duties in the presence of heavy rainfall, flooding, compromised roadbeds, rising water levels, and indications of washout hazards." Ex. 8, Porro Rept., at 8; *see also id.* at 12 ("The railroad was presented with multiple escalating warning signs of imminent danger, each of which triggered non-discretionary duties under CSX and GCOR rules."). In particular, Mr. Porro points to various rules of CSXT's Maintenance and Ways Department (rules termed "MWI" for shorthand), a CSXT Bridge Resource Guide, and a CSXT dispatcher guideline, all of them purely internal to CSXT. *Id.* at 2 (Bridge Resource Guide); *id.* at 6 (CSXT "violat[ed] mandatory protocols" by not ordering a track inspection after "SkyGuard escalated flash flood warnings as rainfall exceeded MWI 1110-04 thresholds"); *id.* at 8 (asserting violations of MWI 1110-04, MWI 1401-05, and CSXT Dispatcher Procedural Instructions).

But internal CSXT rules and policies are just that: internal. They are not enforceable by Plaintiffs or other third parties, and they do not create a legal duty that others may enforce. Courts

---

*Operating Rules* (8th Edition). CSXT has not adopted GCOR, as Mr. Porro readily conceded when pressed. Porro Dep. Tr., Ex. 9 at 213:4-7.

applying Tennessee law have repeatedly held as much. Typical is *Tipton v. CSX Transp., Inc.*, where then-Chief Judge Varlan granted summary judgment for CSXT because CSXT's internal operating rules did not "provide[] a standalone, actionable basis for state-law negligence and nuisance claims." No. 3:15-CV-311-TAV-CCS, 2017 WL 10398182, at *21 (E.D. Tenn. Oct. 25, 2017); *see also Johnson v. Rowsell*, No. M2009-00731-COA-R3-CV, 2009 WL 3460365, at *7 (Tenn. Ct. App. Oct. 27, 2009) (affirming summary judgment where court could "find no authority that establishes that an internal policy creates a legal duty to the public at large").

The outcome might be otherwise had the referenced CSXT rules or policies been instituted because they were required by law. It was not in *Tipton*, and it is not here. Nor do Plaintiffs so contend, through their experts or even in their Complaint. Indeed, Plaintiffs' expert Mr. Porro readily admits there is no such regulatory requirement or basis for his theories of duty. Ex. 9 at 218:17-219:1 (conceding he cites no authority for the contention that railroads routinely notify local government of risks to public safety); *id.* at 165:21-166:3 ("No, ma'am, I don't know that there's a CFR that matches what you're asking."); *id.* at 174:20-175:1; 176:21-178:5. Given a similar lack of legal directive, courts refuse to transform a company's internal rules into legally binding duties, including in the rail setting. *Tipton*, 2017 WL 10398182, at *21; *Johnson*, 2009 WL 3460365, at *7 (affirming summary judgment where court could "find no authority that establishes that an internal policy creates a legal duty to the public[]").

### 3. CSXT Breached No Duty To Conduct Inspections Or Train Employees

Mr. Porro initially opined that CSXT failed to conduct "special inspections" as called for by an FRA regulation, and failed to visually inspect and verify track and bridge conditions as required. Ex. 8 at 13 (citing 49 CFR 213.239 on special inspections); at 15 (citing 49 CFR 213.233 on verification of track conditions). Yet his own testimony, among other undisputed evidence,

13

proves this false. Mr. Porro ultimately concedes CSXT did in fact perform any required special inspection. Ex. 9 at 190:2-05. He likewise concedes that CSXT's Mr. Orr did inspect the track after the flash flood warning. *Id.* at 192:17-192:24.

Indeed, CSXT undeniably exceeded inspection requirements. The relevant bridge inspection requirement, contained in 49 CFR 237.101, requires that a rail bridge be inspected each 540 days. CSXT's bridge inspector Mr. Hutchison testified, without contradiction, that the company exceeds that requirement, as he personally inspected the Trace Creek Bridge annually. Ex. 10, Hutchison Dep. Tr. at 31:4-10. There is no evidence that CSXT failed to properly inspect the Trace Creek Bridge; there is undisputed evidence that it did. *Id.*; Ex. 11, Foster Dep. Tr. at 83:20-25; 79:2-82:20.

As for training, Mr. Porro asserts CSXT failed to ensure adequate oversight and supervision of trained employees. Ex. 8 at 16-18 (citing 49 CFR 243 Training, Qualification, and Oversight). This fails to assert any actionable duty for two reasons. First, Mr. Porro does not identify which provision of 49 CFR 243 CSXT purportedly violated, nor does he supply any evidentiary basis for the opinion. Second, and more fundamentally, his interpretation of the regulation is wrong. By its plain terms, 49 CFR 243 applies only to "Safety-Related Railroad Employees"—it does not govern every railroad employee, and it does not govern employees engaged in debris removal operations. *See* Ex. 12, FRA Federal Register, Nov. 7, 2014, Section-by-Section Analysis for Part 243.1, at 66476; Ex. 13, Training, Qualification, and Oversight for Safety-Related Railroad Employees: Compliance Guide. Mr. Porro offers no analysis of this scope limitation; he simply ignores it.

### 4. CSXT Assumed No Voluntary Undertaking

Finally, Mr. Porro opines that CSXT "has a duty to ensure the safety of the communities it serves" because CSXT "issued its Environmental, Social and Governance Reports" and "[t]hese reports are a voluntary undertaking by CSX." Ex. 8 at 3. This profoundly misapprehends the

14

voluntary undertaking doctrine. As the Tennessee Supreme Court has explained, a voluntary undertaking arises only "where a party has undertaken to provide services to another" and then harm results "from the negligent performance of the undertaking." *Grogan v. Uggla*, 535 S.W.3d 864, 873-74 (Tenn. 2017). Otherwise, and barring some exception not found here, there is no duty in Tennessee to rescue or to act voluntarily. *See Satterfield v. Breeding Insulation. Co.,* 266 S.W.3d 347, 355-62 (Tenn. 2008) (tracing Tennessee law on the "no duty to act rule" since "[i]mposing a duty to act or to rescue strays dangerously into interference with individual liberty").

Mr. Porro cites no "services" that CSXT volunteered to provide Plaintiffs, for there are none. Instead, Mr. Porro relies on the deposition of CSXT's Senior Manager of Sustainability, Ms. Hensley, Ex. 8, Porro Rept. at n. 12, and her testimony that CSXT voluntarily prepares reports for its customers, employees, and shareholders regarding various topics. Ex. 8 at 3. Granted, these reports are prepared "voluntarily," Ex. 14, Hensley Dep. Tr. at 13:24-14:5—confirming the earlier dispositive point that they are not required by law, so are not enforceable in this case. What they are *not*, though, are some *specific* voluntary, binding commitment by CSXT to assume and accept some new duty at law, much less a duty relevant to this flood and this community. These annual reports are prepared as public disclosures to CSXT's stakeholders, customers, employees, and shareholders. *Id*. The reports make no mention of Waverly, Humphreys County, any particular bridge, or CSXT voluntarily taking on any duties to Plaintiffs. Because these reports do not speak to Plaintiffs, or Waverly, and do not reveal CSXT volunteering to do anything with respect to the claims in this lawsuit, they do not constitute a "voluntary undertaking."

### 5. CSXT Breached No Duty Concerning Debris or The Trace Creek Bridge, And Breached No Theorized Duty to Warn

This leaves only Plaintiffs' assertion of duties either from the FRA's drainage regulation or from Tennessee law of natural water flow and warnings. Plaintiffs allege that CSXT's "failure

15

to comply with the federal standard of care for railroad safety set forth in 49 CFR 213.33 establishes a breach by CSX of its duty as a Tennessee landowner." SAC ¶ 66. Plaintiffs add that CSXT committed this failure in a particular way: by permitting water obstruction through debris accumulating under its bridge. *See, e.g.*, *id.* ¶¶ 2, 7, 22, 30, 61. Plaintiffs assert that CSXT failed to warn Waverly's public safety officials of the risk posed by accumulated water allegedly caused by the obstructed bridge. *Id.* ¶¶ 11, 68, 74, 81, 88.

With discovery closed, Plaintiffs have no competent record evidence of either theory—a failed duty to keep the Trace Creek Bridge free from obstruction, or of some "warning."

***No obstruction.*** Plaintiffs' first notion is flatly contradicted by the undisputed record. There is no evidence the space under the bridge was obstructed on the day of the flood—the day that matters, for all of Plaintiffs' grievances of debris and all their alleged harms turn on what occurred on, and only on, that day. Plaintiffs have produced no evidence that debris was clogging the culvert on the day of the flood, or that the space under the bridge was obstructed.

This is confirmed by the undisputed record evidence that water flowed freely under the bridge on the day of the flood—including a picture *depicting that very thing*: water flowing freely, not obstructed or clogged by debris. *See* Ex. 15, Orr Dep. Tr. Vol. II at 15:1-16:11; 16:24-17:7; 18:10-17; 42:18-23; Ex. 16, Oakley Dep. Tr. at 110:23-113:17; 123:14-23; Ex. 17, Rigney, et. al v. CSX 000001 (Oakley Dep. Ex. 5).

This dooms Plaintiffs' reliance on clogging as a source of any duty, including the drainage regulation. SAC ¶¶ 65-66. Indeed, and oddly, after hailing this regulation (49 CFR 213.33) in their operative complaint and as useful when opposing CSXT's motion to dismiss, it is notably absent from Plaintiffs' experts' reports and their deposition testimony. No Plaintiff expert offers any testimony, or any opinion, that CSXT failed to comply with this regulation. Mr. Porro, while citing

16

a litany of inapplicable CFR provisions (discussed just above), completely ignores FRA's drainage provision. It provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." Notably, 49 CFR 213.33 does not mandate the complete absence of debris, nor daily inspections nor constant debris removal. The regulation is functional: its point, in plain English, is to ensure that drainage is "free of obstruction" in order to "accommodate expected water flow." The undisputed evidence reveals that the area under CSXT's bridge was free of obstruction, with water flowing freely under it, on August 21, 2021. Thus, whether expected or unexpected, water flow was in fact "accommodated." Ex. 15 at 15:1-16:11; 16:24-17:7; 18:10-17; 42:18-23; Ex. 16 at 110:23-113:17; 123:14-23; Ex. 17.

In light of that and all relevant evidence and history, CSXT's experts uniformly and without contradiction confirm that CSXT fully complied with the duty and standard of care set forth in 49 CFR 213.33. *See, e.g.*, Ex. 18, Peterson Rept. at 40 ("The CSX Trace Creek Bridge meets the applicable Federal Regulation for the design of railroad bridges, Title 49, Subtitle B, Chapter II Part 213.33 Drainage."); Ex. 19, Rusk Rept. at 16 ("CSX was in compliance with Part 213.33 Drainage."); Ex. 18 at 41 ("Leading up to August 21, 2021, tracks and bridges were inspected and maintained in compliance with federal law, including those set forth in 49 Part 213 Track Safety Standards, particularly those set forth in 49 Part 213.33 Drainage[.]").

As for "expected water flow," the same holds. Not one of Plaintiffs' experts opines on this subject, as not one addresses expected water flow for this bridge. In contrast, CSXT's expert, Mr. Rusk, explains the importance and meaning of this standard, how it is interpreted, what it requires, and how CSXT fully met it. *See* Ex. 19 at 14 ("[T]here was no debris that would affect the bridge's ability to accommodate expected water flow."); *id.* ("If the drainage facility accommodates the

17

expected water flow, then it is considered to be in compliance."); *see also id.* at 13 (explaining FRA Compliance Manual guidance addressing "expected water flow").

The same goes for any obstruction as it may relate to Tennessee water law. There is, again, no evidence to back Plaintiffs' theory. Plaintiffs' retained engineer Dr. Blackler, while modeling water flow from CSXT's bridge, does not analyze the presence or effect of debris or obstruction on water movement: he simply assumes it for purposes of his modeling. Ex. 2 at 52:9-22; 100:25-101:5. No other Plaintiff expert fills the void.

***No breached duty to warn***. Plaintiffs' failure to adduce evidence of any clog or obstruction under Trace Creek Bridge also dooms their warnings claim—as it is the existence of a CSXT-created obstruction that Plaintiffs claim CSXT had an obligation to warn them about. There being no obstruction, there was nothing for CSXT to warn about.

### 6. A Washout And "Pooling" Were Not Foreseeable

While not necessary to finding no duty for the reasons just explained, Plaintiffs' duty theory also and alternatively fails because a party can only owe a duty to prevent the foreseeable, and Plaintiffs' theorized washout was not foreseeable as shown by the undisputed evidence.

As this Court previously noted, whether duties at law exist depends in part on foreseeability. "To determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable, and, if so, must then apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable." Op. at 5. "A risk is unreasonable and gives rise to a duty to act with due care if the *foreseeable* probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant . . ." *Id.* (quoting *McCall*, 913 S.W.2d at 153) (emphasis added). "That is, in consideration of, among other things, the presence or absence of prior similar incidents, and other circumstances, does the foreseeability of the harm outweigh the burden of the duty imposed?" *Giggers*, 227 S.W.3d at 365.

18

Plaintiffs theorize that a washout led to a "tidal wave" that caused their harm. Thus, to establish CSXT's duty to act on this risk, including to warn of it, Plaintiffs must establish with evidence that a washout at this location was foreseeable. The undisputed record lacks any such evidence. There is no evidence in the record of a washout previously at this location, including during prior floods, or any reason why it foreseeably would do so on August 21, 2021. Ex. 16 at 137:9-13. Mr. Porro is not to the contrary, acknowledging that railroads cannot at all times predict where and when a washout might occur. Ex. 9 at 170:16-19. And even when a railroad does "everything within its power . . . there may still be a flash flood or a washout[.]" *Id.* at 171:15-22.

The same goes for Plaintiffs' related theory of pooling, ponding, and forming an "unnatural lake" where the washout occurred on August 21, 2021. Ex. 16 at 49:11-50:24. The record contains no evidence of this occurring ever before at this location, *id.*, and no other evidence that might enable CSXT to have foreseen it occurring in 2021, at this location, for the first time.

Absent identifying prior similar incidents, or any facts which should have alerted CSXT to the risk of *this* washout or this unnatural ponding at *this* location in *these* conditions at *this* point in time, Plaintiffs cannot establish foreseeability, and thus cannot establish this threshold predicate for establishing duty. *See, e.g.*, *Rice v. Sabir*, 979 S.W.2d 305, 307 (Tenn. 1998) (finding no duty to warn when "the risk of harm was not reasonably foreseeable"); *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 716 (Tenn. Ct. App. 2019) (landowner duties require foreseeability).

* * *

"Summary judgment is appropriate when an essential element of negligence is missing." *Kellner v. Budget Car & Truck Rental, Inc.*, 359 F.3d 399, 406 (6th Cir. 2004). Even where a duty exists, "the question becomes whether . . . defendant breached the duty." *McCall*, 913 S.W.2d at 153. Plaintiffs having no evidence of any actionable duty breached, summary judgment is in order.

19

### C. ICCTA Preempts Plaintiffs' Effort to Dictate Rail Regulation Through Tort Law

In its ruling denying CSXT's motion to dismiss, the Court set out the framework for assessing whether Plaintiffs' claims are preempted by the ICCTA:

> In 2008, the Sixth Circuit adopted the STB's "comprehensive test for determining the extent to which a particular state action or remedy is preempted by § 10501(b)," *Blissfield*, 550 F.3d at 539 (quoting *New Orleans & Gold Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008)), and reaffirmed as much in 2019. *See CSX Transp., Inc. v. City of Sebree, Kentucky*, 924 F.3d 276, 283 (6th Cir. 2019) (quoting *Blissfield*, 550 F.3d at 539). Under that test, there are two types of preempted state actions or regulations: those that are 'categorically preempted' and those that are 'preempted as applied.'" *City of Sebree*, 924 F.3d at 283 (citing *Blissfield*, 550 F.3d at 540). "A state [action] is categorically or facially preempted if it would directly conflict with exclusive federal regulation of railroads." *Id*. (quoting *Blissfield*, 550 F.3d at 539) (internal quotation marks omitted). On the other hand, "[t]he as-applied analysis requires an 'assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.' *City of Sebree*, 924 F.3d at 283 (quoting *Barrois*, 533 F.3d at 332).

Op. at 11-12. The Court denied CSXT's threshold motion, in part, on the rationale that CSXT "do[es] not mention this framework" and had not indicated whether its ICCTA defense is one of categorical or as-applied preemption. Op. at 12. As to preemption, the Court concluded: "Though Plaintiffs' claims may be preempted by either or both the ICCTA and the FRSA, CSXT will have to marshal the undisputed material evidence and law at summary judgment." Op. at 17.

CSXT submits that it has now done so. First, CSXT clarifies that it asserts as-applied ICCTA preemption. Applying the Court's analysis, then, the question is whether Plaintiffs' claims, now subjected to discovery, would prevent or unreasonably interfere with railroad transportation.

Undisputed material evidence reveals they would. As this Court rightly observed, Plaintiffs' theory of misconduct by CSXT begins with, and hinges on, debris blockage under the Trace Creek Bridge. Op. at 2 ("Blocked by debris . . .") (citing SAC ¶ 22); Op. at 3 ("With the Culvert blocked . . .") (citing SAC ¶ 24-25). Plaintiffs allege this blockage set off a chain of events that "overwhelmed the Railway Dam, creating massive breaches in the earthen embankment"

which in turn "unleashed millions of gallons of water on Waverly and its unsuspecting residents." *Id.* at 3 (citing SAC ¶¶ 24-26); *see also id.* at 13 (noting reference to "several allegations in the complaint that relate to the alleged failure to keep the Culvert free of debris . . .").

All of this turns on a theory of obstruction to the free flow of water caused by debris. Indeed, when CSXT pointed in its motion to dismiss briefing to the many instances of the Complaint attacking the Bridge's infrastructure—its design, construction and maintenance— Plaintiffs emphatically assured the Court that this was not their position in the case—that their position, beyond their warnings theory, turned not on anything about the bridge but on obstruction by debris. *E.g.*, Plaintiffs' Opp. to Motion to Dismiss at 3, Dkt. No. 69 ("However, CSXT fails to explain how fulfilling its duties as a Tennessee landowner to keep its culverts free of debris and to provide warning of imminent danger necessarily implicates the design and construction of its track . . . the Complaint contains numerous allegations that detail CSXT's non-compliance to its failure to keep its Trace Creek bridge culvert free of debris which obstructed and diverted its natural flow. Am. Compl. ¶ 21, 22, 25, 30, and 62."); *id.* at 15 ("Plaintiffs allege that CSXT did not live up to the federal standard set forth in 49 CFR § 213.33 by failing to maintain its culvert free of debris and other obstructions, failing to order additional inspections and clear the culvert of debris after learning about the forecasted rain, failing to monitor and clear the culvert once the rain began, and failing to warn about the flood dangers of the backed-up water.").

The evidentiary record now reveals that there was no such obstruction to the free flow of water on the day of the flood. Ex. 15 at 15:1-16:11; 16:24-17:7; 18:10-17; 42:18-23; Ex. 16 at 110:23-113:17; 123:14-23; Ex. 17. As to water flow, then, Plaintiffs' claims can only be about the CSXT rail bridge and its surrounding infrastructure.[3] And all that leaves is precisely the sort of

---

[3] Plaintiffs' warnings theory fails for independent reasons explained in this brief.

challenge to the design, construction, or operation of railroad infrastructure that courts commonly find preempted as-applied under ICCTA. *See, e.g.*, *Jones Creek Invs., LLC v. Columbia Cnty.*, 98 F. Supp. 3d 1279 (S.D. Ga. 2015) (ICCTA preempts plaintiffs' state law claims against railroad stemming from "the failure, construction, design, and operation of" culverts under track); *Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*, CV No. 12-4179, 2014 WL 4287086, at *6 (D.S.D. Aug. 28, 2014) (ICCTA preempts state law claims seeking to regulate and compel railroad's "reconstruction of its culvert, roadbed, and tracks"); *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144-46 (8th Cir. 2015) (denying petition for review of STB's decision that state law claims seeking compensation from railroad for flooding and property damage allegedly caused by improper design, construction, and maintenance of rail line and support structures are preempted by ICCTA); *A & W Props., Inc. v. Kan. City S. Ry. Co.*, 200 S.W.3d 342, 344-349 (Tex. App. 2006) (affirming summary judgment concluding that property owner's state law claims alleging railroad's refusal to enlarge a culvert threatened flooding of its property are preempted by ICCTA).

Plaintiffs' own allegations, materially unchanged in this respect since the complaint the Court previously considered, confirm the point by steadfastly insisting that their grievance concerns the earthen railbed which supports CSXT's rail bridge and accompanying elevated tracks. Plaintiffs allege that the storm waters "were further prevented from flowing downstream by the man-made dam formed by the earthen railbed which supported CSX's elevated tracks (the 'Railbed Dam')." SAC ¶ 3. Plaintiffs add that "the Railbed Dam *was ill-equipped* to withstand the pressure of millions of gallons of trapped water applying horizontal pressure against its sides" (SAC ¶ 33); that "[t]he Railbed Dam was *not designed* to withstand horizontal pressure delivered by millions of gallons of water") (*id*. ¶ 61(k)); and, again, that "the earthen Railbed Dam . . . [was] *not designed* for the task"). *Id*. ¶ 12 (all emphases added).

22

Simply put, absent debris-induced obstruction—for which there is no evidence—Plaintiffs are, and only can be, saying that CSXT's rail bridge and supporting structures should have been designed or constructed differently.[4] ICCTA's definition of "Transportation," over which the STB has exclusive jurisdiction, undoubtedly covers this theory, as it is "broadly defined" to include not merely tracks but "facilities" (stated twice) along with "spur, industrial, team, switching or side tracks . . . ." *City of Sebree*, 924 F.3d at 283 (quoting in part 49 U.S.C. 10501(c)).

Plaintiffs' claims are pure second-guessing of how CSXT builds its rail structures. Only the STB may do so. Plaintiffs' claims "have the effect of preventing or unreasonably interfering with railroad transportation," bringing Plaintiffs' claims squarely within the scope of ICCTA preemption. Op. at 12 (quoting *City of Sebree*, 924 F.3d at 283 (citing *Blissfield*, 550 F.3d at 540)).

That indulging these claims would burden and interfere with rail transportation is further evidenced by a declaration already submitted in this action by CSXT employee Daniel DeBoer. Decl. of Daniel DeBoer, Dkt. No. 4-2 ("DeBoer Decl."). Mr. DeBoer's declaration testimony, unrebutted in this case, explains that if CSXT were forced to alter, monitor, manage, maintain, and operate the Trace Creek Bridge as sought by Plaintiffs, then CSXT's rail transport operations would need to change materially. DeBoer Decl. at ¶ 8. Any stoppage of rail traffic for bridge renovations or revisions to accommodate the duties Plaintiffs hypothesize, and the tort liability Plaintiffs seek to impose, would "limit CSXT's ability and operational flexibility to efficiently conduct railroad operations." *Id*. Specifically, "Mainline rail traffic wanting to move from the

---

[4] Plaintiffs' engineering expert offers no opinion on the Trace Creek Bridge's design or that it somehow caused the events of August 21, 2021. Ex. 2 at 64:4-9 ("did you provide in your expert report any opinions specific to the design standard of the Trace Creek Railroad Bridge? A. No."); *id.* 174:24-175:8; *id.* 176:18-20 ("I am not providing an opinion on the - - the design of that embankment or the annual frequency capacity of the bridge."). Thus, Plaintiffs' attack on CSXT's infrastructure fails for the additional reason that there is no record evidence to support it.

23

southeastern United States would be blocked or negatively impacted from moving toward Midwest states such as Texas, Arkansas, Mississippi and beyond and vice-versa." *Id*. Those trains would "need to be rerouted, likely through St. Louis or New Orleans," which could cause "delay and disruption for the goods being transported" and "rail traffic diversion to those other hubs would create congestion in those already busy areas." *Id*. ¶ 9. This would also lead to other related burdens such as costs for additional crew, fuel, maintenance and wear, and rerouting fees. *Id*.

Compounding matters, the rail line at issue here is part of STRACNET, the U.S. military's Strategic Rail Corridor Network used to ensure that the nation's rail infrastructure can be used by the military in national defense emergencies. *Id.* at ¶ 10. CSXT is thus subject to federal military monitoring of its closure decisions that impact rail lines within this network. *Id*.

Plaintiffs' inclusion of a maintenance grievance—attacking not merely infrastructure design and construction but also bridge maintenance—does not save their claims. First, the only maintenance grievance Plaintiffs have asserted regarding the Trace Creek Bridge and its infrastructure is the supposed failure to maintain its culvert to avoid obstruction, a claim now debunked by the undisputed record evidence. Moreover, ICCTA's sweeping scope preempts maintenance claims that interfere with rail infrastructure, and with a railroad's ability to manage its operations. *See, e.g.*, *City of Sebree*, 924 F.3d at 285 (finding ICCTA preempts ordinance and settlement agreement requiring railroad to obtain city approval before maintenance or construction projects since "the Ordinance has the effect of prohibiting CSX from using the maintenance method it prefers," so "has the effect of unreasonable interfering with rail operations").

Discovery has confirmed that ICCTA, as applied, preempts Plaintiffs' claims.

### D. The FRSA Preempts Plaintiffs' Attempt To Impose Additional Safety-Related Duties Beyond Subsuming FRA Obligations

Congress enacted the FRSA "to promote safety in every area of railroad operations and to

reduce railroad-related accidents." 49 U.S.C. § 20101. Congress sought nationwide uniformity in the area of rail safety: "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1). Thus the FRSA vests in the Secretary of Transportation [("Secretary")] broad powers to prescribe regulations for "every area of railroad safety." *Id.* § 20103(a) (emphasis added). The Secretary delegated to the FRA its authority to prescribe safety regulations. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662-63 (1993). Congress later amended the FRSA to clarify that while it bars states from imposing obligations in addition to or inconsistent with federal regulation, it does not preempt state tort claims premised on a railroad's alleged failure to comply with federal safety regulations. *See id.* § 20106(b)(1); § 20106(b)(1)(A). Thus, and subject to limited exceptions not applicable here, a state law or suit such as this case is preempted "if a FRSA regulation 'substantially subsume[s]' the subject matter of the suit," unless a plaintiff sufficiently alleges failure to comply with those regulations. *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 429 (6th Cir. 2009) (quoting *Easterwood*, 507 U.S. at 675).

As shown above, Plaintiffs have now unveiled the various FRA regulations on which they rely. Those regulations—covering inspection, training, and drainage—"substantially subsume" the subject matter of Plaintiffs' alleged duties and alleged wrongdoing. Any question on this score at the pleadings stage is now resolved by Plaintiffs' experts' reliance on those very regulations. And in each instance, as shown, the regulation (insofar as it applies at all) was met by CSXT and not breached. The narrow exception for a "local safety or security hazard . . . " (49 U.S.C. § 20106(a)(2)(A)–(C)) cannot save the claims, since there is nothing internally local or security-bound about floodwaters, culverts, or the warnings suggested. *See Parker v. CSX Transp., Inc.*, No. 17-2262, 2017 WL 5560865, at *5 (W.D. Tenn. Nov. 17, 2017) (citation omitted) (exception

does not apply unless hazard in question is "not capable of being adequately encompassed within national uniform standards"). The FRSA preempts Plaintiffs' claims.

### E. Plaintiffs' Strict Liability/Nuisance Claim (Count V) Lacks Evidence And Does Not Fit This Case

Plaintiffs' claim for "Strict Liability/Nuisance" repeats the allegation that CSXT produced an "unnatural lake and tidal wave" which released upon the town of Waverly, resulting in their alleged harm. SAC ¶¶ 93-108. This is a mismatch between law of nuisance and the harms here asserted, and is utterly lacking in evidentiary support.

***Plaintiffs cannot establish a private nuisance.*** A private nuisance is "'anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable.'" *Sadler v. Tennessee*, 56 S.W.3d 508, 511 (Tenn. Ct. App. 2001) (citation omitted). It is a property theory, and even then only viable with evidence of lasting property damage. *See Burnette v. W. Knox Util. Dist.*, No. C.A. 1155, 1988 WL 67154, at *1 (Tenn. Ct. App. June 30, 1988) (holding flood without allegation of lasting property damage is not actionable nuisance). Plaintiffs have pleaded no such enduring disturbance, and the record contains no evidence of one. Plaintiffs' claims of harm do not include property harm, much less a lasting or actionable impairment to their property rights or enjoyment.

***Plaintiffs cannot establish a public nuisance.*** Plaintiffs fare no better under a public nuisance theory. A public nuisance in Tennessee is an interference with the public's use and enjoyment of a public place or with other common rights of the public. *Metro. Gov't of Nashville & Davidson Cnty. v. Counts*, 541 S.W.2d 133, 138 (Tenn. 1976); Restatement (Second) of Torts § 821B (Am. Law Inst. 1979). Critically, a private individual may recover in public nuisance only if he or she "has suffered harm of a different kind from that suffered by other persons exercising the same public right." Restatement (Second) of Torts § 821C cmt. B (Am. Law Inst. 1979); *see*

26

*also Liddle v. Corps of Eng'rs of U.S. Army*, 981 F. Supp. 544, 557–58 (M.D. Tenn. 1997) (dismissing a public nuisance claim where the plaintiffs "suffered no unique injury").

Plaintiffs cannot demonstrate that they suffered harm of a different kind from that experienced by the broader public. The undisputed record—including the produced 911 dispatch orders—establishes beyond dispute that the historic flood in question had severe and widespread effects on residents throughout Humphreys County. Ex. 21, Brown Dep. Tr. at 92:1-7; Ex. 22, 911 Call Dispatch Record (Brown Dep. Ex. 99). Plaintiffs did not uniquely or distinctly experience this flood as compared with the many members of the public who experienced the same devastating flood conditions. *See* Restatement (Second) of Torts § 821C cmt. D (Am. Law Inst. 1979) (reinforcing the uniqueness requirement of Tennessee law).

***Plaintiffs cannot establish a "mixed" nuisance.*** In response to these deficiencies when opposing CSXT's motion for a more definite statement, Plaintiffs suggested that their nuisance claim is one of "mixed" nuisance. Some Tennessee courts have stated that "[c]onduct causing a public nuisance will also give rise to a private nuisance action when it interferes with the use or enjoyment of private property." *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283–84 (Tenn. Ct. App. 1988). Again, this is a property-centric claim in a case not claiming damage to Plaintiffs' properties.

### F. No Evidence Warrants Punitive Damages

Plaintiffs' prayer for punitive damages fails because there is no evidence to support it.

First, punitive damages do not stand alone, and because all of the underlying causes of action fail, so does this prayer for relief. *See, e.g.*, *Wright v. Citizen's Bank of E. Tenn.*, 640 F. App'x. 401, 411 (6th Cir. 2016) (affirming summary judgment on punitive damages where summary judgment on underlying claims proper).

Further, because punitive damages are an extraordinary form of relief, a plaintiff must

27

produce clear and convincing evidence of qualifying conduct to recover them. *See, e.g.*, *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). "Under Tennessee law, punitive damages are proper only if a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Wright*, 640 F. App'x. at 411 (citation omitted). Construing Plaintiffs' Complaint generously, they can only possibly be pursuing punitive damages on a theory of recklessness.[5] "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. *Cf.* T.C.A. § 39-11-302(c) (1991) (criminal definition of 'reckless')." *Hodges*, 833 S.W.2d at 901.

There is no such evidence here, much less clear and convincing evidence. As to the threshold requirement—CSXT's knowledge of the claimed risks—the evidence shows the opposite. There is no evidence that CSXT was aware of debris clogging the culvert on August 21, 2021 (in fact the evidence shows water was flowing). Ex. 15 at 15:1-16:11; 16:24-17:7; 18:10-17; 42:18-23; Ex. 16 at 110:23-113:17; 123:14-23; Ex. 17. The record also confirms CSXT's efforts to clear debris from the space under the Trace Creek Bridge, exactly the opposite of a conscious disregard of it. Ex. 11 at 79:2-82:20; 83:20-25; Ex. 23, Bell Dep. Tr. at 15:23-16:2; 51:8-74:9. Critically, the standard is not the total absence of debris, but debris that actually makes a difference by producing obstruction. Plaintiffs' own expert, Dr. Blackler, explicitly does "not give an opinion of someone doing something wrong" with regard to "the flow of water toward and through Waverly" on August 21. Ex. 2 at 182:18-25. There being no CSXT warning directly to emergency

---

[5] Plaintiffs' Complaint fails to articulate any particular risk that they assert CSXT consciously disregarded. For purposes of this Motion, CSXT presumes that Plaintiffs rely on the claimed presence of debris allegedly clogging the space under the Trace Creek Bridge and the absence of a warning of the same to Waverly personnel.

personnel at 7:50 am CT on August 21, 2021, also does not reflect CSXT's knowledge and conscious disregard of a risk. Indeed, Plaintiffs' emergency management expert testified that CSXT "did not know" that the so-called "tidal wave" was coming toward Waverly. Ex. 3 at 51:20-24. Nor does the record contain evidence of CSXT's knowledge of pooling or ponding behind the tracks at this location, meaning CSXT had no actual or constructive notice of the possibility. Ex. 16, Oakley Dep. Tr. 49:11-50:24.

Plaintiffs cannot show the requisite reckless behavior as a matter of law. In Tennessee, where a defendant takes at least some care to guard against the harm alleged, punitive damages are not warranted. *See, e.g.*, *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 207-08 (Tenn. Ct. App. 2008) (affirming dismissal of award of punitive damages claim where defendant responded to potential harm alleged by initiating voluntary vehicle recall). Here, CSXT took specific acts to guard against any potential harm from the catastrophic flood. For example, CSXT employee Cory Oakley evacuated and rescued civilians during the flooding, saving multiple people. Ex. 16 at 149:11-150:14; Ex. 24, Rigney, et al. v. CSX, 000594-596 (Oakley Dep. Ex. 104). Mr. Oakley was commended by FRA employees, who called his behavior "above and beyond the call of duty," and noted that his "bravery, selfless service, and duty are commendable." Ex. 24 at 595. "These actions show heroism and reflect distinct credit upon himself, CSX's Corporate Citizenship, and A USDOT/FRA regulated entity." *Id.* In fact, an FRA employee personally reached out to Mr. Oakley to "relay the FRA's appreciation for his efforts during the" Waverly flooding. *Id.* at 594.

The record here contrast with those permitting a jury's consideration of punitive awards. The Tennessee Supreme Court found punitive damages available in *Flax v. DaimlerChrysler Corp.*, where a vehicle manufacturer ordered the destruction of its own safety committee's findings warning of the danger associated with defects in its car seats, which defects resulted in a child's

death. 272 S.W.3d 521, 535 (Tenn. 2008). That Court similarly upheld an award of punitive damages against a construction company which buried waste tires "eight to nine feet deep under a layer of compacted rocks, some of which were the size of a pick-up truck" despite being specifically instructed not to do so by the landowner whom it repeatedly told "'not to worry about it' and "we'll clean it up'" and whose own witness testified that "'someone was trying to hide those [tires].'" *Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187-88 (Tenn. 2009) (alteration in original). No such willful suppression or grotesque mischief is found in the record of this case.

Lacking clear and convincing, much less any, evidence of recklessness, courts grant summary judgment rejecting requests for punitive damages. *See, e.g.*, *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 906 (6th Cir. 2010) (affirming grant of summary judgment on punitive damages prayer because allegations that pharmacists improperly filled prescriptions "do not meet the standard for recklessness required under Tennessee law"); *Thompson v. Nat'l R.R. Corp.*, 621 F.2d 814, 819 (6th Cir. 1980) (affirming denial of punitive damages for claims that derailed train traveled too fast and locomotive was unsafe). That result should follow here.

### G. Plaintiffs' Lack Of Necessary Evidence Is More Acute As Two Of Their Experts Should Be Disqualified

As shown above, the opinions of Plaintiffs' experts do not enable Plaintiffs to withstand summary judgment. Strip away their opinions, and Plaintiffs' lack of a viable case for trial is all the more evident. As set forth in CSXT's contemporaneously filed *Dauber*t motions, Ms. Weivoda and Mr. Porro should be disqualified pursuant to Rule of Evidence 702.

### V.    CONCLUSION

CSXT respectfully requests that this Court grant summary judgment in its favor in its entirety, enter judgment for CSXT, and award such further relief as Court deems just and proper.

30

This 3rd day of April, 2026.

Respectfully submitted,

*/s/ S. Camille Reifers*
S. Camille Reifers (BPR #19856)
John J. Bennett (BPR #31976)
Andrew Todd (BPR #39590)
Wai-Lin Danieley (BPR #41433)
REIFERS HOLMES & PETERS, LLC
80 Monroe Avenue, Suite 410
Memphis, TN 38103
(901) 521-2860
creifers@rhpfirm.com
jbennett@rhpfirm.com
atodd@rhpfirm.com
wdanieley@rhpfirm.com

*Attorneys for Defendant CSX Transportation, Inc.*

31

# CERTIFICATE OF SERVICE

I certify that on April 3, 2026, the forgoing document has been served via the Court's CM/ECF system to the following Counsel of Record:

Timothy V. Potter
Andrew E. Mills
Mary Lane Story
Kirk Vandivort
Jennifer Foster
Reynolds, Potter, Ragan & Vandivort, PLC
210 East College Street
Dickson, Tennessee 37055
615.446.2221
615.446.2232 Facsimile
tpotter@rprvlaw.com
amills@rprvlaw.com
mstory@rprvlaw.com
kvandivort@rprvlaw.com
jfoster@rprvlaw.com

Peter J. Flowers
Frank V. Cesarone
Jonathan P. Mincieli
Christopher Warmbold
Tom Connelly
Meyers & Flowers, LLC
3 North Second Street – Suite 300
St. Charles, Illinois 60174 630.232.6333
630.845.8982 Facsimile
 pjf@meyers-flowers.com
fvc@meyers-flowers.com
jpm@meyers-flowers.com
cjw@meyers-flowers.com
tmc@meyers-flowers.com

***Attorneys for Plaintiffs***

/s/ *S. Camille Reifers*
S. Camille Reifers