# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| MATTHEW RIGNEY et al., | ) |
| | )   **NO. 3:22-CV-00342** |
| **Plaintiffs,** | )   **(consolidated)** |
| v. | ) |
| | )   **JUDGE WAVERLY D. CRENSHAW, JR.** |
| **CSX TRANSPORTATION, INC.,** | ) |
| | ) |
| **Defendant.** | )   **MAGISTRATE JUDGE LUKE EVANS** |
| | ) |
| | ) |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO CSX
TRANSPORTATION INC.'S OMNIBUS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................. 4

I.      There Are No Undisputed Facts that Defeat Plaintiffs' Claims Premised on CSTX's Negligent Conduct…………………………………………………………………..…. 4

     A.  CSXT's Duties to Plaintiffs Are Established by Tennessee Common Law and Federal Safety Regulations...…………………………….………………....... 4

          1.  The Opinion Recognized CSXT's Duties to Maintain its Property in a Safe Condition…………………………………………………………….…5

          2.  The Opinion Recognized CSXT's Duty to Warn When a Dangerous Condition Exists on its Property……………………………….…………. 6

          3.  There are Disputed Material Facts as to Whether the Catastrophic Harm Caused to Plaintiffs was a Foreseeable Consequence of CSXT's Failure to Maintain its Property in a Safe Condition…………………………...…. 7

          4.  There are No Disputed Material Facts as to Whether the Catastrophic Harm Caused to Plaintiffs was a Foreseeable Consequence of CSXT's Failure to Timely Warn Waverly Residents of the Unnatural Lake that Had Formed on its Property……………………………………………………………..…. 11

     B.  There are Disputed Material Facts as to Whether CSXT Breached its Duties to Plaintiffs.............................................................................................. 11

          1.  There are Disputed Material Facts as to Whether CSXT Breached its Duty to Maintain its Property in a Condition which did not Endanger Plaintiffs…..... 11

          2.  There are Disputed Material Facts as to Whether CSXT Breached its Duty to Warn Plaintiffs of the Dangerous Condition on its Property……………..15

     C.  There are Disputed Material Facts as to Whether CSXT's Was the Cause-in-Fact of Plaintiffs' Harm.......................................................................................16

II.  Federal Preemption Does Not Apply ...............................................................25

III.  Plaintiffs' Nuisance Claims are Supported by the Evidence ...........................................25

IV.  Genuine Issues of Fact Preclude Summary Judgment on Plaintiffs' Claim for Punitive Damages ………………………………………………………………….......27

V.  CSXT's Premature Daubert Challenge Cannot Support Summary Judgment …………...30

CONCLUSION ...........................................................................................................30

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................13

*Bradshaw v. Daniel*, 854 S.W.2d 865 (Tenn. 1993) ........................................................ 5

*Burkett v. Johnston*, 282 S.W.2d 647 (Tenn. Ct. App. 1955) ........................................18

*Calabria v. Corecivic of Tenn., LLC*, 2024 Tenn. App. LEXIS 95 (Tenn. Ct. App. 2024) ….... 4, 5

*Coln v. City of Savannah*, 996 S.W.2d 34 (Tenn. 1998) ..................................................7

*Dean v. Bays Mountain Park Ass'n*, 551 S.W.2d 702 (Tenn. Ct. App. 1977) .......................... 3, 25

*Doe v. Linder Constr. Co.*, 845 S.W.2d 173 (Tenn. 1992) ..............................................17

*Drewry v. County of Obion*, 619 S.W.2d 397 (Tenn. Ct. App. 1981) ..............................17

*Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178 (Tenn. Ct. App. 2008) ................................28

*Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. 2008) ......................................29

*Gibson v. Metro Cmty. Care Home, Inc.*, 2009 Tenn. App. LEXIS 838 (Tenn. Ct. App. Dec. 15, 2009) …………………………………………………………………………….....14

*Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359 (Tenn. 2009) ............................... 5

*Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175 (Tenn. 2009) ...................................... 29

*Hale v. Ostrow*, 166 S.W.3d 713 (Tenn. 2005) ................................................................17, 19, 20

*Hamblen v. Davidson*, 50 S.W.3d 433 (Tenn. Ct. App. 2000) ...................................... 21

*Harris v. Klare*, 902 F.3d 630 (6th Cir. 2018) ................................................................. 3

*Haynes v. Hamilton County*, 883 S.W.2d 606 (Tenn. Ct. App. 1994) .......................... 18

*Hixson v. Am. Towers, LLC*, 593 S.W.3d 699 (Tenn. Ct. App. 2019) ....................................... 6, 8

*Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992) ...................................... 28, 29

*Kilpatrick v. Bryant*, 868 S.W.2d 594 (Tenn. 1993) ................................................ 17, 19

*Lane v. W.J. Curry & Sons*, 92 S.W.3d 355 (Tenn. 2002) ......................................... 27

*Law v. Louisville & N. R. Co.*, 170 S.W.2d 360 (Tenn. 1942) .................................... 18

*Louisville & N.R. Co. v. Mossman*, 16 S.W. 64 (Tenn. 1891) ................................................. 18, 26

*McCall v. Wilder*, 913 S.W.2d 150 (Tenn. 1995) ........................................................... 5, 8, 10, 11

*McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn. 1991) ................................................................. 18

*McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891 (Tenn. 1996) ...................................... 6, 10

*Maxwell v. Lax*, 292 S.W.2d 223 (Tenn. Ct. App. 1954) ............................................................... 27

*Mohr v. DaimlerChrysler Corp.*, No. W2006-01382-COA-R3-CV, 2008 Tenn. App. LEXIS 619 (Tenn. Ct. App. Oct. 14, 2008) ……………………………………………………………….......21

*Parker v. Holiday Hosp. Franchising, Inc.*, 446 S.W.3d 341 (Tenn. 2014) ...............................5, 13

*Phelps v. Wet Willy's Fireworks Supermarket of Tenn.*, 1997 Tenn. App. LEXIS 176 (Tenn. Ct. App. 1997) ........................................................................................................................................12

*Pittman v. Upjohn Co.*, 890 S.W.2d 425 (Tenn. 1994) ............................................................. 5, 23

*Rice v. Sabir*, 979 S.W.2d 305 (Tenn. 1998) ................................................................................. 8

*Rucker v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 1990 Tenn. App. LEXIS 824 (Tenn. Ct. App. 1990) ……………………………………………………………………………….... 26, 27

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015) ..................... 4, 25

*Tlapanco v. Elges*, 969 F.3d 638 (6th Cir. 2020) ......................................................................... 4

*Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274 (Tenn. Ct. App. 1988) .......................................................................................................................................................... 27

*Wilson v. East Tennessee Human Resource Agency, Inc.*, No. E2010-00997-COA-R3-CV, 2011 Tenn. App. LEXIS 207 (Tenn. Ct. App. Apr. 29, 2011) …………………………………….. 14

*Zollinger v. Carter*, 837 S.W.2d 613 (Tenn. Ct. App. 1992) ....................................................... 26

**Statutes**
49 U.S.C. § 20106(b)(1)(A), (C) .....................................................................................................1

**Regulations**
49 C.F.R. § 213.33 .........................................................................................................................13

**Other Authorities**
Restatement (Second) of Torts §§ 291–293 (1964) ...................................................................5, 9

## PLAINTIFFS' RESPONSE TO DEFENDANT CSX TRANSPORTATION, INC.'S OMNIBUS MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiffs, Matthew Rigney, et al., by and through their counsel, and hereby respectfully submit the following response in opposition to Defendant CSX Transportation, Inc.'s ("CSXT") Omnibus Motion for Summary Judgment:

## INTRODUCTION

In its well-reasoned Opinion issued on March 6, 2024 (the "Opinion"), this Court denied CSXT's motion to dismiss, finding that the pleadings sufficiently stated causes of action for wrongful death, personal injury, and intentional infliction of emotional distress founded in negligence arising from duties recognized under Tennessee common law and federal railroad safety board regulations. (Dkt. 118 p. 8, 10). Of course, the Opinion left open the ability of any party to bring a motion for summary judgment should discovery establish that undisputed material facts sustain or defeat any of Plaintiffs' claims.

CSXT's motion for summary judgment ignores the standards of Rule 56 and instead recycles its unsuccessful arguments regarding preemption and duty set forth in its motion to dismiss. With respect to preemption, CSXT once again reimagines Plaintiffs' claims as imposing duties and remedies which would cause massive disruption to its railway operations to such an extent that it could potentially cripple our country's rail transportation system and endanger our national security interests. (MSJ p. 23-24). Not only does CSXT's motion repeatedly take statements out of context and misrepresents the record before this Court as undisputed, it ignores that the claims at issue here arise from state common law and federal safety regulations and are exempt from preemption under 49 USC 20106(b)(1)(A) and (C). Moreover, CSXT has yet to

1

explain how keeping a culvert clean or, in the event of an imminent catastrophe, making some phone calls, would cause a massive disruption of rail service through central Tennessee.

As established in the Opinion, the question of whether CSXT owed Plaintiffs a duty of care is a question of law. (Dkt. 118 at p. 4). The Opinion confirmed that CSXT, as a Tennessee landowner, has certain duties imposed by the common law to maintain its property in a manner that prevents the formation of dangerous conditions. (Dkt. 118 at p. 6). The Opinion further found that the Amended Complaint adequately pleaded that CSXT breached these duties by allowing the culvert to become clogged with debris, which allowed millions of gallons of water to dam up behind the unnatural earthen embankment CSXT constructed to support its elevated tracks (the "Railbed Dam"). Further, the Opinion recognized that under Tennessee law, once CSXT knew or should have known that a dangerous condition had developed on its land, it had a duty to warn people who stand in harms way. (Dkt. 118 at p. 8, 10).

Remarkably, the pending motion contends that this Court's findings as to CSXT's duties under Tennessee common law have been overturned as a result of deposition testimony elicited from one of Plaintiffs' experts, Mr. Joseph Porro, who provided opinions as to the operational standards upheld by reasonable railroad operators. (MSJ p. 11-14). According to CSXT, Mr. Porro's cited testimony proves that its internal operating rules and policies cannot establish a legal duty. (MSJ p. 12-13). But the Plaintiffs' claims do not cite CSXT's operational rules or internal procedures to establish duty, nor would CSXT's adherence to its own rules or procedures necessarily provide exoneration from compliance with its common law duties as a responsible property owner.

To the extent that it feigns to recognize that it owed any duties to Plaintiffs, CSXT represents that discovery has yielded no evidentiary support to sustain Plaintiffs' claims; however,

2

the record demonstrates the opposite. A cursory review of the evidence adduced from the extensive discovery exchanged between the parties establishes that the elements of Plaintiffs' causes of action are sustained by undisputed facts, as well as by disputed material facts which can only be resolved by a jury.

CSXT's attack on Plaintiffs' nuisance claim also fails because it misapprehends both the nature of nuisance liability under Tennessee law as well as the evidentiary record. In Tennessee, a nuisance is a *condition* that "does not necessarily depend on the degree of care used, but rather on the danger…resulting even with the best of care.". *Dean v. Bays Mountain Park Ass'n*, 551 S.W.2d 702, 705 (Tenn. Ct. App. 1977). Here, the record supports that CSXT's embankment and drainage structures altered the natural flow of surface water, causing it to accumulate, impound, and ultimately discharge in an unnatural and destructive manner.

CSXT's also argues that it is entitled to summary judgment as to Plaintiffs' prayer for punitive damages. This argument fails because CSXT again improperly ignores disputed evidence to reach its self-serving conclusion that no jury could find the company's conduct reckless. However, when viewed in the light most favorable to Plaintiffs, the record supports a finding of recklessness through CSXT's failure to properly maintain the culvert and, worse still, its failure to warn the residents of Waverly of the catastrophic danger an unnatural lake pressed against a Railbed Dam posed to the downstream residents.

At the summary judgment stage, CSXT bears the burden of demonstrating that no genuine dispute of material fact exists and that, based on the record, no reasonable jury could return a verdict in Plaintiffs' favor. *See Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). It has failed to carry that burden but instead effectively demands a level of proof reserved for trial, mischaracterizes and selectively reads Plaintiffs' expert testimony, disregards the permissible role

3

of circumstantial and inferential evidence, and repeatedly resolves disputed facts in its own favor rather than viewing the record in the light most favorable to Plaintiffs. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020).

When the evidence is properly considered under Ruleit is clear that genuine disputes of material fact exist as to causation, duty, breach, and foreseeability. Because those factual disputes must be resolved by a jury, summary judgment should be denied.

## ARGUMENT

**I.    There Are No Undisputed Facts that Defeat Plaintiffs' Claims Premised on CSTX's Negligent Conduct.**

Five elements are necessary to establish negligence claims under Tennessee law, namely: (1) the defendant owed the plaintiff a duty of care, (2) breach of the duty of care, (3) an injury to the plaintiff, (4) cause-in-fact, and (5) proximate cause. *Calabria v. Corecivic of Tenn., LLC,* 2024 Tenn. App. LEXIS 95, ¶ 16. CSTX's motion contends that undisputed facts defeat four of the required elements, specifically duty, foreseeability, breach, and cause-in-fact. For purposes of summary judgment, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). CSXT's motion fails to meet its evidentiary burden to either (1) negate any of the elements of Plaintiffs' negligence claims, or (2) affirmatively demonstrate that Plaintiffs will be unable to establish any such element.

**A.    CSXT's Duties to Plaintiffs Are Established by Tennessee Common Law and Federal Safety Regulations.**

CSXT asserts that it has learned through discovery that its duties as a Tennessee landowner, previously recognized in this Court's March 6, 2004 Opinion, no longer exist. (MSJ p. 10-15). Distilled to its essence, CSXT contends that the deposition testimony of Mr. Porro, a railroad operations expert engaged by Plaintiffs, prohibit CSXT's internal operating rules and policies from being cited to establish a legal duty. (MSJ p. 12-13). But Plaintiffs' allegations of the source of CSXT's duties never cited CSXT's internal operating rules and policies but derive from Tennessee common law.

As explained in this Court's Opinion, the existence of a legal duty is a question of law which is certainly not dependent upon the testimony or opinion of witnesses:

> "Properly defined, duty is the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995) (citing *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 428 (Tenn. 1994)). "A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id*. (citing Restatement (Second) of Torts, § 291 (1964)). "The imposition of a legal duty reflects society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." *Giggers*, 277 S.W.3d at 365 (quoting Bradshaw v. Daniel, 854 S.W.2d 865, 870 (Tenn. 1993)).

**1. The Opinion Recognized CSXT's Duties to Maintain its Property in a Safe Condition.**

Property owners, such as CSXT, have duties arising under the common law to maintain their property in a manner that does not create dangerous conditions and to "either remov[e], or warn[ ] against, any dangerous condition on the premises of which the property owner is actually aware or should be aware through the exercise of reasonable diligence." *Parker v. Holiday Hosp. Franchising, Inc.*, 446 S.W.3d 341, 350 (Tenn. 2014). See also, *5 v. Corecivic of Tenn., LLC,* 2024 Tenn. App. LEXIS 95, ¶ 16).

5

In addition, railroad operators such as CSXT are subject to legal duties established by federal safety regulations. 49 CFR 213.33 provides that "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and *kept free of obstruction*, to accommodate expected water flow for the area concerned." (emphasis added).

The Opinion recognized that under common law and pursuant to federal safety regulations, CSXT owed legal duties to maintain its property in a safe condition and, in the context of Plaintiffs' claims, required the Defendant to act reasonably (1) "to ensure the natural passage of Trace Creek's water flow through its Culvert under its Trace Creek Bridge without obstruction," (Doc. No. 65 ¶ 59(a)); (2) "[to prevent the unnatural accumulation of water on its property and on its property of neighboring property owners," (id. ¶ 59(b)); (3) "to prevent dangerous conditions from existing on its own property," (id. ¶ 59(c)); and (4) "[to not trespass and create dangerous conditions on its neighbor's property," (id. ¶ 59(d)). (5) and to exercise reasonable care under all circumstances." (Id. ¶ 59(g)). Dkt. 118 at 8.

## 2. The Opinion Recognized CSXT's Duty to Warn When a Dangerous Condition Exists on its Property.

The duty to warn of a dangerous condition is ingrained in Tennessee's common law. *McClung v. Delta Square Ltd. Partnership,* 937 S.W.2d 891, 901 (Tenn. 1996) (employing a broader foreseeability analysis consistent with principles of fairness and justice). As with all negligence claims, the determination of whether a duty to warn is owed requires a balancing of the foreseeability and gravity of the potential harm against the burden imposed in preventing that harm. *Id*.; *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 716 ("[o]wners and possessors of property must exercise this same standard of care with regard to persons off the premises when the foreseeability and gravity of harm outweigh the burden imposed by engaging in safer, alternative

conduct."(emphasis in original); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)("[a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm."). The scope of a duty to warn of an existing danger is defined by what is reasonable under the circumstances, taking into account the risks posed by the likely hazards inherent in the situation; the obligation must be proportionate to the magnitude of the potential injury. *Coln v. City of Savannah*, 996 S.W.2d 34, 39 (Tenn. 1998).

In its Opinion, this Court found that CSXT, like any other Tennessee property owner, owed a legal duty to warn if they become aware (or should have become aware) that a dangerous condition existed on their property. (Dkt. 118. p. 8). In the context Plaintiffs' claims, this duty required CSXT to warn anyone in harm's way if a dangerous condition exists on its own property, or if it creates a dangerous condition on its neighbor's property. (Dkt. 118. p. 8).

The tragic deaths of twenty Waverly residents and widespread devastation that was wrought upon the Waverly community underscore the incredible risks posed by the unnatural lake that formed behind the Trace Creek Bridge. In light of that risk, a reasonable jury could conclude that it would have imposed only a minimal burden on CSXT to have one of its employees pick up a phone on the morning of August 21, 2021, and warn those downstream that an unnatural lake filled with millions of gallons of water was being held back by railbed not designed for that purpose.

3.   **There are Disputed Material Facts as to Whether the Catastrophic Harm Caused to Plaintiffs was a Foreseeable Consequence of CSXT's Failure to Maintain its Property in a Safe Condition.**

As acknowledged by CSXT, the Opinion correctly sets forth the fundamental balancing test of Tennessee's foreseeability analysis which weighs whether the foreseeable probability and

gravity of harm posed by defendant's conduct outweighs the burden upon defendant to act (Op. p5; quoting *McCall*, 913 S.W.2d at 153). Ignoring this balancing test which is a normally a question of fact for a jury, CSXT asserts that even if it failed to maintain its property in a safe manner and, even if it failed to warn the residents of Waverly after it knew or should of known that an unnatural lake was forming behind its Railbed Dam, the catastrophic harm caused to the Plaintiffs was not reasonably foreseeable. (MSJ p. 11, 18-19). CSXT cites *Rice v. Sabir*, 979 S.W.2d 305, (Tenn. 1998) and *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 716 (Tenn. Ct. App. 2019), to support its proposition that "[a]bsent identifying prior similar incidents, or any facts which should have alerted CSXT to the risk of *this* washout or this unnatural ponding at *this* location in *these* conditions at *this* point in time, Plaintiffs cannot establish foreseeability, and thus cannot establish this threshold predicate for establishing duty." (MSJ p. 19). But *Rice* does not provide any support for Defendant's "one free tort" theory but simply confirms that a property owner does not have a duty to remove or warn against "conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable care." *Rice* at 309 (homeowner was found not liable when tree trimmer fell off roof made slippery by mold that homeowner had no knowledge of). CSXT's citation to *Hixson* for support is more problematic as foreseeability was not even at issue in the case.

While prior incidents are relevant to the balancing test of a proper foreseeability analysis, CSXT misstates the law by insisting that the catastrophic harm to the residents of Waverly was not foreseeable as a matter of law, because this is the first time, at the Trace Creek Bridge location, that a large section of CSXT's Railbed Dam collapsed, suddenly releasing millions of gallons of water from an unnatural lake which had formed on its property. (MSJ p. 19). As the Tennessee Supreme Court made clear in *McCall v. Wilder*, 913 W.W.2d 150, 153 (1995), duty turns not on

8

the foreseeability of the precise manner in which an injury occurs, but on whether the defendant's conduct created a foreseeable and unreasonable risk of harm. A risk is unreasonable and gives rise to a duty when "the foreseeable probability and gravity of harm" outweigh the burden of taking reasonable precautions, and courts must evaluate that question by considering factors such as the likelihood of harm, its potential magnitude, and the feasibility of safer alternative conduct along with the relative costs associated with that conduct. *Id.* (citing Restatement (Second) of Torts §§ 291–293).

The record contains ample evidence from which a reasonable jury could find that CSXT's conduct posed a foreseeable and unreasonable risk. Plaintiffs have identified multiple sources of foreseeability that extend well beyond hindsight reconstruction. First, the Waverly area had a documented history of flooding, including significant flood events in 2010 and 2019 (a flooding event in which CSXT experienced a washout), placing CSXT on notice of the general risk of high-water conditions affecting infrastructure in and around Trace Creek. (Ex. 8, Corey Oakley Dep. at 44:23-45:11). Second, in the hours leading up to the incident, severe internal weather forecasts and escalating rainfall warnings signaled an extraordinary precipitation event, materially increasing the probability of flooding, debris transport, and hydraulic stress on bridge structures. (Ex. 16, Craig Orr. Dep. at 6:22-10:24). Consider also, the last CSXT conductor that operated a train through the neighboring upstream McEwen area in the early morning hours of August 21, 2021 described the conditions as "riding through a waterfall." (Ex. 18, Eric Gravil Dep. at 28:3-23). Third, the inherent characteristics of the Trace Creek Bridge itself, particularly its susceptibility to debris accumulation during rain events, created a known mechanism by which water could be obstructed, impounded, and suddenly released. (Ex. 7 Andy Essary Dep. at 26:4:6; 69:20-70:13;

9

Ex. 22, Jeremy Bell Dep. at 65:6-66:10; Ex. 5, Joseph Foster Dep. at 24:19-25:6; Ex. 24, Jonathan Hutchinson Dep. at 62:4-63:21).

That risk was not theoretical. Testimony from Mr. Porro confirms that debris accumulation at the bridge was a recurring condition known to CSXT personnel. (Ex. 6, Porro Dep. 143:17–24);Ex. 25, Michael Todd Davis Dep. at 36:5-23). A reasonable jury could infer from this testimony that CSXT was aware that, during periods of elevated flow, the bridge could function as a choke point impeding water passage and creating the very type of pooling and pressure conditions that increase the likelihood of structural compromise or sudden release.

Moreover, CSXT's own conduct in the lead-up to the incident further supports foreseeability. The evidence shows inspections were undertaken in response to flood warnings, demonstrating CSXT's contemporaneous recognition of heightened risk conditions. (Ex. 16, Craig Orr. Dep. at 6:22-10:24). This is critical under *McCall*, because foreseeability is assessed based on what a reasonable actor would recognize under the circumstances, not on whether the precise chain of events had previously occurred. The fact that CSXT mobilized inspections in response to weather alerts is itself evidence that it appreciated the danger posed by flooding conditions to its infrastructure.

When these facts are considered together, in the light most favorable to Plaintiffs, it is reasonable to conclude that it was foreseeable to CSXT that (1) extreme rainfall would generate substantial runoff, (2) debris would accumulate at the bridge and obstruct flow, (3) water would pool upstream, and (4) a sudden release or structural failure could occur with devastating downstream consequences. The law does not require prior identical incidents to establish duty; it requires only that the "general type of harm" be reasonably foreseeable under Tennessee's balancing test. *McClung*, at 900-901. Here, the general risk of flood-related obstruction,

impoundment, and sudden release of water causing downstream injury is precisely the type of harm that a reasonable actor in CSXT's position could (and should) anticipate.

Accordingly, under the framework articulated in *McCall*, the evidence is more than sufficient to permit a jury to find that CSXT's conduct created a foreseeable and unreasonable risk of harm, thereby giving rise to a duty of reasonable care. And because foreseeability "is ordinarily a question for the jury,", summary judgment on this basis is inappropriate. *McCall* at 153.

**4. There are No Disputed Material Facts as to Whether the Catastrophic Harm Caused to Plaintiffs was a Foreseeable Consequence of CSXT's Failure to Timely Warn Waverly Residents of the Unnatural Lake that Had Formed on its Property.**

Absent from CSXT's motion is any argument that the catastrophic injuries and deaths suffered by the Plaintiffs was not a foreseeable consequence of its failure to warn downstream Waverly residents of the danger posed by the unnatural lake that was pressing against the Railbed Dam.

**B. There are Disputed Material Facts as to Whether CSXT Breached its Duties to Plaintiffs.**

**1. There are Disputed Material Facts as to Whether CSXT Breached its Duty to Maintain its Property in a Condition which did not Endanger Plaintiffs.**

CSXT's basis a large part of its motion on its claimed foundational "undisputed fact" that water "flowed freely" and unimpeded beneath the Trace Creek Bridge on August 20, 2021. This premise which CSXT provides as its primary factual basis to avoid liability is totally reliant on the deposition testimony of its employee Mr. Oakley's when he passed over the Trace Creek Bridge the day before the RailBed Dam collapse and recollected that he did not see any debris in the culvert which would have prohibited the flow of water. (MSJ p. 6, 11, 16). But not only is Mr. Oakley's testimony contradicted by lay and expert witnesses, a cursory review of the

circumstances surrounding Mr. Oakley's observations on August 20, 2021, establish that his testimony as to the conditions inside the culvert is incredible on its face.

Mr. Oakley's deposition testimony establish that (1) his inspection of the culvert under the Trace Creek Bridge on August 20, 2021, consisted of riding over it at 25 miles an hour in a high-rail vehicle (essentially a pickup truck modified to run on rail tracks); (2) that his inspection work that day was part of Mr. Oakley routine job duties and not focused on the Trace Creek area; and, (3) that he could not even recall whether he had stopped and gotten out of his vehicle and overlooked the area along the Trace Creek Bridge. Ex. 16, Oakley Depo. Tr. at 145:4-7; 167:18-168:1.

It is well established that courts may disregard impossible or palpably improbable testimony and treat it as no evidence. Further, testimony of inherently impossible observations at variance with well-established and universally recognized physical laws is not credible evidence. P*helps v. Wet Willy's Fireworks Supermarket of Tenn.,* 1997 Tenn. App. LEXIS 176, ¶11. Absent a revelation that Mr. Oakley possesses a superpower to see through bridge embankments as he speeds by them at 25 miles per hour, his testimony that the Trace Creek culvert was free of debris which might impede the flow of water is wholly and utterly incredible.

CSXT's own expert confirmed his human inability to see through the turbid floodwaters of . Ex. 15, Bardol Depo. Tr. at 50:16-51:13 ("I can't see through the turbid waters… I can't tell what's within that water."); *See also* Ex. 16, Craig Orr Depo. Tr. Vol. II at 19:6-18 (Q: "Fair to say you could not see through the water to see if there was any debris at all underneath, correct?" A: "Nobody could. No."). Moreover, Mr. Porro also expressly rejected the notion that a photograph showing water beneath the bridge establishes safe or adequate flow conditions, explaining that, based on his professional experience, the depicted conditions were unsafe and indicative of a

developing hazard. Ex. 6, Porro at 155:19–25, 156:1–6. This testimony directly undermines CSXT's reliance on isolated, unreliable visual observations to establish that the culvert was unobstructed as a factual matter.

More broadly, the evidentiary record demonstrates that a reasonable jury could conclude that the Trace Creek Bridge was obstructed or functionally impaired. Evidence of debris accumulation, the limited and episodic nature of witness observations during a rapidly evolving flood event, and the inability of those witnesses to observe upstream or subsurface conditions all support competing inferences regarding the condition of the bridge. The governing standard is the absence of debris in order for the structure to accommodate expected water flow. 49 C.F.R. § 213.33. Whether the culvert met that functional requirement under the significant rainfall conditions at issue is a quintessential question of fact that cannot be resolved on summary judgment. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

For these reasons, the attack on Plaintiffs' claims that CSXT failed to comply with 49 C.F.R. § 213.33 has no merit. CSXT argues that Plaintiffs lack expert testimony explicitly stating that 49 C.F.R. § 213.33 was violated, however the absence of a talismanic recitation of regulatory language does not eliminate a genuine dispute of a material fact. Section 213.33 requires that drainage structures be maintained and kept free of obstruction sufficient to accommodate expected water flow. 49 C.F.R. § 213.33. Thus, if a jury credits evidence (circumstantial, direct, or a combination thereof) that debris, obstructions, or similar conditions impeded flow or contributed to water impoundment, it could reasonably find that the regulation was not satisfied.

Tennessee law is clear that property owners must exercise reasonable care under all circumstances. *See Parker v. Holiday Hospitality Franchising, Inc.*, 446 S.W.3d 341, 350 (Tenn. 2014). That duty is not defined in a vacuum. As set forth below, courts routinely look to industry

13

standards, internal policies, and applicable regulatory frameworks as evidence of what reasonable care requires in a given context. Thus, even if a particular rulebook is inapplicable by name, the principles reflected in those standards remain probative of whether CSXT acted reasonably.

Tennessee courts have likewise recognized that a defendant's failure to follow its own policies may support a finding of negligence. In *Wilson v. East Tennessee Human Resource Agency, Inc.*, the court reversed a finding of no negligence where the defendant's employee admitted he failed to follow established procedures, concluding that the evidence supported both the existence of a duty and its breach. No. E2010-00997-COA-R3-CV, 2011 Tenn. App. LEXIS 207, at ¶ 20–23 (Tenn. Ct. App. Apr. 29, 2011); *See also Gibson v. Metro Cmty. Care Home, Inc.,* 2009 Tenn. App. LEXIS 838, ¶ 11 (Dec. 15. 2009) (Although not controlling, company rules are admissible to ascertain what the company's employees should have done in a particular situation.")

Mr. Porro's testimony underscores that the absence of an eyewitness confirming obstruction at a precise moment does not eliminate the factual dispute. He explained that inspection methods such as high-rail observations would not necessarily reveal conditions "directly underneath the bridge," thereby limiting the reliability of CSXT's claimed observations. Porro depo. at 146:18–22. CSXT's own expert confirmed the inability to see through turbid floodwaters. Ex. 15, Bardol Depo. Tr. at 50:16-51:13 ("I can't see through the turbid waters… I can't tell what's within that water."); Ex. 16, Craig Orr Depo. Tr. Vol. II at 19:6-18 (Q: "Fair to say you could not see through the water to see if there was any debris at all underneath, correct?" A: "Nobody could. No."). Moreover, Mr. Porro also expressly rejected the notion that a photograph showing water beneath the bridge establishes safe or adequate flow conditions, explaining that, based on his professional experience, the depicted conditions were unsafe and indicative of a developing hazard. Ex. 6, Porro at 155:19–25, 156:1–6. This testimony directly undermines CSXT's reliance

on isolated, unreliable visual observations to establish that the culvert was unobstructed as a factual matter.

**2. There are Disputed Material Facts as to Whether CSXT Breached its Duty to Warn Plaintiffs of the Dangerous Condition on its Property.**

Disputed material facts preclude summary judgment on whether CSXT breached its duty to warn. CSXT relies on generalized weather alerts, but the record shows those early-morning warnings on August 21, 2021 were generic flash flood advisories, not warnings of the specific, acute hazard created by CSXT's infrastructure, namely, the impoundment, pooling, and potential sudden release of a catastrophic amount of water at and around the Trace Creek Bridge.

Those alerts were also inherently unreliable as they were disseminated primarily through electronic, opt-in systems, such as Nixle and National Weather Service email, that only reached subscribers. These alerts, therefore, offered no assurance that those in the affected areas, including Plaintiffs, ever received the warnings. Ex. 9, Gillespie Dep. Tr. at 90:8–92:7, 97:1–5. Deposition testimony confirms that multiple residents received no warning at all, underscoring the glaring deficiencies in these systems. Ex. 10, Rigney Dep. Tr. at 106:19–23; Ex. 11, Prasnikar Dep. Tr. at 82:8–11; Ex. 12, Schultz Dep. Tr. at 60:9–20; Ex. 13, Hall Dep. Tr. at 70:25–71:6.

Even for subscribed recipients, the content of the alerts was insufficient. For example, the 3:29 a.m. Nixle email and the 4:49 a.m. National Weather Service alert referenced only heavy rain and possible flash flooding. Ex. 9, Gillespie Depo. Tr. at 90:8-93:8. They said nothing about a man-made hazard, did not warn of water impoundment upstream of the railroad, or the risk of a catastrophic washout into Waverly. *Id*. This context is not a trivial omission. A reasonable jury could conclude that such vague advisories are no substitute for a targeted warning about a known, localized, and escalating hazard created by CSXT's own property.

Meanwhile, CSXT was actively monitoring conditions and received internal alerts via Sky/Guard Accuweather as early as 3:02 a.m. predicting extreme rainfall of between five to ten more inches. Yet, there is no evidence that CSXT warned local emergency management, law enforcement, or the public regarding a specific hazard to the Trace Creek Bridge. To be clear, CSXT never provided a single warning about the risk of pooling water, obstruction, or an imminent washout associated with its infrastructure.

The absence of such a warning mattered. Chief Gillespie testified that earlier information about a potential track washout "would have altered the response" and that "more information and more of a warning would always help a response or putting together a plan of action." Ex. 9, Gillespie Depo. Tr. at 58:3-59:2, 60:11-14. Sheriff Christopher Davis likewise confirmed that he received no warning from CSXT regarding a hazardous upstream condition at the Trace Creek crossing. Ex. 2, Davis Dep. Tr. 59:12–20, 60:1–4. In other words, those responsible for public safety were left without critical information.

Even the limited, last-minute door-to-door efforts reflect the same critical failure because first responders lacked any meaningful understanding of the real danger. A warning that a resident "may want to move" his vehicles does not convey an imminent, life-threatening event. Ex. 14, Toungette Dep. Tr. at 38:8–18. Consistent with that diluted message, Mr. Toungette testified he had no awareness of any flooding north of the tracks or any washout condition until days later. *Id*. at 39:24–40:6. That is not evidence of a warning—it is the absence of one for which a reasonable jury could find CSXT liable.

**C. There are Disputed Material Facts as to Whether CSXT's Was the Cause-in-Fact of Plaintiffs' Harm.**

16

CSXT identifies its cause-in-fact argument as the primary issue in its motion and cites *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 181 (1992), which quotes *Drewry v. County of Obon,* 619 S.W.2d 397 (1981),  as instructive on this issue. (MSJ p. 4). However, *Linder*,  has no application to a cause-in-fact analysis but rather addressed foreseeability (court held that intervening criminal sexual assault was not  a foreseeable harm to establish a duty against builder whose keys to victim's residence had been stolen). As for the quote from *Drewry*, that appeal involved a review of a bench trial and held that, absent the introduction of some medical evidence to establish the cause of her injuries, plaintiff's *res ipsa loquitur* theory was insufficient to establish causation.

CSXT's cause-in-fact argument rests on a fundamental misstatement of the applicable standard, effectively demanding that Plaintiffs conclusively prove cause-in-fact rather than demonstrate that a reasonable jury could find it. Causation, or cause-in-fact, means that the injury or harm would not have occurred "but for" the defendant's negligent conduct. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (1993). Cause-in-fact is ordinarily a question for the jury, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome. *Hale v. Ostrow*, 166 S.W.3d 713, 718 (2005). A defendant's conduct is the cause-in-fact of a plaintiff's injury if it directly contributed to the plaintiff's injury however, it is not necessary that the defendants' act be the *sole* cause of the plaintiff's injury, only that it be *a* cause. *Id*. When the record is viewed, as it must be, in the light most favorable to Plaintiffs, CSXT's sweeping assertion that there is "nothing" connecting its conduct to Plaintiffs' injuries cannot be sustained.

Under Tennessee law, causation in fact is satisfied where the plaintiff demonstrates that the injury would not have occurred "but for" the defendant's conduct, proven by a preponderance of the evidence. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (holding that causation

requires only that the defendant's conduct be a cause-in-fact of the injury). There is no requirement to establish absolute certainty. Tennessee courts further recognize that causation may be proven through circumstantial evidence and reasonable inferences drawn from the surrounding facts and is "ordinarily a question for the jury." *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. Ct. App. 1994) (citing *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn. 1991)). Indeed, Tennessee law expressly permits proof of causation through direct or circumstantial evidence, or a combination of both. *Law v. Louisville & N. R. Co.*, 170 S.W.2d 360, 363 (1942); *Burkett v. Johnston*, 282 S.W.2d 647, 651 (Tenn. Ct. App. 1955).

Plaintiffs have presented precisely that type of evidence here. Plaintiffs' engineering expert, Dr. Blackler, performed an expansive hydrologic and hydraulic analysis of the Trace Creek Bridge and the surrounding Waverly area and identified conditions consistent with significant water impoundment and altered flow dynamics associated with the catastrophic washout that occurred on August 21, 2021. (Dkt. 257-1, Blackler Report). Contrary to CSXT's assertions, Dr. Blackler's analysis was not confined to isolated conditions at the Trace Creek Bridge but instead evaluated the hydrologic system on a watershed-wide basis using accepted principles of hydrology and hydraulics. He testified that a "watershed" consists of "all of the land area that would drain into a certain point," and that his work involved analyzing how water from that broader drainage area is routed through the system. (Ex. 17, Blackler Dep. at 31:12–21; 40:22–25). His methodology necessarily incorporated upstream contributing areas and subbasins, accounting for how different portions of the watershed generate and deliver flow at varying rates and times. (Ex. 17, Blackler Dep. at 31:23–32:5). He further explained that his analysis applied the physics of open-channel hydraulics to calculate flow velocities, depths, and travel times, thereby determining how water moved through the system and into downstream areas. (Ex. 17, Blackler Dep. at 27:8–12).

18

Consistent with standard forensic hydrologic practice, Dr. Blackler also calibrated his modeling against real-world observations, including photographic and testimonial evidence, to ensure that the model accurately reflected conditions "observed on the ground." (Ex. 17, Blackler Dep. at 28:18–24; 30:1–7). Taken together, this testimony demonstrates that Dr. Blackler employed a comprehensive, system-wide analysis that considered watershed inputs, flow routing, hydraulic constraints, and observed conditions rather than relying solely on localized water levels at the Trace Creek Bridge. By its nature, the causal mechanism must be reconstructed through expert hydrologic and hydraulic analysis, considered alongside the surrounding factual record.

CSXT's disputed contention that torrential rainfall and regional flooding was the sole cause of Plaintiffs' injuries do not diminish Plaintiffs' claims that multiple factors were at play, specifically the sudden massive release of water upon Waverly from the unnatural lake which had formed on Defendant's property. CSXT may still be liable if its conduct was a contributing but-for cause of Plaintiffs' injuries. See *Kilpatrick v. Bryant*. A jury could reasonably find that, while rainfall set the stage, CSXT's failures exacerbated the conditions or transformed them into a more destructive force. The presence of concurrent causes does not absolve liability. *Hale*, 166 S.W.3d at 718.

While acknowledging the extraordinary rainfall event, Dr. Blackler analyzed the hydrologic response of the system, including how a volume of roughly 350 Olympic sized swimming pools of water was suddenly released through the track washout in a short period of time and routed through the watershed into the City of Waverly. (Ex. 17, Blackler Dep. at 40:22–25; 31:12–21); Dkt. 257-1, Blackler Report p. 13. A reasonable jury could infer from this testimony that the torrent of water released towards Waverly did not merely coincide with the flood event but instead contributed to the manner in which the wave of floodwaters wreaked havoc

19

among the Plaintiffs in Waverly. Viewed in the light most favorable to Plaintiffs, this evidence supports the reasonable inference that the sudden release of a substantial volume of impounded water through the washed-out railbed increased the rate and velocity of floodwaters while simultaneously reducing its travel time downstream. (Ex. 17, Blackler Dep. at 27:8–12, 222:11-223:8). A jury could reasonably find that this accelerated and intensified flow diminished the time available for residents to react, evacuate, or seek higher ground, thereby contributing to the severity of the injuries and loss of life. Such conclusions are firmly grounded in Dr. Blackler's system-wide hydrologic analysis and present appropriate questions of fact for the jury. When considered collectively and in the proper light, this evidence is more than sufficient to permit a finding that CSXT's conduct was a cause-in-fact of Plaintiffs' injuries.

Lay testimony further reinforces Dr. Blackler's conclusion. Plaintiffs have presented eyewitness accounts describing the sudden, violent, and rapidly escalating nature of the flooding, consistent with a surge as opposed to a gradual accumulation from rainfall alone. (Ex. 19, Angela Reeves, Dep. at 53:1-23; Ex. 11, Joseph Prasnikar Dep. at 79:17-23; Ex. 13, Danielle Hall Dep. at 99:23-100:7; Ex. 20, Cameron Guy Dep. at 50:8-13; Ex. 21, Tracy Kilburn Dep. at 59:17-25).These accounts are corroborated by contemporaneous video evidence capturing the rapidly evolving conditions on the ground. Dkt. 257-1, Blackler Report, pp. 19-30. Rather than addressing this evidence under the governing standard, CSXT attempts to improperly heighten Plaintiffs' burden by insisting on individualized hydrological modeling for each Plaintiff and the elimination of every possible alternative cause. There is no such requirement of undeniable scientific precision under Tennessee law. All Plaintiffs must demonstrate is that the defendant's act be a cause of their injuries. *Hale v. Ostrow*, 166 S.W.3d 713, 718 (2005). By insisting on a level of proof akin to absolute certainty, CSXT seeks to improperly convert the summary judgment standard into a trial

20

on the merits with a nonexistent burden of proof that stretches far beyond a preponderance of the evidence standard.

CSXT also mischaracterizes Plaintiffs' expert proof in an effort to manufacture an evidentiary gap. Its claim that there "is nothing competing" and that Plaintiffs' experts offer "no causation opinions" is demonstrably false. Dr. Blackler's analysis evaluates water flow dynamics, examines the physical conditions at and around the Trace Creek Bridge, and explains how those conditions would influence water accumulation and release during the storm event. The resulting surge of floodwater impacting multiple individuals downstream provides the common mechanism of harm supported by the evidence. Dr. Blackler opines that the increased volume and flow rate intensified the force of the floodwaters, driven by greater depth and velocity, thereby pushing conditions into a heightened danger zone where the risk of injury and death was significantly elevated and the decedents' ability to escape was substantially diminished. Dkt. 257-1, Blackler Report at 35-36; Ex. 17, Blackler Dep at 222:11-223:8. This constitutes a scientifically grounded basis from which a jury may reasonably infer causation. Experts are not required to trace the precise path of every gallon of water on a plaintiff-by-plaintiff basis. Such granular determinations are neither feasible nor required, and the differences in each Plaintiff's circumstances present appropriate questions of fact for the jury, who is charged with weighing all the expert testimony alongside the full evidentiary record. *Mohr v. DaimlerChrysler Corp.*, No. W2006-01382-COA-R3-CV, 2008 Tenn. App. LEXIS 619 at ¶ 19 (Ct. App. Oct. 14, 2008) quoting *Hamblen v. Davidson*, 50 S.W.3d 433, 440 (Tenn. Ct. App. 2000) ("While expert testimony may be required to prove causation in technically complex cases, the issue of causation is ultimately one for the jury to determine, and 'this Court has noted that a jury may infer a causal connection through the use of circumstantial evidence, expert testimony or both.'").

CSXT's "no-warning" causation argument also fails because it is dependent on an imprecise and unsupported timeline for when Waverly officials began responding and warning residents. Chief Gillespie expressly disclaimed any such precision during his deposition. When asked when his department began paging additional personnel, he testified: "I really don't know," and "think[s] it probably was between 6:00 and 7:00 that morning," while noting that dispatch records would be more accurate. Ex. 9, Gillespie Depo. Tr. 58:3–59:2, 60:11–14, 120:9-10 ("That's ballpark ma'am. I -- I don't recall the times."). Far from establishing a definitive start time for coordinated response efforts, Chief Gillespie's testimony underscores uncertainty especially when viewed in the light most favorable to the Plaintiffs. A reasonable jury could infer from this lack of certainty that earlier information would have materially impacted the available response window.

Similarly, Chief Gillespie's testimony about "paging additional personnel" does not establish that all available personnel were actually mobilized at that time. His statement reflects only that he made a decision to begin paging, not that all police and fire personnel were reached, responded, or were in position to act. *Id*. Chief Gillespie further testified that earlier information about a potential track washout "would have altered the response" and that "more information and more of a warning would always help a response or putting together a plan of action." Ex. 9, Gillespie Depo. Tr. 58:3–59:2, 60:11–14. His estimate that "around 6:25" the police department "started moving folks into place" reflects only a vague, experience-based precaution, untethered to any confirmed warning of impounded water or a potential track washout which reinforces Plaintiffs' position that officials were operating with incomplete information. Ex. 9, Gillespie Depo. Tr. 94:24–95:15. A reasonable jury could conclude that earlier, more specific warning information would have prompted broader and earlier mobilization of personnel, as well as more timely and targeted evacuations.

The testimony of Sheriff Christopher Davis—unmentioned in CSXT's timeline—independently confirms both the absence of any warning from CSXT and the critical actions that could have been taken had such a warning been provided. He testified that no notice ever came to him and that he was not aware of CSXT contacting his office or any local emergency management agency regarding a hazardous condition upstream at the Trace Creek crossing. Ex. 2, Davis Dep. Tr. 59:12–20, 60:1–4. When asked what actions could have been taken with such information, Sheriff Davis testified that officers could have driven through the area using loudspeakers and bullhorns, and employed additional methods such as "sirens, mass media, Nixles," as well as conducting on-foot evacuations. *Id*. at 59:10–12. Notably, Sheriff Davis further agreed that these efforts could have saved lives. *Id*. at 58:3–4. This testimony provides direct evidence that actionable warning mechanisms were available but never triggered due to the absence of a warning from CSXT.

Under Tennessee law, Plaintiffs must show that the absence of a warning was a cause-in-fact of their injuries by demonstrating that an adequate warning would have altered conduct in a way that prevented harm. *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 433 (Tenn. 1994). That standard is satisfied here. Plaintiffs' emergency-management expert, Kristin Weivoda, opines that accepted practice required direct notification when known infrastructure conditions posed an imminent threat, and that earlier notification would have materially increased opportunities for protective action, including targeted evacuations and movement to higher ground. (Dkt. 257-4, Weivoda Report at 5-6). She further explains that the lack of timely notice left first responders unaware of the true severity of the hazard, causing them to treat the event as a no-notice incident rather than a rapidly escalating, infrastructure-driven emergency. (Dkt. 257-4, Weivoda Report at 3-4). Critically, she concludes that earlier notification would have provided meaningful lead time for

23

life-saving measures and, more likely than not, would have saved lives. *Id*. CSXT's reliance on isolated testimony that some response efforts were already underway does not defeat causation. At most, responders were addressing general flash-flood conditions without hazard-specific information about the compromised rail embankment, impounded water, and impending catastrophic release near the Trace Creek Bridge. Id.; Ex. 9, Gillespie Depo. Tr. at 59:17-19 ("[I]t had not been raining in Waverly that much and so it was hard for people to wrap their heads around that we were going to flood at all.").

Chief Gillespie's testimony underscores the emergency response in Waverly was inherently dynamic and driven by the information available in real time. He acknowledged that responders "did the best [they] could with [the information] [they] were given," reflecting that decisions evolved as conditions developed. Ex. 9, Gillespie Depo. Tr. 57:6–10. As Chief of Public Safety overseeing both police and fire operations, his testimony supports the inference that additional, hazard-specific information, such as a targeted warning from CSXT, would have meaningfully informed how resources were deployed, how evacuations were prioritized and communicated, and how agencies coordinated their efforts.

Sheriff Davis's testimony also reinforces this point, describing a rapidly escalating situation requiring immediate, real-time decision-making among agencies that "work hand-in-hand" and depend on coordinated interagency response. Ex. 2, Davis Dep. Tr. 8:6–15. Together, this testimony supports a reasonable inference that earlier or more specific warnings would have materially affected the timing, coordination, and effectiveness of emergency response efforts, including evacuations. A reasonable jury could therefore conclude that a timely warning from CSXT regarding the imminent hazard posed by the railbed failure would have provided critical time and information necessary to mitigate harm or prevent loss of life.

Ultimately, CSXT's motion invites the Court to weigh competing evidence and draw inferences in its favor, which is impermissible at this stage. Where, as here, the record contains conflicting testimony, competing expert analyses, and reasonable inferences supporting causation, summary judgment must be denied. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 265 (Tenn. 2015). The disputed statements of fact and supporting testimony, including that of Dr. Blackler, Ms. Weivoda, Chief Gillespie, Sheriff Davis, and other witnesses, plainly establish genuine issues of material fact as to whether CSXT's conduct was a but-for cause of Plaintiffs' injuries.

## II. Federal Preemption Does Not Apply

Defendant's renewed invocation of ICCTA and FRSA preemption remains unavailing. Neither bar Plaintiffs' claims. Both this Court's March 6, 2024 Memorandum Opinion (Dkt. 118) and Plaintiffs' earlier responsive briefing (Dkt. 69) establish that CSXT's arguments mischaracterize both the nature of Plaintiffs' claims and the governing preemption standards. As demonstrated above, there are no undisputed facts which have been established by CSXT which would alter the conclusions this Court previously reached in its Opinion that preemption does not apply to Plaintiffs' state law claims.

## III. Plaintiffs' Nuisance Claims are supported by the evidence.

CSXT's attack on Plaintiffs' nuisance claim fails because it misapprehends both the nature of nuisance liability under Tennessee law as well as the evidentiary record. In Tennessee, a nuisance is a *condition* that "does not necessarily depend on the degree of care used, but rather on the danger…resulting even with the best of care.". *Dean v. Bays Mountain Park Ass'n*, 551 S.W.2d 702, 705 (Tenn. Ct. App. 1977). Here, the record supports that CSXT's embankment and drainage

25

structures altered the natural flow of surface water, causing it to accumulate, impound, and ultimately discharge in an unnatural and destructive manner.

Tennessee courts have long held that a landowner of higher lands who interferes with the natural drainage of surface water and causes it to collect and discharge in concentrated or unnatural quantities upon lower lands is liable for the resulting harm. f*v. Carter,* 837 S.W.2d 613, 614–15 (Tenn. Ct. App. 1992). Likewise, "[i]t is equally well-settled that 'a wrongful interference with the natural drainage of surface water causing injury to an adjoining landowner constitutes an actionable nuisance.'" *Id*. at 615. This principle applies with particular force to railroads, which have an affirmative duty to provide culverts or drainage for the safe passage of accumulated surface water and are liable for damages caused by failing to do so. *Louisville & N.R. Co. v. Mossman*, 16 S.W. 64 (Tenn. 1891). The proof here permits a reasonable jury to conclude that CSXT's embankment functioned as a barrier that effectively created a man-made lake of impounded water, which was suddenly released, amplifying the force, velocity, and timing of floodwaters that struck Plaintiffs and their decedents.

Tennessee courts also recognize nuisance liability in cases involving death and personal injury resulting from defective drainage conditions. In *Rucker v. Metropolitan Government of Nashville & Davidson County*, the Tennessee Court of Appeals affirmed a wrongful death judgment where a decedent drowned after a roadway flooded due to a defectively maintained drainage system, holding that the defendant's conduct "resulted in a nuisance and defective storm drainage system" that was a proximate cause of the death. 1990 Tenn. App. LEXIS 824, at ¶ 6–7. The court further held that heavy rainfall did not defeat liability where the defendant had notice of recurring flooding and failed to remedy the condition. *Id.* at ¶ 10–13. *Rucker* thus forecloses

26

CSXT's suggestion that nuisance is limited to property damage and confirms that such conditions may give rise to liability for catastrophic injuries and deaths.

Tennessee law provides that "[a] public nuisance becomes also a private nuisance as to any person who is especially injured by it." *Maxwell v. Lax*, 292 S.W.2d 223, 226 (Tenn. Ct. App. 1954). The inquiry is not whether others were also harmed by the same event, but whether Plaintiffs were subjected to a distinct hazard created by the defendant's conduct. Here, the record supports that Plaintiffs were directly impacted by a concentrated, artificially released surge of impounded water, akin to a dam-break, rather than the generalized flooding experienced by the broader public. That constitutes a different kind of harm sufficient to satisfy the Restatement's standard.

CSXT's attempt to foreclose a "mixed nuisance" theory is similarly misplaced. Tennessee law recognizes that the same conduct may give rise to both public and private nuisance liability where it interferes with public rights while causing special injury to particular individuals. *Maxwell*, 292 S.W.2d at 226; *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283–84 (Tenn. Ct. App. 1988). Nuisance is not limited to property damage and encompasses conditions that unreasonably threaten the safety of persons. *Rucker v. Metropolitan Government of Nashville & Davidson County*, 1990 Tenn. App. LEXIS 824(nuisance theory for wrongful death of 84 year old who drowned in her automobile during a heavy rainstorm); *Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 356 (Tenn. 2002)(Nuisance found where trees posed hazard to plaintiff's health and safety.). The evidence here supports a condition affecting the public generally by interfering with natural drainage and public safety, while simultaneously imposing catastrophic, individualized harm to Plaintiffs and their decedents.

## IV. Genuine Issues of Fact Preclude Summary Judgment on Plaintiff's Claim for Punitive Damages

27

CSXT's argument that punitive damages fail as a matter of law is incorrect because it improperly weighs the evidence and ignores substantial proof from which a reasonable jury could find reckless conduct by clear and convincing evidence. While true that punitive damages require a showing of proof that a defendant acted intentionally, fraudulently, maliciously, or recklessly (*Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992)), the record here supports a finding of recklessness through CSXT's awareness and conscience disregard of a substantial and unjustifiable risk. Contrary to CSXT's assertion that there is "no evidence" of such conduct, the proof, when viewed in Plaintiffs' favor, demonstrates that CSXT had longstanding knowledge of flood-prone conditions, recurring debris accumulation, and the risks associated with inadequate drainage at the Trace Creek Bridge, yet failed to implement adequate measures to prevent obstruction, impoundment, and catastrophic release of water. A reasonable jury could find that CSXT's decision not to warn first responders of the escalating hazardous conditions along its rail embankment, despite its awareness of the risks and forecasted weather, constituted a gross deviation from the standard of care.

CSXT's reliance on selective testimony to negate knowledge or risk is likewise misplaced as is its reliance on *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178 (Tenn. Ct. App. 2008), which does not provide CSXT safe harbor. The dispositive inquiry in *Duran* was whether the evidence rose above ordinary negligence, not whether the defendant exercised "some care." The court in *Duran* affirmed dismissal of punitive damages because the proof did not reach the required level of a conscious disregard for safety, not because the defendant had taken partial precautions. *Id.* at 208. Evidence here that water was observed flowing at certain times, or that CSXT undertook some limited debris-clearing efforts months prior to the event, does not foreclose a finding of recklessness; at most, it creates factual disputes regarding the adequacy and timing of those efforts.

28

Indeed, a jury could conclude that sporadic inspections or reactive clearing efforts without ensuring that the drainage system could safely accommodate foreseeable flood conditions, demonstrate awareness of the risk coupled with a failure to meaningfully address it.

Nor does CSXT's reliance on testimony that it did not anticipate a "tidal wave" defeat punitive damages. Tennessee law does not require foresight of the precise manner in which harm occurs; rather, it is sufficient that the defendant was aware of a substantial risk of serious harm and disregarded it. The record supports that CSXT knew of the potential for debris obstruction, dangerous water accumulation at this location, and the risk of washouts yet failed to act commensurately with that risk. A reasonable jury could find that this conscious inaction, particularly in the face of escalating weather warnings, meets the *Hodges* standard for recklessness.

CSXT's attempt to distinguish cases where punitive damages were permitted is also unavailing. While cases such as *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. 2008), and *Goff v. Elmo Greer & Sons Construction Co.*, 297 S.W.3d 175 (Tenn. 2009), involved egregious facts, Tennessee law does not limit punitive damages to those extremes. Rather, the question is whether the evidence would permit a reasonable jury to find conscious disregard of a known, substantial risk. Here, the combination of CSXT's knowledge of recurring flooding conditions, the foreseeable risk of obstruction and impoundment, and the failure to take adequate preventative action is sufficient to present that question to the jury.

Finally, CSXT's argument that certain post-event conduct such as individual acts of rescue negates punitive liability is legally irrelevant. Punitive damages turn on the defendant's conduct leading up to the harm, not after-the-fact efforts to mitigate it. Accordingly, the record contains evidence from which a reasonable jury could find by clear and convincing evidence that CSXT

consciously disregarded a known and substantial risk, summary judgment on Plaintiffs' punitive damages claim is improper.

## V. CSXT's Premature Daubert Challenge Cannot Support Summary Judgment

CSXT's final argument improperly blurs the distinction between Rule 702 admissibility and the standards on summary judgment. The mere prospect of a Daubert challenge does not permit the Court to "strip away" expert testimony at this stage. Those opinions remain part of the record and must be viewed in the light most favorable to Plaintiffs. CSXT's request that the Court effectively discount the opinions of Mr. Porro and Ms. Weivoda, months before Daubert scheduled briefing, is a transparent attempt to resolve contested admissibility issues under the guise of summary judgment. Its reliance on its assumed exclusion of their testimony provides no legitimate basis for summary judgment and should be rejected.

**CONCLUSION**

CSXT's Omnibus Motion for Summary Judgment should be DENIED in its entirety.

/s/Timothy V. Potter

**TIMOTHY V. POTTER    #017520**
**ANDREW  E. MILLS      #031236**
Reynolds, Potter, Ragan & Vandivort, PLC
210 East College Street
Dickson, Tennessee  37055
615.446.2221
615.446.2232 Facsimile
tpotter@rprvlaw.com
amills@rprvlaw.com
*Counsel for Plaintiffs*

*Pro Hac Vice:*
**PETER J. FLOWERS              IL BAR #06210847**
**JONATHAN P. MINCIELI          IL BAR #06274091**
**CHRISTOPHER J. WARMBOLD   IL BAR #06314229**
**THOMAS M. CONNELLY           IL BAR #06332570**

30

Meyers & Flowers, LLC
3 North Second Street - Suite 300
St. Charles, Illinois 60174
630.232.6333
630.845.8982 Facsimile
pjf@meyers-flowers.com
jpm@meyers-flowers.com
cjw@meyers-flowers.com
tmc@meyers-flowers.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Plaintiffs, Matthew Rigney et al., Response to CSX Transportation, Inc.'s Motion for Summary Judgment has been sent to:

| | | |
|---|---|---|
| Ms. S. Camille Reifers | #019856 | ☐ Via U.S. Mail, postage prepaid |
| Mr. John J. Bennett | #031976 | ☐ Via Facsimile |
| Andrew Todd | #39590 | ☐ Via Email |
| Wai-Lin Danieley | #41433 | ☐ Via UPS overnight |
| Reifers, Holmes & Peters, LLC | | ☐ Via Hand Delivery/Courier |
| 80 Monroe Avenue – Suite 410 | | ☐ Via Service of Process |
| Memphis, Tennessee 38103 | | ■ Via CM/ECF, efile, or other |
| 901.521.2860 | | electronic service format |
| creifers@rhpfirm.com | | |
| jbennett@rhpfirm.com | | |

*Attorney for Defendant CSX Transportation, Inc.*

This 24th day of April, 2026.

s/Timothy V. Potter
**TIMOTHY V. POTTER**

31