# RIGNEY, et al.

## vs.

# CSX TRANSPORTATION, INC.

---

# SHERIFF DAVID CHRISTOPHER DAVIS, SR.

## February 10, 2025

---





VETERAN COURT REPORTING
D. Rochelle Koenes, RPR, LCR
veterancourtreporting@gmail.com
(931) 919-8932

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

MATTHEW RIGNEY and DANIELLE
HALL, individually, as the
surviving parents and next of
kin of Ryan Rigney and Rileighanna
Rigney, deceased, and as the parents
and legal guardians of M.R. and
B.R., minors, et al.

    Plaintiffs,

vs.        Case No. 3:22-CV-00342
        JUDGE WAVERLY D. CRENSHAW, JR.
        MAGISTRATE JUDGE ALISTAIR NEWBERN

CSX TRANSPORTATION, INC.

    Defendant.

_____

Videotaped Deposition of:
SHERIFF DAVID CHRISTOPHER DAVIS, SR
Taken on behalf of the Plaintiffs
February 10, 2025

_____

Veteran Court Reporting
veterancourtreporting@gmail.com
D. Rochelle Koenes, RPR, LCR
P.O. Box 3593
Clarksville, Tennessee 37043
(931)919-8932

I N D E X

                      Page
Examination
By Mr. Vandivort            5

Examination
By Ms. Reifers            69
Examination
By Mr. Vandivort         170

Examination
By Ms. Reifers        178

E X H I B I T S

                      Page
Exhibit No. 1            45
    Drone News 4 Photograph

Exhibit No. 2            75
    Humphreys County Sheriff's Office
    Facebook posting

Exhibit No. 3            77
    Humphreys County Sheriff's Office dated
    August 21, 2021

Exhibit No. 4            82
    Humphreys County Hazard Mitigation Plan
    for 2019 attendance list

Exhibit No. 5          122
    Photograph Bates Number 000001
Exhibit No. 6          155
    FOIA production Waverly PD Bates Number 1
    through 12

A P P E A R A N C E S

For the Plaintiffs:
    MR. JONATHAN P. MINCIELI
    Attorney at Law, Pro Hac Vice
    Meyers & Flowers, LLC
    3 North Second Street - Suite 300
    St. Charles, IL 60174
    630-232-6333
    jpm@meyers-flowers.com

    MR. KURT VANDIVORT
    MS. MARY LANE HARMON STORY
    MR. ANDREW E. MILLS (Via Zoom)
    Reynolds, Potter, Ragan & Vandivort, PLC
    210 East College Street
    Dickson, TN 37055
    615-446-2221
    kvandivort@rprvlaw.com
    mstory@rprvlaw.com
    amills@rprvlaw.com

For the Defendants:
    MS. S. CAMILLE REIFERS
    MR. JOHN J. BENNETT
    Attorney at Law
    Reifers, Holmes, & Peters, LLC
    80 Monroe Avenue - Suite 410
    Memphis, TN 38103
    901-521-2860
    creifers@rhpfirm.com
    jbennett@rhpfirm.com

Also present:
    WAI-LIN DANIELY (Defense Team)

S T I P U L A T I O N S

    The videotaped deposition of SHERIFF DAVID CHRISTOPHER DAVIS, SR was taken by counsel for the Plaintiffs, by subpoena, at 210 E. College Street, Dickson, Tennessee, on February 10, 2025, for all purposes under the Federal Rules of Civil Procedure.

    All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the question, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

    It is agreed that D. ROCHELLE KOENES, Notary Public and Licensed Court Reporter, for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are waived.

Case 3:22-cv-00342   Document 277-2   Filed 04/24/26   Page 2 of 7 PageID #7194   EXHIBIT 2

* * *

THE VIDEOGRAPHER: Here begins the deposition of Sheriff Chris Davis. Today's date is February 10, 2025. The time on the video monitor is 9:10.

Counsel, please identify yourselves and state whom you represent.

MR. VANDIVORT: Kirk Vandivort for the plaintiffs.

MR. MINCIELI: Jonathan Mincieli for the plaintiffs.

MS. REIFERS: Camille Reifers representing CSX.

MR. BENNETT: John Bennett for CSX.

THE COURT: Will the court reporter please swear in the witness.

* * *

SHERIFF CHRIS DAVIS was called as a witness and, after having been duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. VANDIVORT:

Q. State your full name.

A. David Christopher Davis, Sr.

Q. All right. And we are here today -- you have taken a deposition before?

A. Yes.

Q. So rules of deposition: I'm going to ask you questions and other counsel will be asking you questions. I'll give you an opportunity to answer those. You will answer out loud and verbally rather than the shaking of the head or nodding of the head.

A. Yes, sir.

Q. It allows everyone to pick that up, especially our court reporter.

A. Okay.

Q. So any -- any -- any issue with that?

A. No, sir.

Q. Okay. So tell me -- what -- what is your position?

A. Sheriff, Humphreys County Sheriff.

Q. Okay. And how long have you been in that job?

A. Since September 1 of 2006.

Q. Okay. And, Sheriff, I'll -- I'll just refer to you as Sheriff Davis if that's okay.

A. Sure.

Q. So, Sheriff, how many county deputies do you have in your department?

A. Including SROs, 26.

Q. Twenty-six?

A. Yes, sir.

Q. And how many deputies generally are going to be on patrol at any one time?

A. Two to three.

Q. Two to three?

A. Yes, sir.

Q. Okay. And how does that work? Is it in shifts?

A. Yes, sir. We work 12-hour shifts. We -- 6P to 6 -- or 6A to 6P, 6P to 6A.

Q. Has that changed over the course of the last five years?

A. We have added some staff. We've added more -- not the patrol staff. We've added SRO staff. We may have added more to patrol, yes, sir.

Q. Okay. All right. So you've increased the number of deputies?

A. Yes, sir.

Q. Okay. And obviously you operate a jail facility?

A. Yes, sir.

Q. Okay.

A. Worst four-letter word in the dictionary.

Q. Sir?

A. Worst four-letter word in the dictionary, J-A-I-L.

Q. Understood. Understood. Not an easy job.

A. No, sir.

Q. Okay. And what other law enforcement agencies are within the county, and what relationship do you have with those agencies?

A. We've got McEwen on the east end; Waverly, Central; and New Johnsonville on the west end.

Q. Okay.

A. We work hand-in-hand with each other. They handle all of the business calls as far as the call volume inside the cities. We back each other up and respond to each other if necessary.

Q. You have written mutual aid agreements or just --

A. You know, I don't -- under the new nouns, I don't know if we necessarily have a mutual aid agreement. More so -- it would be more so on their side with them having one with us than us having one with them.

Q. Okay. Each of you assist one another though?

A. Yes, sir.

Q.    Okay. And what do you -- what do you start to see at that point?

A.    I'm starting to see this area of rushing -- rushing water coming across and through here.

Q.    What is in -- you're holding your hand up. It's near the U-haul Neighborhood Dealer?

A.    I don't -- I've never heard of this U-haul Neighborhood.

Q.    Okay.

A.    This is Tristar Carport now, the old Save A Lot. This is the old nursery here.

Q.    Okay.

A.    This is Michael Todd's.

Q.    And that's to the south. Michael Todd's is to the south.

A.    Yes, sir.

Q.    And the nursery is to the south?

A.    I'm seeing all of this water.

Q.    Okay. Are you -- when you say you're seeing water, what -- what's the condition of the water?

A.    Rushing. It's rushing water.

Q.    Okay.

A.    It's rushing water, and I'm seeing some guys that's actually Swiftwater -- God, I can't

remember Brian's last name.

Q.    About what time of day is it now?

A.    I lose time, but I'm saying this is probably within -- I'm going to say this is probably within 30, within 40 -- 40 minutes to an hour of me -- of me getting up. I lose time. I can't --

Q.    Okay.

A.    -- tell that exactly.

Q.    Okay. Okay. So you're seeing rushing water?

A.    Correct.

Q.    And what is at that juncture?

A.    That's the bridge.

Q.    When you say "the bridge" --

A.    CSX trestle.

Q.    Okay.

A.    You can see Trace Creek.

Q.    Were you able to see the bridge at this point?

A.    No. Well, I could see -- if I'm looking down the roadway, I could see the bridge and the water coming across.

Q.    Okay. What was the condition of the trestle?

A.    I don't have a clue at that point.

Q.    Okay. Did you -- were you able -- you said you were able to observe rushing water. Was it going over the bridge?

A.    It was -- you could tell it -- yes. It was definitely crossing the road. There was no traveling that way.

Q.    Okay. Did you see water flowing under the bridge?

A.    I -- no, because it was coming across the roadway.

Q.    Okay. Did you see it falling underneath the railroad tracks?

A.    At this point in time when I started -- when I got through this area, I could tell that most of the water here had gone, but I didn't want to come down into this area because of the damage that I was seeing. And at this point in time in through here, what I was seeing, I come down -- and somewhere right in here from just west of this driveway and Michael Todd's here is where I started looking at turning around.

Q.    Okay.

A.    When I started to turn around, I looked back to my right and this is when I'm seeing tracks suspended in the air.

Q.    Okay. When you say "tracks suspended in the air" --

A.    Yes, sir. No trestle, no -- not a trestle but no railroad bed underneath them.

Q.    Okay. Now there have been photos that -- I'm going to show you a photo. I'm going to ask you do you generally recognize this photo?

MS. REIFERS: I object to the extent that there is writing by a news agency on this photograph.

BY MR. VANDIVORT:

Q.    Go ahead. Do you recognize that area?

A.    It appears -- it appears to be that of Highway 70 --

Q.    Okay.

A.    -- close to the trestle.

Q.    Okay. And is that generally the condition that you saw the railroad in on that day?

A.    Yes, sir.

Q.    Okay. And is that -- you said the railroad tracks were suspended in midair?

A.    Yes, sir.

Q.    Do you know -- why didn't -- what, from what you could observe, had caused that?

A.    It appeared to be the water that had

A. From Trace Creek. I mean, most of it had come down Trace Creek.

Q. Okay. And specifically you had described back when you -- when you said the trusses were suspended in the air, about what was the distance that -- that you could see them suspended in the air. What was the width of the area that you saw the trusses?

A. When you say the -- are you talking about the railroad tracks?

Q. Yes, sir. You said they were midair. They were suspended in midair.

A. The best I recall, you had -- there was two different sections. It would like -- had come out -- if I'm standing in the road looking at the tracks, there would have been some to right and then a small gap down to the left, the best I can recall.

Q. Okay. About what's the width of the gaps that you're seeing?

A. Oh, wow. I'm horrible. Maybe 40 yards, maybe 60 yards total.

Q. Okay.

A. Somewhere in there.

Q. Okay. If you had received notice regarding those issues with the trusses blowing out or the

berm blowing out, what could you have done?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: If -- are you saying -- ask me that again, please.

BY MR. VANDIVORT:

Q. Yes, sir. So if you or your department or even emergency management had received notice of there being issues with the -- the berm blowing out underneath the railroad tracks, what would have -- or what could have your response been?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: With that -- having knowledge of that blowing out, I don't know that there was anything that we could have done after it had -- we had knowledge of it blowing out.

BY MR. VANDIVORT:

Q. Okay. How about prior to?

A. Yes, sir.

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: And prior to, I think there's some steps with the Nixles, the other things that we could have started reaching out to people.

BY MR. VANDIVORT:

Q. Okay. When you say "prior to," what was the condition that you observed, again, with the water to the right of the railroad tracks?

MR. MINCIELI: North.

BY MR. VANDIVORT:

Q. North. Yeah. North of the railroad tracks.

A. It would have been to my right traveling.

Q. Yes, sir.

A. What would have -- say it -- ask me again?

Q. Sure. What was the condition that you saw of the water to the north of the railroad tracks as you were coming down Gorman Hill and -- and traveling west on 70?

A. The -- the first time that I can say that that was -- you couldn't tell that that water was rushing, that water -- it -- it was almost like that mud puddle thing I'm talking about. You don't know --

Q. Was it pooling?

A. Pooling.

Q. Okay.

A. It's more, like I say, a mud puddle. You don't know how deep it is until you step in it

sometimes.

Q. Okay. So -- but at that point from a standpoint of notice that there's pooling of water, if you had received that notice in advance, what could you-all have done?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: I think that -- the only thing that I could think of is that if we had any idea that you could have done the -- I mean the sirens, the mass media, the Nixles, that kind of thing.

BY MR. VANDIVORT:

Q. How about -- were -- were you able to -- what's the Nixle system?

A. The Nixle system is basically where 911 would send a message of information to anyone who had signed up through the process through their -- I don't want to say it's an app but through some system through the internet.

Q. Okay. And, in fact, could -- could -- if -- from an evacuation standpoint, could it have been on foot as well?

A. Yeah. Absolutely.

Q. Okay. Some people have described the --

Case 3:22-cv-00342   Document 277-2   Filed 04/24/26   Page 5 of 7 PageID #7197   EXHIBIT 2

the area that you had described as a lake effect. It kind of was a lake effect. How would you describe it?

A. Absolutely. I can see the lake effect as the big mud puddle that I was talking about in that sense. It had pooled and I myself have used the word "lake" before. It did look like a lake to the right.

Q. Based on your observations in that area where the trestles were midair, what had caused that to -- for that track to be suspended in midair?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: I'm going to say pressure.

BY MR. VANDIVORT:

Q. Okay. When you say "pressure," pressure from what?

A. Water.

Q. Okay. And where was the water?

A. North side of the tracks.

Q. Was that from -- could you -- what you could observe as far as what you had -- what has been described as the lake effect?

A. Correct.

Q. Okay.

A. Knowing that land.

Q. Okay. All right. And again, from a standpoint of efforts that could have been made, could that have saved lives?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: Yes.

BY MR. VANDIVORT:

Q. Again, had you since learned that there had been an issue with CSX railroad earlier that morning?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: Ask me that again, please.

BY MR. VANDIVORT:

Q. Sure. Have you since learned -- since this incident -- that there had been an -- issues with CSX that morning?

MS. REIFERS: Same objection.

THE WITNESS: I understood that they had stopped traffic earlier --

BY MR. VANDIVORT:

Q. Okay.

A. -- that day.

///

Q. Okay.

A. Or that morning.

Q. Okay. And is that what you had experienced. Did you see any railroad crossings or trains running that morning for CSX?

A. No, sir.

Q. As part of an emergency response, could you-all have sent officers out with bullhorns or knock on doors?

A. Cars, just driving through the area on our loudspeaker, sirens, whatever.

Q. Okay. Did that notice ever come to you?

A. No, sir.

Q. Okay. To your knowledge, did CSX ever contact you or your office or emergency manage- -- management to provide notice that there was a hazardous condition with the railroad berm along Highway 70 at Trace Creek at the CSX railroad crossing?

A. Not that I'm aware of.

Q. Did they -- did CSX ever contact you, emergency management, or any other local agency to say that they had canceled trains or stopped trains from running due to hazardous conditions that morning?

MS. REIFERS: Objection. Assumes facts not in evidence.

THE WITNESS: Not that I'm aware of.

BY MR. VANDIVORT:

Q. Did anyone from CSX provide any warning that there were conditions that posed a threat of harm due to flooding in the area around the railroad berm maintained by CSX at the Trace Creek railroad bridge crossing?

MS. REIFERS: Objection. Calls for speculation.

THE WITNESS: Not that I'm aware of.

BY MR. VANDIVORT:

Q. Sheriff, how many lives were lost that day?

A. Twenty.

Q. How long was Highway 70 closed that --

A. Several.

Q. -- how -- how long a time period?

A. It was several days.

Q. Okay. How soon did CSX railroad start operating again?

A. I would not -- I don't -- I don't have a clue.

Q. Okay. Is the town and the county still recovering?

A. Yes, sir.

Q. Okay. Did you personally go out and help recover folks that day?

A. All of them.

Q. Did you see the -- the remains?

A. Yes, sir.

MR. VANDIVORT: Okay. Let's just take a break. Okay?

MS. REIFERS: Sure.

THE VIDEOGRAPHER: Going off of the record. The time on the monitor is 10:10.

(Short break.)

THE VIDEOGRAPHER: Back on the record. The time on the monitor is 10:19.

BY MR. VANDIVORT:

Q. Sheriff, I have just some follow-up questions for you.

A. Sure.

Q. We had -- we had brought up the Local Emergency Planning Committee. Local industry, you had mentioned I think Seymours, DuPont has been involved in that?

A. Chemours.

Q. Chemours has been involved in that. From a standpoint of planning, is that -- is there a

sharing process that you-all share plans with those industries?

A. Emergency evacuation plans, response plans, that kind of thing.

Q. Okay. And is that something that's gone over on a regular basis when you meet?

A. Yes, sir.

Q. And is there -- are there actual training drills that -- that are underway with those entities?

A. Yes.

Q. Okay. And does that occur on a quarterly basis? Monthly basis?

A. No, LEPC meets monthly. Now what the process or what they do is different -- that's different schedules through -- through the year.

Q. Okay. And again, CSX, have they participated in that process, to your knowledge?

A. I'm not familiar with -- I'm not familiar with CSX coming through LEPC.

Q. Okay. Do your -- to your knowledge, have they -- have they been involved with your agency in those types of scenarios? Evacuation scenarios or --

A. I don't remember evacuation scenario, no.

Q. Okay. So on --

A. I do -- let me follow up on that --

Q. Sure.

A. -- because I do want to mention that. I do think that and -- I'm going back through the years -- I do remember CSX coming through a couple of times that has had some trainings and I'm going back -- I believe one of them dealt with derailments --

Q. Okay.

A. -- and how we would get -- knowing what was involved with that derailment, the type of products or whatever and what it would take if we had to do some kind of evacuations or something of that nature.

Q. And you said that -- you recall them participating once or twice?

A. I remember a couple -- a couple of times.

Q. And how long have you been sheriff?

A. Going into my 20th year.

Q. Okay. I want to ask you about the -- the -- the lake effect, if you will, when you came off Gorman Hill.

A. Yes, sir.

Q. Do you recall, was it running -- was the

water running from east to west as well as north to south?

A. Well, the water was spread out and then naturally that creek flows to the west.

Q. Okay. And do you recall -- did it run from the point at the bottom of the hill all the way to the water that you saw rushing under the midair trusses?

A. I would make that assumption knowing that McEwen is higher in elevation than Waverly and would follow the normal pattern of that creek.

Q. Okay. So you were seeing water on the right side of the railroad track all the way down to where the trusses were midair?

A. Correct. Yes, sir.

Q. And that was the lake effect?

A. Correct. At some point in time the -- the road dips -- would dip under where the railroad -- you would see the railroad's bed elevated.

Q. Okay.

A. So at some point in time, though, when -- as you're coming west past the rock crusher, the road actually comes underneath.

Q. The trusses are up above?

A. You would look to the right.

Case 3:22-cv-00342    Document 277-2    Filed 04/24/26    Page 7 of 7 PageID #7199

EXHIBIT 2